

**Dated: June 08, 2017.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 14-11732-HCM |
| RTX CUSTOM HOMES, INC. | § | (Chapter 7) |
|     Debtor. | § | |
| RICHARD MUNOZ, JR., assignee of | § | |
| John Patrick Lowe, Trustee | § | |
|     Plaintiff, | § | |
| v. | § | Adversary No. 15-01110-HCM |
| | § | |
| CEDAR PARK CONSTRUCTION, LLC, | § | |
| and TOM MCGRATH | § | |
|     Defendants. | § | |

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
### WITH RESPECT TO TRIAL IN ADVERSARY PROCEEDING NO. 15-01110

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE:**

The U.S. Bankruptcy Court for the Western District of Texas, Austin Division (Bankruptcy Judge H. Christopher Mott), submits the following Proposed Findings of Fact and Conclusions of Law ("Proposed Findings and Conclusions") to the U.S. District Court for the Western District of Texas, Austin Division ("District Court") for consideration and review, in accordance with 28 U.S.C. § 157(c)(1) and Rule 9033 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

1

# TABLE OF CONTENTS

**INTRODUCTION AND BACKGROUND** ........................................................................ 4

    A. Bankruptcy Court Jurisdiction and Authority .......................................................... 4

    B. Description of Debtor and Parties to Adversary Proceeding .................................. 6

    C. Bankruptcy Case and Munoz acquisition of RTX Claims ...................................... 7

    D. Procedural Background of Adversary Proceeding ................................................. 9

    E. Trial Transcript and Exhibits ............................................................................... 12

    F. Witnesses and Credibility ................................................................................... 12

    G. Considerations with respect to Proposed Findings and Conclusions ................. 14

**PROPOSED FINDINGS OF FACT** ......................................................................... 15

    A. General Overview ............................................................................................... 15

    B. RTX Background ................................................................................................. 16

    C. Cedar Park Background ...................................................................................... 18

    D. Construction Project Descriptions ....................................................................... 18

    E. Business Relationship between RTX and Cedar Park .......................................... 20

    F. Fraudulent Transfer Payments .......................................................................... 27

    G. Preference Payments ......................................................................................... 30

    H. Construction Trust Fund Payments .................................................................... 32

    I. Breach of Contract .............................................................................................. 34

        1. Old 1431 Project ............................................................................................ 35

        2. Verano Project ............................................................................................... 40

        3. Cedar Park Defenses ..................................................................................... 48

        4. Summary—Breach of Contract ...................................................................... 52

    J. Proof of Claim by Cedar Park ............................................................................. 53

    K. Objections to Proof of Claim ............................................................................... 54

        1. Old 1431 Project ............................................................................................ 55

        2. Verano Project ............................................................................................... 56

        3. Camino Del Verde Project .............................................................................. 61

        4. Valley View Project ........................................................................................ 63

5. Zen Gardens Project ...................................................................................... 66

6. Angel Valley Project ...................................................................................... 70

7. Summary—Objections to Proof of Claim ......................................................... 70

L. Setoff ................................................................................................................... 71

**PROPOSED CONCLUSIONS OF LAW** ....................................................................... 71

A. Constructive Fraudulent Transfer Cause of Action ............................................... 72

B. Preference Cause of Action ................................................................................... 78

C. Texas Construction Trust Fund Act Cause of Action ............................................ 89

D. Breach of Contract Cause of Action ..................................................................... 98

1. Old 1431 Project .......................................................................................... 98

2. Verano Project ............................................................................................ 100

3. Cedar Park Defenses ................................................................................... 103

4. Summary—Breach of Contract ..................................................................... 105

E. Objections to Proof of Claim ............................................................................... 105

1. Cedar Park Proof of Claim ........................................................................... 105

2. Burden of Proof ........................................................................................... 106

3. Specific Objections to Claims by Project ...................................................... 108

4. Summary—Objections to Proof of Claim ....................................................... 111

F. Setoff .................................................................................................................. 112

G. Recovery of Attorney's Fees ................................................................................ 114

1. Plaintiff's Fees and Expenses ....................................................................... 115

2. Defendants' Fees and Expenses ................................................................... 120

**CONCLUSION** .................................................................................................... 126

**Exhibit A**—Proposed Form of Final Judgment

**I.**
**INTRODUCTION AND BACKGROUND**

1.      On December 28 and 29, 2016, this Court conducted a bench trial on the merits in this adversary proceeding no. 15-01110 ("Adversary Proceeding"). This Adversary Proceeding was filed in the Chapter 7 bankruptcy case of RTX Custom Homes, Inc., as debtor ("RTX"), main case no. 14-11732.

2.      Appearing at the trial were Mr. Richard Munoz, Jr., as assignee ("Plaintiff"); Cedar Park Construction, LLC and Tom McGrath (collectively "Defendants"); and respective counsel for Plaintiff and Defendants.

**A. Bankruptcy Court Jurisdiction and Authority**

3.      This Court (a bankruptcy court) has statutory jurisdiction over the Adversary Proceeding under 28 U.S.C. § 1334(b). This Adversary Proceeding and this bankruptcy case has been referred to this Court by the District Court under 28 U.S.C. § 157(a)(1) and the Standing Order of Reference of Bankruptcy Cases and Proceedings entered in this District on October 4, 2013.

4.      However, this Court does not have jurisdiction and authority to enter a final judgment on all of the claims in this Adversary Proceeding. In short, this is because only some of the claims are "core" proceedings under 28 U.S.C. § 157(b)(1).

5.      On the one hand, Plaintiff's claims for recovery of fraudulent transfers and preferences under the Bankruptcy Code, and its objection to the proof of claim filed in this bankruptcy case, are all statutory "core" proceedings. 28 U.S.C. § 157(b)(2)(B), (F), (H). This Court has statutory jurisdiction to enter a final judgment on claims that are "core" proceedings under 28 U.S.C. § 157(b)(1).

6.     On the other hand, some of Plaintiff's claims—such as claims under the Texas Construction Trust Fund Act, Texas Theft Liability Act, and breach of contract—are based solely on state law. These state law claims are only "related to" this bankruptcy case under 28 U.S.C. § 157(c)(1). This Court has the statutory jurisdiction and authority to enter a final judgment in "related to" proceedings (often called "non-core" proceedings)—*only* with the consent of all parties under 28 U.S.C. § 157(c)(2).[1] Here, the Defendants expressly did not consent to entry of a final judgment by this Court. As a result, this Court only has jurisdiction and authority to submit proposed findings of fact and conclusions of law to the District Court for review on these "non-core" (related to) claims under 28 U.S.C. § 157(c)(1).

7.     In sum, this Adversary Proceeding has a mix of claims—some claims are "core" proceedings and some claims are "non-core" (related to) proceedings. This Court has statutory jurisdiction to enter a final judgment only on the claims that are "core" proceedings. This Court does not have statutory jurisdiction and authority to enter a final judgment on the claims that are "non-core" (related to) proceedings, due to lack of party consent. This Court is required to submit proposed findings and conclusions to the District Court on the "non-core" (related to) claims.

8.     Given the situation, this Court has chosen to submit *all* of its findings and conclusions in this Adversary Proceeding to the District Court for review and entry of a final judgment by the District Court under 28 U.S.C. § 157(c)(1) and Bankruptcy Rule 9033. This approach has been chosen by the Court for several reasons.

---

[1]  *See also Wellness Int'l Network v. Sharif (In re Sharif)*, --U.S.--, 135 S. Ct. 1932, 1940, 1949 (2015) (recognizing that bankruptcy courts have constitutional authority to determine "non-core" claims with consent of the parties; if parties do not consent, bankruptcy court must submit proposed findings and conclusions to district court).

9.     First, the facts in this Adversary Proceeding are common and closely intertwined between the "core" claims and the "non-core" (related to) claims. Second, as set forth above, this Court does not have jurisdiction and authority to enter a final judgment on the "non-core" claims in this Adversary Proceeding. Third, as a procedural matter, this Court cannot enter a "final judgment" on less than all the claims in one adversary proceeding.

10.    It is theoretically possible that this Court could sever the claims that are "core" proceedings into a separate adversary proceeding and enter a final judgment only on those "core" claims; and just submit proposed findings and conclusions on the "non-core" (related to) claims to the District Court. Severance, however, could lead to inconsistent judicial results, given the common facts coupled with a different standard of review by the District Court. Severance would also increase the cost to the parties. On balance, this Court believes the best approach in this particular Adversary Proceeding is to submit all of its findings and conclusions in this Adversary Proceeding to the District Court as proposed findings of fact and conclusions of law.

11.    For these reasons, this Court is submitting the following Proposed Findings of Fact and Conclusions of Law on all claims and defenses in this Adversary Proceeding to the District Court for *de novo* review to the extent required, and entry of a final judgment by the District Court in accordance with 28 U.S.C. § 157(c)(1) and Bankruptcy Rule 9033.

**B.  Description of Debtor and Parties to Adversary Proceeding**

12.    The debtor in this bankruptcy case is RTX Custom Homes, Inc. ("RTX"). RTX was a general contractor that built residential custom homes in Central Texas.

RTX filed a voluntary bankruptcy petition under Chapter 7 (liquidation) with this Court on November 24, 2014. John Patrick Lowe was appointed as Chapter 7 Trustee ("Trustee") for the RTX bankruptcy estate.

13.     The Plaintiff in this Adversary Proceeding is Mr. Richard Munoz, Jr., as assignee of the Trustee ("Plaintiff"). As explained below, Mr. Richard Munoz Jr. ("Mr. Munoz") purchased all causes of action of RTX and the RTX bankruptcy estate against the Defendants from the Trustee. Mr. Munoz then filed this Adversary Proceeding as Plaintiff. In substance, the claims brought by Plaintiff in this Adversary Proceeding are claims that RTX and the RTX bankruptcy estate had against the Defendants. Mr. Munoz is the principal and owner of RTX.

14.     One Defendant in this Adversary Proceeding is Cedar Park Construction, LLC ("Cedar Park").[2] Cedar Park acted as subcontractor for RTX on certain residential construction projects.

15.     The other Defendant in this Adversary Proceeding is Mr. Tom McGrath ("Mr. McGrath"). Mr. McGrath is the managing member and principal of Cedar Park, a co-Defendant.

### C. Bankruptcy Case and Munoz acquisition of RTX Claims

16.     RTX, as debtor, filed Chapter 7 bankruptcy in this Court on November 24, 2014. Mr. Munoz, as President of RTX, signed the bankruptcy petition. The Trustee was appointed for the RTX bankruptcy estate. Cedar Park, as a creditor, then filed a Proof of Claim in the RTX bankruptcy case in the amount of $90,008 [Claim No. 12-1] ("Proof of Claim").

---

[2]  Cedar Park was sometimes referred to as "CPC" at trial and in pleadings filed by the parties.

17.     On June 30, 2015, the Trustee filed a Motion to Compromise with Cedar Park and Mr. McGrath in the RTX bankruptcy case ("Settlement Motion"). The Settlement Motion requested that the Court approve a proposed settlement whereby the Trustee would waive all of RTX's claims and causes of action against Cedar Park and Mr. McGrath, and Cedar Park would waive and release its Proof of Claim filed against the RTX bankruptcy estate.

18.     Mr. Munoz filed an objection to the Settlement Motion. Through the objection, Mr. Munoz offered to pay cash to the Trustee for the claims of RTX that were proposed to be released against Cedar Park and Mr. McGrath. On September 9, 2015, the Court conducted a hearing on the Settlement Motion and the objection thereto by Mr. Munoz. The Court did not approve the Settlement Motion as proposed; instead, the Court conducted an auction between Mr. McGrath and Mr. Munoz for the claims held by the RTX bankruptcy estate. After the auction, the Court approved the sale to Mr. Munoz (the highest bidder). All of the RTX bankruptcy estate's claims and causes of action against Cedar Park and Mr. McGrath were sold to Mr. Munoz for the cash sum of $25,000 paid to the RTX estate and reduction in the proofs of claim filed by Mr. Munoz against the RTX estate. The Trustee then executed an assignment of RTX's claims to Mr. Munoz.

19.     As a result, Mr. Munoz is now the owner of any claims that were held by RTX and the RTX bankruptcy estate against Cedar Park and Mr. McGrath. Mr. Munoz, as assignee (Plaintiff), then filed this Adversary Proceeding against Cedar Park and Mr. McGrath (as Defendants).

### D. Procedural Background of Adversary Proceeding

20. On October 27, 2015, Mr. Munoz, as assignee of the Trustee for the RTX bankruptcy estate and Plaintiff, initiated this Adversary Proceeding by filing a Complaint to Avoid and Recover Transfers and Objection to Claim ("Complaint"). (dkt# 1).[3] The Complaint was filed against Cedar Park and Mr. McGrath as Defendants (collectively "Defendants").

21. The Complaint sets forth six causes of action, summarized as follows. First, Plaintiff seeks to recover certain payments made by RTX to Cedar Park on two construction projects as "constructive fraudulent transfers" under the Bankruptcy Code. Second, Plaintiff seeks to recover certain payments made by RTX to Cedar Park on various projects as "preferences" under the Bankruptcy Code. Third, Plaintiff seeks recovery from Cedar Park and Mr. McGrath under the Texas Construction Trust Fund statute (Texas Property Code, Chapter 162) for misapplication of construction trust funds on two projects. Fourth, Plaintiff seeks recovery for breach of contract between RTX and Cedar Park on two projects. Fifth, Plaintiff objected to the Proof of Claim filed by Cedar Park in this bankruptcy case based on several construction projects. Finally, Plaintiff sought recovery from Cedar Park and Mr. McGrath under the Texas Theft Liability Act for unlawful appropriation of property belonging to RTX.[4] Plaintiff also specifically requested recovery of attorneys' fees from Cedar Park under the breach of contract action in the Complaint.

---

[3] The reference to "dkt#" means the docket number maintained in CM/ECF by the Clerk of the Bankruptcy Court.

[4] Plaintiff did not pursue a claim under the Texas Theft Liability Act at trial. (PTO, p. 1, dkt# 38).

22. On December 4, 2015, Defendants filed their Original Answer to the Complaint ("Answer"). (dkt# 5). In general, through the Answer, Defendants admitted and denied various allegations in the Complaint and set forth certain affirmative defenses. Defendants did not request recovery of their attorneys' fees in their Answer. (dkt# 5).

23. On December 6, 2015, the Court entered a Scheduling Order in this Adversary Proceeding. (dkt# 6). Among other matters, the Scheduling Order set deadlines for completion of discovery, filing of dispositive motions, amendment of pleadings, and set a docket call for trial. At the joint request of the parties, the Court extended certain deadlines in the Scheduling Order on several occasions. (dkt# 12, 15, 18, 23).

24. On October 25, 2016, Plaintiff filed a Motion for Partial Summary Judgment seeking summary judgment on its constructive fraudulent transfer cause of action. (dkt# 19, 20). Defendants filed a Response opposing such Motion. (dkt# 24). On November 21, 2016, the Court entered an Order denying the Motion for Partial Summary Judgment. The Court denied summary judgment due to Plaintiff's failure to prove that RTX was "insolvent," which is a necessary element of a constructive fraudulent transfer cause of action. (dkt# 26).

25. On December 19, 2016, Plaintiff filed a Motion to Compel Production of Documents requesting that the Court order Defendants to produce unredacted bank statements for Cedar Park for the period of March through November 2014. Plaintiff's counsel acknowledged that he should have caught the issue at an earlier date, but argued that the burden to Defendants would be relatively light since Cedar Park had

already produced the same bank statements in redacted form. On December 21, 2016, the Court entered an Order Denying Motion to Compel Production of Documents. (dkt# 39). In short, the Court denied the Motion to Compel since it was filed on the eve of trial, well after the discovery deadline, and months after the redacted documents were produced by Defendants to Plaintiff.

26.     The Court set the trial for December 28 and 29, 2016. (dkt# 23, 27). On December 20, 2016, Plaintiff and Defendants filed their Joint Pretrial Order with the Court ("PTO"). (dkt# 38). The PTO set forth certain agreed facts, disputed facts, and disputed legal issues.

27.     Trial on the merits was conducted on December 28 and 29, 2016. (Trial Transcripts, dkt# 50, 51). After completion of trial, the Court entered an Order Requiring Post-Trial Submissions ("Post-Trial Order"). (dkt# 47). In sum, through the Post-Trial Order, the parties were required to separately submit Proposed Findings of Fact and Conclusions of Law with detailed references to the record and legal citations. The Post-Trial Order also required the parties to file detailed fee motions if either party was seeking an award of attorney's fees and expenses in this Adversary Proceeding.

28.     On February 7, 2017, Plaintiff filed his Proposed Findings of Fact and Conclusions of Law with the Court ("Plaintiff's Proposed Findings"). (dkt# 57). On the same date, Defendants also filed their Proposed Findings of Fact and Conclusions of Law with the Court ("Defendants' Proposed Findings"). (dkt# 58).

29.     On February 15, 2017, Defendant Cedar Park filed a Notice of Reduction in Claim, whereby Cedar Park stipulated to the voluntary reduction of its Proof of Claim by certain amounts. (dkt# 77, main case no. 14-11732).

30.     On February 15, 2017, Plaintiff filed a Motion for Allowance of Attorneys' Fees with the Court ("Plaintiff's Fee Motion"). (dkt# 62). On February 24, 2017, Defendants filed their Objection to Plaintiff's Fee Motion. (dkt# 65).

31.     On February 17, 2017, Defendants filed their Application for Recovery of Attorneys' Fees and Costs ("Defendants' Fee Motion"). (dkt# 63). On February 24, 2017, Plaintiff filed a Response to Defendants' Fee Motion. (dkt# 64). On March 2, 2017, Defendants filed a Limited Reply to such Response. (dkt# 66).

**E.  Trial Transcript and Exhibits**

32.     The Court conducted a bench trial in this Adversary Proceeding on December 28 and 29, 2016. Written transcripts of the trial have been prepared. (dkt# 50, 51). References to the trial transcripts are made in the following manner: "Tr., [date], [page number], [line number] (if applicable)."

33.     At the commencement of and during trial, the Court admitted certain exhibits into evidence. References to trial exhibits are made in the following manner: Plaintiff's exhibits are referred to as "PX-[number]," and Defendants' exhibits are referred to as "DX-[number]." In sum, Plaintiff's exhibits PX-3 through PX-24, PX-26 through PX-28, and PX-30 were admitted. In sum, Defendants' exhibits DX-1 through DX-19 were admitted. Some exhibits were admitted for a limited purpose, such as for demonstrative purposes or judicial notice purposes.

**F.  Witnesses and Credibility**

34.     During trial, the following three witnesses testified:

(1) Mr. Richard Munoz, Jr. ("Mr. Munoz"). Mr. Munoz is the Plaintiff and principal of RTX. Mr. Munoz was a primary witness at trial. Significant personal

animosity remains between Mr. Munoz (Plaintiff) and Mr. McGrath (a Defendant), which colored the testimony of both witnesses at trial. Mr. Munoz came across as an intelligent, thoughtful, and (for the most part) credible witness. However, Mr. Munoz exceeded the boundaries of both his knowledge and his experience to cast blame on Mr. McGrath and Cedar Park for poor workmanship and other "laundry list" defects on several construction projects. In this area, Mr. Munoz's testimony often consisted of conclusory and unsupported statements. As a result, the Court gives very little weight to this part of Mr. Munoz's testimony.

(2) Mr. Tom McGrath ("Mr. McGrath"). Mr. McGrath is a Defendant and the principal of Cedar Park, the other Defendant. Mr. McGrath was a primary witness at trial. Mr. McGrath stepped into an inherently difficult situation when his company (Cedar Park) took over to try and complete construction projects started by RTX's predecessor (Terry Ford Custom Homes). From his testimony, it is apparent that Mr. McGrath is very knowledgeable and experienced in all phases of residential construction, including the materials and labor required to actually get a job done. However, much of Mr. McGrath's testimony lacked credibility and was inconsistent with respect to important details of the events and transactions in dispute. The recordkeeping by his company (Cedar Park) with regard to the projects was sometimes incomplete or inaccurate. At trial, Mr. McGrath often evaded answers, claimed he did not remember when convenient to do so, and provided testimony that was sometimes contradictory. As a result, the Court gives limited probative weight to much of Mr. McGrath's testimony.

(3) Mr. Bradley Swearingen ("Mr. Swearingen"). Mr. Swearingen was a non-party witness. Mr. Swearingen is a partner in Rio96 Property Group ("Rio96"). Rio96

contracted with RTX and its predecessor to build a home called the "Verano Project." Mr. Munoz (Plaintiff) was a partner with Mr. Swearingen in Rio96. Mr. Munoz (Plaintiff) provided information to Mr. Swearingen so that Mr. Swearingen could file a claim against RTX's estate on behalf of Rio96 that cast blame on Cedar Park for problems with the Verano Project. At trial, Mr. Swearingen was an intelligent, candid, and credible witness. However, given Mr. Swearingen's connection with Mr. Munoz (Plaintiff), his lack of construction experience, and his lack of knowledge about Cedar Park's actual work on the Verano Project, the Court gives limited probative value to the substance of some of Mr. Swearingen's testimony.

**G. <u>Considerations with respect to Proposed Findings and Conclusions</u>**

35.    The following constitutes the Court's proposed Findings of Fact and Conclusions of Law regarding the trial in the Adversary Proceeding. In reaching its findings and conclusions, the Court has considered and weighed the testimony, demeanor and credibility of all witnesses, all admitted exhibits, the record, and the pleadings and briefs filed by the parties—regardless of whether specifically referred to in these proposed Findings of Fact and Conclusions of Law. To the extent deemed necessary, the Court has also conducted its own independent legal research.

36.    If any proposed Finding of Fact is construed to be a proposed Conclusion of Law, they are hereby adopted as such by the Court. If any proposed Conclusion of Law is construed to be a proposed Finding of Fact, they are hereby adopted as such by the Court.

37.    The Court has intentionally omitted pennies/cents[5] in the dollar figures used in these proposed Findings of Fact and Conclusions of Law.

## II.
## PROPOSED FINDINGS OF FACT

38.    Following are the Court's proposed Findings of Fact organized by topics and claims.

### A. General Overview

39.    This Adversary Proceeding involves a short, failed business relationship between two residential construction companies (RTX and Cedar Park) and their respective principals (Mr. Munoz and Mr. McGrath). RTX (as contractor) hired Cedar Park (as subcontractor) to perform construction work on six residential projects. The relationship started out well; but rapidly fell apart.

40.    Plaintiff (Mr. Munoz) contends that RTX funded construction draws as requested by Cedar Park until it began to appear that materials that Cedar Park was being paid for were not actually being purchased by Cedar Park. When Mr. Munoz of RTX questioned Mr. McGrath of Cedar Park about the materials, the relationship quickly soured, Cedar Park ceased work, and the relationship ultimately ended.

41.    Mr. Munoz (of RTX) and Mr. McGrath (of Cedar Park) were unable to overcome their frustrations, which prevented an amicable resolution at the end of their business relationship. In turn, this led to protracted and expensive litigation. RTX quickly filed litigation in state court against Cedar Park and Mr. McGrath, and Cedar Park and Mr. McGrath made claims against RTX and Mr. Munoz.

---

[5] Sense, however, has not been intentionally omitted by the Court.

42.     The litigation escalated further when RTX filed Chapter 7 bankruptcy. Cedar Park filed a Proof of Claim against RTX for unpaid invoices of $90,008 in the RTX bankruptcy case. (PX-3). Mr. Munoz then purchased RTX's claims against Cedar Park and Mr. McGrath from the bankruptcy Trustee, after a contested auction with Mr. McGrath. (PTO, p. 4, dkt# 38).

43.     In this latest round, Mr. Munoz (as Plaintiff and owner of RTX's claims) filed the Adversary Proceeding against Cedar Park and Mr. McGrath (as Defendants). In general, Plaintiff seeks recovery of payments made by RTX to Cedar Park as "constructive fraudulent transfers" and "preferences" under the Bankruptcy Code. Plaintiff also seeks recovery for misapplication of construction trust funds under the Texas Construction Trust Fund Act. Finally, Plaintiff seeks recovery for breach of contract and objects to the Proof of Claim filed by Cedar Park in the RTX bankruptcy case.

44.     Cedar Park worked on six construction projects for RTX. Only one of the six projects had a signed written contract. Many of the facts are convoluted and mired in conflicting and vague testimony.

**B. <u>RTX Background</u>**

45.     RTX Custom Homes, Inc. (herein "<u>RTX</u>") was a general contractor that built residential homes in Central Texas. (PTO, p. 2, dkt# 38). Mr. Munoz was the owner and President of RTX when it filed bankruptcy.

46.     RTX is the successor entity to "Terry Ford Custom Homes, Inc." Mr. Munoz had been developing real estate for many years. His neighbor, Mr. Terry Ford, was in the construction and remodeling business. Mr. Munoz and Mr. Ford then joined

forces to build residential homes and incorporated Terry Ford Custom Homes in 2007. Terry Ford Custom Homes acted as the general contractor when building residential homes. (Tr., 12/28/16, p. 102, l. 3–11).

47.    According to Mr. Munoz, he was the "developer" that purchased, designed and developed the projects. Mr. Ford was the "general contractor" that provided the on-site and construction management expertise. (Tr., 12/28/16, p. 102, l. 8–11). Primarily, Mr. Munoz's experience in the residential construction business was on the financial side, such as how much materials cost, how long projects should take, planning and budgeting. (Tr., 12/28/16, p. 102, l. 12–16).

48.    By early 2014, Terry Ford Custom Homes was in the midst of several residential construction projects. Some Terry Ford projects were underbid and had significant construction delays. Mr. Ford also needed help with the construction work. (Tr., 12/28/16, p. 111, l. 5–13).

49.    Mr. McGrath (and his company Cedar Park) then appeared on the scene. Mr. McGrath called Mr. Munoz to advise that Cedar Park was taking over a remodel project that Terry Ford Custom Homes had started in 2013 and that was still unfinished. (Tr., 12/28/16, p. 110, l. 11–15). Mr. Munoz then met with Mr. McGrath in person to discuss the possibility of Cedar Park providing construction services for Terry Ford Custom Homes. Mr. McGrath ultimately agreed that Cedar Park would help finish a couple of Terry Ford Custom Homes' projects. (Tr., 12/28/16, p. 71, l. 18–21).

50.    In the spring of 2014, Mr. Ford resigned from Terry Ford Custom Homes. Mr. Munoz of RTX then hired Cedar Park to help finish the construction of the remaining

projects that Terry Ford Custom Homes had started. RTX later retained Cedar Park to start a new project from the ground up for RTX. (PTO, p. 2, dkt# 38).

51.     Mr. Munoz then changed the corporate name of Terry Ford Custom Homes, Inc. to RTX in the summer of 2014. (Tr., 12/28/16, p. 182, l. 14–16). RTX remained as the general contractor on the construction projects. (PTO, p. 2, dkt# 38).

### C. Cedar Park Background

52.     Cedar Park Construction, LLC (herein "<u>Cedar Park</u>") is a Texas limited liability company formed in 2011. Mr. McGrath is the managing member, President, and the principal of Cedar Park. (PTO, p. 2, dkt# 38; Declaration, Exhibit A, p. 1, dkt# 24-1).

53.     Mr. McGrath has been in the construction industry for about 30 years. His father was a master carpenter and builder. Mr. McGrath has performed general contracting work for the last 16 years on residential and commercial projects.

54.     Mr. McGrath has supervised all phases of construction, which included performing construction work on the projects through his company. He handles all aspects of residential construction including bidding, estimating, purchasing, invoicing, overseeing subcontractors and employees, and building homes from excavation and pouring of slabs to the framing, roofing, punch lists and completion. (Tr., 12/28/16, p. 69, l. 18–22; Tr., 12/29/16, p. 38, l. 15–25; p. 39, l. 1–16).

### D. Construction Project Descriptions

55.     Six residential construction projects are involved in this Adversary Proceeding. Cedar Park performed construction work for RTX on these projects. The two projects primarily in dispute in this Adversary Proceeding are the "Old 1431 Project" and the "Verano Project."

56.     A general description of the six construction projects are as follows:

(1)     19831 Old FM 1431, Jonestown, Texas ("Old 1431 Project"). This construction project was an addition to an existing home owned by the Rectors ("Rectors"). RTX hired Cedar Park to build this addition from the ground up. Cedar Park did not complete this project. (Tr., 12/29/16, p. 9, l. 23–25; p. 10, l. 1–9).

(2)     4217 Verano Drive, Austin, Texas ("Verano Project"). This construction project was a "spec" home owned by Rio96 Property Group ("Rio96"). Terry Ford Custom Homes started the initial construction. Cedar Park was hired later to work on the project. Cedar Park did not complete this project. (Tr., 12/29/16, p. 8, l, 18–25; p. 9, l. 1–22).

(3)     2333 Camino Del Verde, Texas ("Camino Del Verde Project"). This construction project was a "spec" home owned by Terry Ford Custom Homes, which was sold during construction to John and Jennifer Ferrell. Terry Ford Custom Homes started the initial construction. Cedar Park was hired later to work on the project. Cedar Park apparently completed this project. (Tr., 12/29/16, p. 7, l. 17-25; p. 8, l. 1-17).

(4)     4603 Valley View, Leander, Texas ("Valley View Project"). This construction project was a custom home in Leander, Texas. Terry Ford Custom Homes started the initial construction. Cedar Park was hired later to work on the project. Cedar Park apparently completed this project. (Tr., 12/29/16, p. 6, l. 24–25; p. 7, l. 1–7).

(5)     700 Zen Gardens, Austin, Texas ("Zen Gardens Project"). This construction project was a 5,000 square foot custom home in Steiner Ranch built for Wendy and Rick Jones. Terry Ford Custom Homes started the initial construction.

Cedar Park was hired later to work on the project. Cedar Park apparently completed this project. (Tr., 12/29/16, p. 5, l. 23–25; p. 6, l. 1–14; p. 20, l. 3–5).

(6)    18115 Angel Valley, Leander, Texas ("Angel Valley Project"). This construction project was a horse stable/barn addition to an existing home with upstairs living quarters. Terry Ford Custom Homes started the initial construction. Cedar Park was hired later to work on the project. Cedar Park apparently completed this project. (Tr., 12/29/16, p. 7, l. 8–16).

### E.  Business Relationship between RTX and Cedar Park

57.    Cedar Park acted as the subcontractor and RTX as the general contractor on the construction projects. (PTO, p. 2, dkt# 38); (Tr., 12/28/16, p. 110, l. 16–18; p. 167, l. 22–24; p. 168, l. 17). RTX (and its predecessor Terry Ford Custom Homes) entered into construction contracts with the homeowners. RTX hired Cedar Park as a subcontractor to complete construction of the projects.

58.    Cedar Park performed construction work for RTX for only about seven months—from about March 2014 to early October 2014. According to Mr. McGrath, Cedar Park had a few other small remodeling jobs in 2014, but most of Cedar Park's work in 2014 was on the residential construction projects for RTX. (Tr., 12/28/16, p. 61, l. 21–25; p. 62, l. 1–3; Tr., 12/28/16, p. 73, l. 16–25; p. 74, l. 1).

59.    RTX hired Cedar Park as a subcontractor to help RTX finish the ongoing construction projects that Terry Ford Custom Homes had started. RTX was not the property owner with respect to any of the projects, except for the Camino Del Verde Project (which was sold during construction).

60.     Most of the construction projects were "handshake deals" between RTX and Cedar Park. (Tr., 12/28/16, p. 72, l. 15–21). The only written contract executed between RTX and Cedar Park was for the Old 1431 Project. (PX-30); (DX-1). However, Cedar Park also provided construction work for RTX on the Verano Project, as demonstrated by the testimony and invoices submitted by Cedar Park to RTX and paid by RTX. (PX-3). Likewise, Cedar Park provided construction work on the Camino Del Verde Project, the Zen Gardens Project, the Valley View Project, and the Angel Valley Project, as demonstrated by the testimony and invoices submitted by Cedar Park to RTX and paid by RTX. (PX-3).

61.     With respect to the Old 1431 Project, RTX and Cedar Park entered into a written construction contract dated June 10, 2014, for Cedar Park to provide construction work for RTX ("Old 1431 Contract"). (PX-30); (DX-1). Under the Old 1431 Contract, RTX was to make progress payments to Cedar Park "as requested for materials and or for completed work." *See* Old 1431 Contract, Art. 5. (PX-30); (DX-1). Mr. McGrath (of Cedar Park) also acknowledged that this was the payment arrangement with RTX. (Tr. 12/28/16, p. 27, l. 6–15). Although the Old 1431 Contract incorrectly defined RTX as the "Owner" and Cedar Park as the "General Contractor," there is no dispute that the Rectors were actually the owners of the home (not RTX). The Old 1431 Project was an addition to a home already owned by the Rectors.

62.     The Court specifically finds that RTX was the general contractor and Cedar Park was the subcontractor on the Old 1431 Project. The Court also specifically finds that under the Old 1431 Contract, Cedar Park was to be paid by RTX for materials

provided by Cedar Park and work completed by Cedar Park upon invoice from Cedar Park.

63.     With respect to the Verano Project, a written contract was drafted, but was never signed. (Tr., 12/28/16, p. 77, l. 17–25; p. 78, l. 1; p. 113, l. 5–17). No written contract regarding the Verano Project, signed or unsigned, was introduced into evidence. However, the evidence demonstrated that the same payment agreement existed between RTX and Cedar Park for the Verano Project as the written contract for the Old 1431 Project. For example, Mr. Munoz testified that Cedar Park would get paid by RTX for the line items that Cedar Park completed. (Tr., 12/28/16, p. 112, l. 14–17). Mr. McGrath confirmed that Cedar Park received payments from RTX for construction of improvements pursuant to Cedar Park's invoices and draw requests. (Tr., 12/28/16, p. 61, l. 9–11).

64.     The communications between RTX and Cedar Park, as well as the surrounding acts and circumstances, demonstrated a meeting of the minds by the parties on the Verano Project. In about a four-month span, Cedar Park sent five invoices to RTX for materials and services provided to the Verano Project totaling about $194,876. RTX paid Cedar Park all of the amounts requested in four of the invoices and part of the fifth invoice, for a total of about $149,645 in payments on the Verano Project. (PX-3). Much of the construction work was being performed on the Verano Project by Cedar Park at the same time as the Old 1431 Project (which had a written contract). There were constant communications between RTX and Cedar Park regarding the Verano Project. (Tr., 12/28/16, p. 113, l. 25; p. 114, l. 1–19). Cedar Park performed substantial construction work on the Verano Project. (Tr., 12/29/16, p. 9, l. 1–22). Given

the conduct of the parties, as well as the surrounding circumstances and communications, the Court finds that there was a meeting of the minds between RTX and Cedar Park on material terms of a construction agreement with respect to the Verano Project.

65.    After considering and weighing all the evidence, the Court specifically finds that Cedar Park and RTX had a valid oral construction agreement with respect to the Verano Project. The construction agreement (like the written contract on the Old 1431 Project) was that Cedar Park would be paid by RTX for materials provided by Cedar Park and work completed by Cedar Park on the Verano Project upon invoice from Cedar Park.

66.    With respect to the construction projects, Cedar Park submitted invoices to RTX. As RTX got funding from homeowners, RTX would then pay Cedar Park on its invoices. Both Mr. Munoz and Mr. McGrath testified that the agreement was that Cedar Park would be paid for its invoices when RTX received its funding from the homeowners and their banks. Both Mr. Munoz and Mr. McGrath testified that the parties actually operated under this payment arrangement. (Tr., 12/28/16, p. 72, l. 22–25; p. 73, l. 1–4; p. 156, l. 16–25). In short, RTX "would pay [Cedar Park] when [RTX] got paid" by the homeowners. (Tr., 12/28/16, p. 73, l. 1–2; p. 156, l. 22–23).

67.    Both Mr. McGrath (on behalf of Cedar Park) and Mr. Munoz (on behalf of RTX and its predecessor Terry Ford Custom Homes) effectively acknowledged that they were handling "trust funds" in their capacity as contractors. (Tr., 12/28/16, p. 61, l. 2–20; p. 181, l. 25; p.182, l. 1–4). RTX received funds from homeowners (and their lenders) for construction of improvements to real property located in Texas and used such funds

to pay Cedar Park. (Tr., 12/28/16, p. 72, l. 22–25; p. 73, l. 1–2; p. 156, l. 16–25). Cedar Park received payments from RTX for construction of improvements to real property located in Texas. (Tr., 12/28/16, p. 61, l. 6–11). The Old 1431 Project, the Verano Project, the Valley View Project, and the Zen Gardens Project were all homes owned by and being built for third-party homeowners by RTX under construction contracts.

68.     The Court finds that the funds received by RTX from homeowners (and their lenders), which were then paid to Cedar Park, were for the construction of improvements on real property located in Texas. The Court also finds that the funds received by Cedar Park from RTX were for the construction of improvements on real property located in Texas. As a result, the Court specifically finds that the funds received by RTX (as general contractor), which were then paid to Cedar Park (as subcontractor), constituted "construction trust funds" when held by RTX. The Court further specifically finds that when the funds were received by Cedar Park (as subcontractor) from RTX (as general contractor), they constituted "construction trust funds" when held by Cedar Park. The Court also finds that RTX (as general contractor) had control and direction of the construction trust funds it received from homeowners and paid to Cedar Park (as subcontractor).

69.     With respect to day-to-day operations, Mr. Munoz sometimes met and regularly communicated with Mr. McGrath about the projects. In these meetings and conversations, the parties discussed what items would be funded and how funds should be applied. (Tr., 12/28/16, p. 113, l. 25; p. 114, l. 1–25; p. 115, l. 1–25;  p.116, l. 1–9). (PX-9) (Text messages between Mr. McGrath and Mr. Munoz from March 7, 2014 to October 21, 2014). Mr. Munoz (of RTX) acknowledged that he rarely visited the

construction sites. (Tr., 12/28/16, p. 155, l. 3–10). Cedar Park was responsible for the on-site management of construction for the six projects. The evidence also demonstrated that Mr. Munoz did not have on-site construction experience in building residential homes. (Tr., 12/28/16, p. 168, l. 4–22).

70.    The relationship between RTX and Cedar Park first began to deteriorate in August 2014. With respect to the Old 1431 Project, BMC Lumber (the lumber vendor) contacted Mr. Munoz of RTX regarding lumber that had been charged by Cedar Park to a Terry Ford Customs Home account at BMC Lumber. According to Mr. Munoz, Cedar Park was not authorized to charge on the Terry Ford Customs Home account with BMC Lumber. Evidently, when Mr. Munoz contacted Mr. McGrath of Cedar Park regarding the situation, Mr. McGrath informed Mr. Munoz that Cedar Park would pay BMC Lumber as Cedar Park had charged for the lumber by "mistake." (Tr., 12/28/16, p. 30, l. 25; p. 31, l. 1–3). Then, with respect to the Verano Project, Mr. Munoz contacted Ja Mar Roofing, the roofing contractor. Mr. Munoz learned that Ja Mar Roofing had not been paid by Cedar Park for roofing materials, even though RTX had paid Cedar Park for roofing. (Tr., 12/28/16, p. 119, l. 14–25; p. 120, l. 1).

71.    These two events lead Mr. Munoz to begin to question the trustworthiness of Cedar Park and Mr. McGrath with respect to money matters. When confronted by Mr. Munoz on the roofing issue with Ja Mar Roofing, Mr. McGrath became angered that his integrity was being questioned. A series of emails sent between September 4, 2014 and October 8, 2014, from Mr. McGrath to Mr. Munoz show Cedar Park's intention to cease work on the ongoing projects. (PX-11, 14, 18).

72.     Cedar Park ceased work on the Old 1431 Project by September 30, 2014, and on the Verano Project by October 9, 2014, according to Cedar Park's Proof of Claim. (PX-3). Cedar Park ceased work on the Zen Gardens Project by October 16, 2014, the Valley View Project by October 8, 2014, the Camino Del Verde Project by September 11, 2014, and the Angel Valley Project by October 22, 2014, according to Cedar Park's Proof of Claim. (PX-3).

73.     On October 8, 2014, as the relationship was ending, Cedar Park submitted a batch of invoices to RTX on several projects. (PX-17). On October 17, 2014, Cedar Park again submitted a batch of invoices to RTX on several projects. (PX-20). Mr. Munoz (of RTX) testified that these Cedar Park invoices contained various questionable items. (Tr., 12/28/16, p. 123, l. 11–22; p. 125, l. 15–25; p. 126, l. 1–16); (PX-17); (PX-20). According to Mr. McGrath, Cedar Park was merely wrapping up each of the construction projects and sending its "final invoices" to RTX in connection with Cedar Park's work on all the projects. (Tr., 12/29/16, p. 11, l. 14–24).

74.     On October 17, 2014, Mr. Munoz emailed Mr. McGrath in an attempt to resolve Mr. Munoz's questions about Cedar Park's final invoices. (PX-21); (DX-19). On October 27, 2014, Mr. Munoz communicated with Mr. McGrath in an attempt to resolve the parties' disputes through mediation or some other type of resolution. (PX-23). This attempt was not successful.

75.     On November 4, 2014, RTX filed a state court suit against Cedar Park and Mr. McGrath. Cedar Park filed a counterclaim against RTX and a third party petition against Mr. Munoz. (PTO, p. 3, dkt# 38). This state court suit remains pending.

76.     Soon thereafter, on November 24, 2014, Mr. Munoz put RTX into Chapter 7 bankruptcy. According to Mr. Munoz, the RTX bankruptcy was filed due to a number of factors, including homeowner and vendor lawsuits and because RTX did not have anyone that could complete construction on the projects. (Tr., 12/28/16, p. 129, l. 22–25; p.130, l. 1–8).

## F. Fraudulent Transfer Payments

77.     In this Adversary Proceeding, Plaintiff seeks to recover certain payments made by RTX to Cedar Park on the Old 1431 Project and Verano Project as "constructive fraudulent transfers" under § 548(a)(1)(B) of the Bankruptcy Code. The gist of Plaintiff's claim is that RTX paid Cedar Park more than the value actually provided by Cedar Park on such projects, and therefore payments made by RTX to Cedar Park are recoverable as constructively fraudulent.

78.     Specifically, Plaintiff seeks to recover the following payments made by RTX to Cedar Park ("Fraudulent Transfer Payments"):

### Old 1431 Project

| Invoice | Date Paid | Materials | Amount |
|---------|-----------|-----------|--------|
| 11672 | 07/24/14 08/07/14 | Framing-lumber | $12,235 |
| 11672 | 07/24/14 08/24/14 | Beams & trusses | $ 2,500 |
| 11682 | 09/19/14 09/25/14 | Door materials | $13,488 |
| 11682 | 09/19/14 09/25/14 | Windows | $ 7,959 |
| 11682 | 09/19/14 09/25/14 | Fireplace | $ 1,587 |
| Total | | | $37,769 |

<u>Verano Project</u>

| Invoice | Date Paid | Materials | Amount |
|---------|-----------|-----------|--------|
| 11668 | 07/08/14 08/01/14 08/02/14 | Roofing less payment to Dan James, Principal of Ja Mar Roofing | $12,854 |
| 11687 | **[6] | Roofing | $19,824 |
| Total | | | $32,678 |

(Plaintiff's Proposed Findings, pp. 24–26, dkt# 57); (PX-3). The total amount of Fraudulent Transfer Payments that Plaintiff seeks to recover is $70,447. (Plaintiff's Proposed Findings, pp. 24–26, dkt# 57).

79.    The Fraudulent Transfer Payments were made by RTX to Cedar Park during the period of July 2014 through September 2014. Under the Bankruptcy Code, to recover such payments from Cedar Park as constructively fraudulent, Plaintiff must prove that RTX was "insolvent" at the time the transfers were made (July 2014 through September 2014) or became insolvent as a result of such transfers. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I); (¶¶ 225–229 of Conclusions of Law below).

80.    In an effort to establish RTX's insolvency, Plaintiff introduced RTX's 2013 Form 1120 U.S. Corporation Income Tax Return ("<u>2013 Tax Return</u>") into evidence. (PX-24). More particularly, Mr. Munoz testified with respect to Schedule L ("<u>2013 Balance Sheet</u>") of RTX's 2013 Tax Return. The 2013 Balance Sheet indicated that, as of the end of 2013, RTX had assets of $977,570 and liabilities of $1,360,571. (PX-24, Schedule L, Lines 15 and 18–21).

81.    The dollar figures in RTX's 2013 Balance Sheet included with its 2013 Tax Return was unsupported by competent testimony. Mr. Munoz, as the principal of RTX,

---

[6] Cedar Park issued Invoice# 11687 to RTX on October 8, 2014, which included a second charge for roofing of $19,824 for the Verano Project. (PX-3, Invoice# 11687). However, there was insufficient evidence to establish that RTX actually paid $19,824 to Cedar Park for this second roofing charge.

admitted that he did not prepare RTX's 2013 Tax Return or the attached 2013 Balance Sheet. Mr. Munoz merely testified that he "would have" worked with the accountant to provide information for the accountant to prepare the 2013 Tax Return. (Tr., 12/28/16, p. 103, l. 23–25; p.104, l. 1–4). Mr. Munoz also admitted that he was not an accountant and has no training in business valuation, appraisal or property valuation. (Tr., 12/28/16, p. 151, l. 6–14).

82.     When cross-examined, Mr. Munoz testified that he did not know whether the dollar figures contained in the 2013 Balance Sheet were book value or fair market value, but were probably book value because the accountant never requested valuation information. (Tr., 12/28/16, p. 151, l. 15–25; p.152, l. 1–5). Mr. Munoz also did not know the definition of "fair market value." (Tr., 12/28/16, p. 152, l. 6–7). After weighing the evidence, the Court finds that the 2013 Balance Sheet listed the assets of RTX at "book value" and not "fair value."

83.     At trial, the Court also took judicial notice of RTX's bankruptcy schedules filed on November 24, 2014. (Tr., 12/28/16, p. 7, l. 4–15); (PX-25). According to RTX's bankruptcy schedules, RTX had assets of $78,466 and liabilities of $614,802 as of November 24, 2014. (PX-25). Mr. Munoz (as President) signed and prepared RTX's bankruptcy schedules. However, no probative evidence was submitted to support the valuation of RTX assets or most of the liabilities set forth in RTX's bankruptcy schedules.

84.     Mr. Munoz generally testified that RTX's financial condition worsened during the 2014 year. Mr. Munoz testified that he made about $180,000 in loans to RTX in 2014. (PX-26). According to Mr. Munoz, he made the loans to RTX in 2014 because

RTX had to take over the remaining construction jobs when Cedar Park ceased work and because RTX was running short on cash because of funds not paid correctly on the projects by Cedar Park. (Tr. 12/28/16, p.109, l. 17–25; p.110, l. 1–8). Mr. Munoz did not provide any testimony regarding the fair value of RTX's assets.

85.    Plaintiff offered no probative evidence, documentary or otherwise, regarding the fair value of RTX's assets during the July 2014 through September 2014 period in which the Fraudulent Transfer Payments were made to Cedar Park. Indeed, there was no probative evidence, documentary or otherwise, submitted whatsoever as to the fair value of RTX's assets during any period of time.

86.    After weighing the evidence, the Court specifically finds as a factual matter, that Plaintiff failed to prove that RTX was insolvent at the time the Fraudulent Transfer Payments were made to Cedar Park or that RTX was made insolvent by such payments.

### G. Preference Payments

87.    Plaintiff also seeks to recover certain payments made by RTX to Cedar Park as "preferences" under § 547 of the Bankruptcy Code. The gist of Plaintiff's claim is that payments made by RTX to Cedar Park within 90 days of its bankruptcy filing should be recovered as they "preferred" Cedar Park ahead of other unsecured creditors.

88.    Specifically, Plaintiff seeks to recover the following payments made by RTX to Cedar Park during the 90 days before RTX's bankruptcy filing ("Preference Payments"):

| Check # | Date | Amount | Project |
|---------|------|--------|---------|
| 1011 | 08/28/14 | $  10,000 | Valley View |
| 1357 | 08/28/14 | $    5,000 | Valley View |
| 1013 | 09/06/14 | $  19,425 | Verano |

| Bank Check | 09/12/14 | $ 22,782 | Zen Gardens |
|---|---|---|---|
| 1365 | 09/16/14 | $ 20,028 | Valley View |
| 1367 | 09/17/14 | $ 15,000 | Zen Gardens |
| 1016 | 09/21/14 | $ 20,569 | Old 1431 |
| 1024 | 09/25/14 | $ 12,593 | Old 1431 |
| 1025 | 09/30/14 | $ 23,447 | Old 1431 |
| 1373 | 10/02/14 | $ 9,189 | Zen Gardens |
| 1371 | 10/02/14 | $ 5,019 | Valley View |
| 1029 | 10/09/14 | $ 17,204 | Verano |
| | | | |
| Total | | $180,256 | |

(PTO, p. 5, dkt# 38); (Plaintiff's Proposed Findings, p.18, dkt# 57); (DX-10).

89.    To recover these payments from Cedar Park as preferences under the Bankruptcy Code, Plaintiff must prove, among other things, that the Preference Payments: (a) were a transfer of an interest in property of RTX (the debtor) to Cedar Park; and (b) enabled Cedar Park to receive more than Cedar Park would have received in a "hypothetical" Chapter 7 liquidation of RTX. *See* 11 U.S.C. § 547(b); (¶¶ 243–244 of Conclusions of Law below).

90.    On each of these projects, RTX acted as a general contractor and Cedar Park acted as a subcontractor for the construction of residential homes. As set forth in more detail in the Court's Findings of Fact ¶¶ 66–68 above: (a) both Mr. Munoz (of RTX) and Mr. McGrath (of Cedar Park) agreed that Cedar Park would be and was paid for its invoices when RTX received its funding from the homeowners; (b) both Mr. McGrath (of Cedar Park) and Mr. Munoz (of RTX and its predecessor Terry Ford Custom Homes) effectively recognized that they were handling "trust funds" in their capacity as contractors; (c) RTX received funds from homeowners for construction of improvements to real property located in Texas, and RTX used such funds to pay Cedar Park for

construction of such improvements; and (d) the funds received by RTX (as general contractor), which were then paid to Cedar Park (as subcontractor), constituted "construction trust funds" when held by RTX.

91.    As a result, the Court specifically finds that the Preference Payments were made by RTX to Cedar Park (as subcontractor) from "construction trust funds" held and received by RTX (as general contractor). The Court further finds that the Preference Payments were made to Cedar Park (as subcontractor) by RTX (as general contractor) for construction of improvements of specific real property located in Texas (the Valley View, Verano, Zen Gardens, and the Old 1431 Projects).

92.    In sum, for these factual reasons, the Court finds that Plaintiff did not prove that the Preference Payments were a transfer of RTX's interest in property to Cedar Park. Plaintiff also did not prove that the Preference Payments enabled Cedar Park to receive more than Cedar Park would have received in a hypothetical Chapter 7 liquidation of RTX. (¶¶ 244–269 of Conclusions of Law below).

### H.  Construction Trust Fund Payments

93.    Plaintiff also seeks to recover from Cedar Park and Mr. McGrath for misapplication of "construction trust funds" under Chapter 162 of the Texas Property Code (the Texas Construction Trust Fund Act). The gist of Plaintiff's claim is that Cedar Park and Mr. McGrath used "construction trust funds" received from RTX for purposes other than paying for labor and materials on the Old 1431 Project and the Verano Project.

94.     Specifically, Plaintiff contends that Cedar Park received payments from RTX for the following items, which Cedar Park did not use for their intended purposes (the "Construction Trust Fund Payments"):

| Project | Invoice | Date | Amount | Purpose of Payment |
|---------|---------|------|--------|--------------------|
| Old 1431 | 11672 | 07/24/14 08/07/14 | $12,234 | Framing Material-Lumber |
| Old 1431 | 11672 | 07/24/14 08/07/14 | $ 2,500 | Beams & Trusses |
| Old 1431 | 11682 | 09/19/14 09/25/14 | $13,487 | Doors |
| Old 1431 | 11682 | 09/19/14 09/25/14 | $7,959 | Windows |
| Old 1431 | 11682 | 09/19/14 09/25/14 | $1,587 | Gas fireplace |
| Verano | 11668 | 07/08/14 08/01/14 08/02/14 | $17,204 -$4,350 =$12,854 | Roofing |
| Verano | 11687 | **[7] | $19,824 | Roofing |
| Total | | | $70,445 | |

(Plaintiff's Proposed Findings, p. 16–17, dkt# 57).

95.     The payments received by Cedar Park from RTX constituted "construction trust funds." (Findings of Fact ¶¶ 66–68 above). The Court further specifically finds that the Construction Trust Fund Payments received by Cedar Park from RTX with respect to the Old 1431 Project and the Verano Project constituted construction trust funds. Mr. McGrath, as managing member and the President of Cedar Park, had control over the disbursement of the construction trust funds by Cedar Park. (Tr., 12/28/16, p. 61, l. 6–20).

96.     Here, however, RTX was acting as a "general contractor" and Cedar Park was acting as its downstream "subcontractor" with respect to the Old 1431 Project and

---

[7] Cedar Park issued Invoice# 11687 to RTX on October 8, 2014, which included a second charge for roofing of $19,824 for the Verano Project. (PX-3, Invoice# 11687). However, there was insufficient evidence to establish that RTX actually paid $19,824 to Cedar Park for this second roofing charge.

Verano Project. Both of the homes under construction were owned by third party homeowners. The Rectors owned Old 1431 and Rio96 owned Verano; RTX did not own the homes. Mr. Munoz testified that "these weren't RTX-owned properties, these were all properties that were owned by individuals." (Tr., 12/28/16, p. 124, l. 25; p.125, l. 1–2). These homeowners contracted with RTX (and its predecessor Terry Ford Custom Homes) for the construction. RTX, in turn, contracted with Cedar Park for the construction. Cedar Park, in turn, contracted with various materialmen and suppliers.

97.    As a result, the Court specifically finds that RTX was the "upstream" general contractor that paid the Construction Trust Fund Payments to Cedar Park as the "downstream" subcontractor on the Old 1431 Project and the Verano Project. Put differently, Cedar Park, as the downstream subcontractor, received the Construction Trust Fund Payments from RTX, the upstream general contractor.

98.    RTX was not entitled to payments from Cedar Park based on any work performed or materials supplied by RTX to Cedar Park on the Old 1431 Project and the Verano Project. Cedar Park did not make or owe any payments to RTX based on any work RTX performed or any materials supplied by RTX to Cedar Park on the Old 1431 Project and the Verano Project.

99.    In sum, for these factual reasons, the Court finds that RTX was not a beneficiary of the Construction Trust Fund Payments made to Cedar Park. (¶¶ 273–296 of Conclusions of Law below).

### I.  **Breach of Contract**

100.    Plaintiff has also sued Cedar Park for breach of contract on two projects— the Old 1431 Project and the Verano Project. The Court will set forth its factual findings

with respect to each project separately, and then address Cedar Park's defenses to the breach of contract action.

1. <u>Old 1431 Project</u>

101. A written agreement was executed between RTX and Cedar Park with respect to the Old 1431 Project (herein "<u>Old 1431 Contract</u>"). (PX-30); (DX-1); (¶ 61 of Findings of Fact above). Under such contract, Cedar Park was entitled to payment from RTX upon invoice for materials provided and for work completed by Cedar Park on the project.

102. The following chart summarizes the invoices sent by Cedar Park to RTX and the payments received by Cedar Park from RTX on the Old 1431 Project:

| Date | Invoice # | Amount Invoiced | Amount Paid | Remaining Balance |
|------|-----------|-----------------|-------------|-------------------|
| 07/24/14 | 11672 | $62,658 | $ 62,658 | $ 0 |
| 09/07/14 | 11682 | $68,783 | $ 56,608 | $ 12,174 |
| 09/25/14 | 11688 | $7,675 | $ 0 | $ 7,675 |
| Total | | $139,115 | $119,266 | $ 19,849 |

(PX-3); (Tr., 12/28/16, p. 28, l. 1–25, p. 29, l. 1–11).

103. Plaintiff contends that Cedar Park breached the contract with RTX on the Old 1431 Project, because RTX paid Cedar Park for certain materials as requested, but Cedar Park never purchased the materials. Specifically, Plaintiff contends that RTX paid Cedar Park for the following materials invoiced by Cedar Park, and that Cedar Park failed to use the funds it received from RTX to purchase the materials for the Old 1431 Project:

| Invoice # | Materials | Amount |
|-----------|-----------|--------|
| 11672 | Framing Lumber | $12,234 |
| 11672 | Beams and trusses | $ 2,500 |

| 11682 | Cornish and frame lumber[8] | $12,174 |
| 11682 | Doors materials | $13,487 |
| 11682 | Windows materials | $ 7,959 |
| 11682 | Fireplace | $ 1,587 |
| Total | | $49,941 |

(Plaintiff's Proposed Findings, pp.7–8, 27–28, dkt# 57).

104.    Cedar Park invoiced and was paid $12,234 for framing lumber and $2,500 for beams and trusses by RTX on the Old 1431 Project. Cedar Park marked the invoice for these materials as "paid" by RTX on August 7, 2014. (PX-3, Invoice# 11672). At trial, Mr. McGrath admitted that Cedar Park did not purchase these materials. (Tr., 12/28/16, p. 30, l. 13–25; p. 31, l. 1-3). Instead, Cedar Park charged these materials to the account of RTX at BMC Lumber, which Mr. McGrath of Cedar Park stated was a "mistake." However, no adjustment was ever made by Cedar Park. (Tr., 12/28/16, p. 30, l. 25; p. 31, l. 1–3). Mr. Munoz confronted Mr. McGrath about these charges, and Mr. McGrath agreed that Cedar Park would pay them. However, this did not occur. (Tr., 12/28/16, p. 116, l. 14–25; p.117, l. 1–22). Mr. McGrath testified that he agreed to credit these charges, but he never gave a credit for them to RTX. (Tr., 12/29/16, p. 20, l. 6–16). Mr. McGrath also testified that these amounts were "put back into the project," but his testimony was general and conclusory; no specifics were provided. (Tr., 12/28/16, p. 31, l. 11–19).

105.    Mr. McGrath testified that the BMC Lumber account was used on several construction projects with Mr. Munoz's consent. (Tr., 12/29/16, p. 14, l. 18–25; p. 15, l. 1–5). Emails introduced suggest that perhaps Mr. Munoz was aware of Cedar Park charging on the BMC Lumber account at certain times. (DX-12); (DX-14). Regardless, in

---

[8] Cedar Park issued Invoice# 11682 to RTX which included a charge for cornish and frame lumber of $12,174 for the Old 1431 Project. (PX-3, Invoice# 11682). However, there was insufficient evidence to establish that RTX actually paid this $12,174 to Cedar Park for the cornish and frame lumber charge.

this particular situation, the evidence showed that Cedar Park was actually paid money by RTX for the framing lumber, beams and trusses. Mr. McGrath admitted that he did not use the funds Cedar Park received to purchase these materials. Mr. McGrath also admitted that Cedar Park never credited RTX for this amount. (Tr., 12/28/16, p. 30, l. 13–25; p. 31, l. 1–3; Tr., 12/29/16, p. 20, l. 6–16).

106.   As a result, the Court finds Cedar Park invoiced and RTX paid Cedar Park the amount of $12,234 for framing lumber and $2,500 for beams and trusses on the Old 1431 Project. The Court further finds that Cedar Park did not purchase these materials or complete work using these materials on the Old 1431 Project. This was a breach of the Old 1431 Contract by Cedar Park and caused damages to RTX in the amounts paid by RTX to Cedar Park for the materials ($12,234 for framing lumber and $2,500 for beams and trusses). Cedar Park did not credit RTX for these amounts.

107.   Cedar Park also invoiced and was paid $13,487 for door materials and $7,959 for window materials by RTX on the Old 1431 Project. RTX paid Cedar Park for these materials. (PX-3, Invoice# 11682); (Tr. 12/28/16, p. 33, l. 9–23). At trial, Mr. McGrath admitted that Cedar Park never ordered these materials. (Tr., 12/28/16, p. 33, l. 9–23). Initially, Mr. McGrath testified that Cedar Park did not order these materials because Cedar Park was not given money to do so. (Tr., 12/29/16, p. 21, l. 12–19). Then later Mr. McGrath's testimony changed, and he admitted that Cedar Park received payment from RTX for the door and window materials when Cedar Park invoiced RTX for the materials. (Tr., 12/29/16, p. 42, l. 9–12). Cedar Park's own records show that these materials were billed by Cedar Park on Invoice# 11682. (PX-3). Cedar Park's own

records show that Invoice# 11682 was fully paid by RTX, except the balance of $12,174 for cornish and framing lumber. (PX-3).

108.    As a result, the Court finds that Cedar Park invoiced and RTX paid Cedar Park the amount of $13,487 for door materials and the amount of $7,959 for window materials on the Old 1431 Project. The Court further finds that Cedar Park did not purchase these materials or complete work using these materials on the Old 1431 Project. This was a breach of the Old 1431 Contract by Cedar Park and caused damages to RTX in the amounts paid by RTX to Cedar Park for the materials ($13,487 for door materials and $7,959 for window materials). Cedar Park never credited RTX for these amounts.

109.    Cedar Park also invoiced and was paid $1,587 for a fireplace by RTX on the Old 1431 Project. (PX-3, Invoice# 11682). Cedar Park's records did not show that Cedar Park ever paid the vendor (Gas Logs) for the fireplace. (DX-8).

110.    At trial, Mr. McGrath admitted that Cedar Park had not actually paid the vendor (Gas Logs) for the fireplace. Instead, Mr. McGrath generally testified that Cedar Park bartered services with Gas Logs (the vendor) in exchange for the fireplace. (Tr., 12/28/16, p. 34, l. 18–23). Mr. McGrath also admitted that Cedar Park did not deliver the fireplace to the Old 1431 Project or to RTX. (Tr., 12/28/16, p. 34, l. 24–25; p. 35, l. 1). At trial, Mr. McGrath tried to justify the non-delivery by suggesting that the fireplace remained at Gas Logs where it still could be picked up. (Tr., 12/29/16, p. 22, l. 23–25; p. 23, l. 1–3).

111.    Mr. McGrath's testimony about the supposed barter with Gas Logs and the remaining availability of the fireplace at Gas Logs was not persuasive. Cedar Park

did not provide supporting documentary evidence at trial. There was no evidence from Gas Logs that the fireplace had really been paid for through barter by Cedar Park, or that the fireplace was still available for pickup as suggested by Mr. McGrath.

112.    As a result, the Court finds that Cedar Park invoiced and RTX paid Cedar Park the amount of $1,587 for a fireplace to be purchased by Cedar Park and installed at the Old 1431 Project. After weighing the evidence, the Court further finds that Cedar Park did not purchase the fireplace, did not deliver the fireplace, and did not complete the work using the fireplace at the Old 1431 Project. This was a breach of the Old 1431 Contract by Cedar Park and caused damages to RTX in the amounts paid by RTX to Cedar Park for the fireplace ($1,587). Cedar Park has never credited RTX for this amount.

113.    Cedar Park also invoiced RTX for cornish and frame lumber in the amount of $12,174 for the Old 1431 Project. (PX-3, Invoice# 11682). However, the evidence did not demonstrate that RTX actually paid $12,174 to Cedar Park for this cornish and frame lumber. Mr. McGrath testified that Cedar Park provided these materials to the Old 1431 Project. (Tr., 12/28/16, p. 31, l. 20–25; p. 32, l. 1–2). But Cedar Park's own documentation on the Old 1431 Project did not reflect receipts from any of the vendors that Mr. McGrath suggested would have provided the cornish and frame lumber. (Tr., 12/28/16, p. 32, l. 3–21); (DX-8). Then post-trial, Cedar Park stipulated to a voluntary reduction in its Proof of Claim by the amount of this $12,174 unpaid charge for the cornish and frame lumber. (main case no. 14-11732, dkt# 77); (Defendants' Proposed Findings, p. 4, dkt# 58).

114.    The Court finds that RTX did not actually pay the $12,174 to Cedar Park for the invoiced cornish and frame lumber. As a result, RTX did not suffer any recoverable damages for breach of contract based on this unpaid charge by Cedar Park for cornish and frame lumber. Further, Cedar Park has voluntarily reduced its Proof of Claim for this unpaid charge of $12,174 for cornish and frame lumber.

115.    In sum, after weighing the evidence and considering the credibility of the witnesses, the Court finds as a factual matter, that (a) Cedar Park breached its contract with RTX on the Old 1431 Project; and (b) RTX suffered actual damages as a result of Cedar Park's breach for the following materials paid for by RTX but not purchased for or provided to the Old 1431 Project by Cedar Park:

| Materials | Amount of Damages |
|---|---|
| Framing Lumber | $12,234 |
| Beams and trusses | $ 2,500 |
| Doors materials | $13,487 |
| Windows materials | $ 7,959 |
| Fireplace | $ 1,587 |
| **Total Damages** | **$37,767** |

2.  Verano Project

116.    Cedar Park and RTX had a valid construction agreement with respect to the Verano Project, even though the agreement was not reduced to a signed written contract. Under the agreement, Cedar Park was entitled to payment from RTX upon invoice for materials provided and for work completed by Cedar Park on the Verano Project. (¶¶ 63–65 of Findings of Fact above).

117.    The following chart summarizes the invoices sent by Cedar Park to RTX and payments received by Cedar Park from RTX with respect to the Verano Project:

| Date | Invoice # | Amount Invoiced | Amount Paid | Remaining Balance |
|------|-----------|-----------------|-------------|-------------------|
| 05/21/14 | 11663 | $47,500 | $47,500 | $      0 |
| 07/02/14 | 11668 | $58,494 | $58,494 | $      0 |
| 08/11/14 | 11674 | $ 7,022 | $ 7,022 | $      0 |
| 09/03/14 | 11680 | $35,675 | $35,675 | $      0 |
| 10/08/14 | 11687 | $46,185 | $    954 | $45,231 |
| Total |  | $194,876 | $149,645 | $45,231 |

(PX-3).

118.    Plaintiff asserts that Cedar Park breached the agreement with RTX on the
Verano Project for several reasons.

119.    First, Plaintiff contends that RTX paid Cedar Park for roofing on the
Verano Project, but Cedar Park failed to use all of the funds to pay for roofing. Rio96
was the owner of the home under construction at the Verano Project. Ja Mar Roofing
was a roofing company retained by Cedar Park to provide roofing materials and
services for the Verano Project. (Tr., 12/28/16, p. 78, l. 19–21; p. 119, l. 14–23).

120.    Cedar Park issued Invoice# 11668 to RTX, which included a draw charge
for "roofing material" for the Verano Project of $17,204. RTX paid this invoice to Cedar
Park on August 2, 2014. (PX-3, Invoice# 11668).

121.    Cedar Park also issued Invoice# 11687 to RTX on October 8, 2014, which
included a second charge for roofing of $19,824 for the Verano Project. (PX-3,
Invoice# 11687). However, there was insufficient evidence to prove that RTX actually
paid the $19,824 to Cedar Park for this second roofing charge.

122.    Mr. McGrath provided conflicting and confusing testimony regarding
whether Cedar Park paid Ja Mar Roofing for roofing on the Verano Project and how
much Cedar Park paid for roofing. First, Mr. McGrath testified that Cedar Park, in fact,
did pay Ja Mar Roofing for the roofing. (Tr., 12/28/16, p. 53, l. 5–6). Later, Mr. McGrath

testified that Cedar Park did not pay Ja Mar Roofing, because Mr. Munoz told Mr. McGrath to use the roofing money to pay the stucco contractor. (Tr. 12/28/16, p. 56, l. 18–25; p. 57, l. 1–20). However, a contemporaneous text message exchange contradicted Mr. McGrath's testimony and showed that Mr. McGrath represented that Cedar Park had already paid the roofing deposit to Ja Mar Roofing and did not need to use the roofing money for stucco. (Tr.12/28/16, p. 56, l. 22–25; p. 57, l. 1–20); (PX-9, Text message, 09/02/14).

123.    Mr. McGrath proceeded to expressly deny that Ja Mar Roofing had been paid by Rio96 (the homeowner) pursuant to a subsequent settlement between Ja Mar Roofing and Rio96. (Tr., 12/28/16, p. 54, l. 14–16; p. 57, l. 25; p. 58, l. 1–6). On further examination by his attorney, Mr. McGrath then reversed course again and testified that Ja Mar Roofing was paid by Cedar Park through a settlement with Rio96. (Tr., 12/28/16, p. 78, l. 19–25; p. 79, l. 1–6). No written proof of this supposed settlement payment by Cedar Park to Ja Mar Roofing was provided to the Court.

124.    The real truth came out when Mr. Swearingen (of Rio96) testified that Rio96 (not Cedar Park) paid $18,000 to DL Phillips (an affiliate of Ja Mar Roofing) under a settlement between DL Phillips and Rio96 reached after Cedar Park stopped work on the Verano Project. (Tr., 12/28/16, p. 88, l. 2–9). Mr. Swearingen testified that Rio96 also paid $16,000 to Cedar Park under a settlement reached after Cedar Park ceased work on the Verano Project. (Tr., 12/28/16, p. 87, l. 16–25; p. 88, l. 1). There was no probative evidence that Cedar Park paid Ja Mar Roofing or anyone for roofing on the Verano Project under the settlements.

125.    Mr. McGrath testified these settlements occurred after Cedar Park had filed its Proof of Claim in this bankruptcy case for unpaid amounts owed by RTX. (Tr., 12/28/16, p. 50, l. 10–15). After trial, Cedar Park stipulated to the reduction of its unpaid Proof of Claim against RTX by the amount of $34,000, which consists of the $18,000 paid by Rio96 to DL Phillips (an affiliate of Ja Mar Roofing) and $16,000 paid by Rio96 to Cedar Park under the settlements. (main case no. 14-11732, dkt# 77); (Defendants' Proposed Findings, p. 4, dkt# 58).

126.    But at bottom, the evidence at trial showed that the only payments that Cedar Park actually made for roofing on the Verano Project from funds received from RTX were the amounts of $1,850 and $2,500 paid to Dan James (a principal of Ja Mar Roofing). (DX-9, p. 1). These two payments made by Cedar Park for roofing on the Verano Project total only $4,350.

127.    After weighing the evidence and the credibility of the witnesses, the Court finds that (a) RTX paid the amount of $17,204 to Cedar Park for roofing on the Verano Project under Invoice# 11668; (b) Cedar Park used only $4,350 of the $17,204 roofing funds received from RTX to actually pay for roofing on the Verano Project; and (c) Cedar Park thereby breached the agreement with RTX on the Verano Project, which caused damages to RTX in the amount of $12,854 ($17,204 paid by RTX to Cedar Park for roofing less $4,350 actually paid by Cedar Park for roofing on the Verano Project).

128.    Next, Plaintiff contends that Cedar Park also breached the agreement on the Verano Project because of Cedar Park's poor workmanship and incomplete work. (Plaintiff's Proposed Findings, pp. 12-13, 27-28, dkt# 57). Specifically, Plaintiff contends that certain air conditioning (HVAC), electrical and framing work performed by Cedar

Park and invoiced to RTX on the Verano Project was either not fully completed or completed incorrectly by Cedar Park.

129.    In an attempt to itemize and prove its damages, Plaintiff tried to rely on a Proof of Claim filed by Rio96 (the Verano Project owner) against RTX in the bankruptcy case. (Plaintiff's Proposed Findings, pp. 12–13, dkt# 57). This Proof of Claim filed by Rio96 against RTX was not admitted into evidence, but is on file with the Court. (main case no. 14-11732, claim no. 13-1). At trial, the Court took judicial notice of the filing of the Proof of Claim by Rio96. (Tr., 12/28/16, p. 94, l. 19–24).

130.    Based on Rio96's Proof of Claim, Plaintiff appears to contend that: (a) Cedar Park was paid $9,790 for HVAC work that was not delivered or completed by Cedar Park; (b) $8,000 in damages were suffered due to wrong HVAC units being installed and poor workmanship on the installation by Cedar Park; (c) $2,047 in damages were suffered based on amounts paid by Rio96 to pay HVAC suppliers and subcontractors to get mechanic's liens released; (d) $4,000 in damages were suffered for framing work that was not properly completed by Cedar Park; (e) $5,600 for electrical work was paid for but not completed by Cedar Park; (f) $6,000 in repair costs were incurred to correct electrical deficiencies caused by the poor workmanship of Cedar Park; and (g) $1,100 in repair costs to correct framing deficiencies caused by the poor workmanship by Cedar Park. These alleged damages total the amount of $36,537. (Plaintiff's Proposed Findings, pp. 12–13, dkt# 57).

131.    In defense, Cedar Park introduced photographs of the work that Cedar Park performed on the Verano Project at trial. (DX-11). The photographs were taken by Mr. McGrath about three months after Cedar Park ceased work on the Verano Project.

As a result, the photographs also show work completed by other subcontractors after Cedar Park stopped working on the Verano Project. Mr. McGrath testified in detail as to the work Cedar Park performed in each photograph and the work shown in the photographs that other subcontractors performed. (Tr., 12/29/16, p. 30, l. 3–25; p.31, l. 1–25; p. 32, l. 1–25; p. 33, l. 1–17).

132.    Plaintiff called Mr. Swearingen (a principal of Rio96, the owner of the home) to testify to support these damages allegedly caused by Cedar Park on the Verano Project. Although Mr. Swearingen was candid and intelligent, his experience and background was in computer science (not construction). More importantly, Mr. Swearingen did not know what work Cedar Park had done (or not done) on the Verano Project.

133.    Mr. Swearingen (of Rio96) admitted that he did not actually know who had done the work on the Verano Project, because Rio96 had contracted with RTX (not Cedar Park) for construction of the home. (Tr., 12/28/16, p. 99, l. 25; p.100, l. 1–2). Mr. Swearingen had never even met Mr. McGrath of Cedar Park. (Tr. 12/28/16, p. 86, l. 4–24). Mr. Swearingen testified that Rio96 had problems with incomplete framing, an incomplete HVAC unit and some slab work on the Verano Project. But, Mr. Swearingen admitted he was not competent to testify as to what work was, or was not, performed by Cedar Park or the cost to repair any faulty work by Cedar Park. (Tr., 12/28/16, p. 92, l. 25; p. 93, l. 1–25; p. 94, l. 1–2).

134.    In compiling Rio96's Proof of Claim for damages, Mr. Swearingen admitted that he had actually received the information from Plaintiff (Mr. Munoz). (Tr., 12/28/16, p. 99, l. 13–24). It was apparent to the Court that Plaintiff (Mr. Munoz)

provided the information to Mr. Swearingen so that Mr. Swearingen (on behalf of Rio96) could file a claim against RTX and try to cast blame on Cedar Park for problems with the Verano Project. At trial, it also came to light that Plaintiff (Mr. Munoz) was a partner with Mr. Swearingen in Rio96, the owner of the Verano Project. (Tr., 12/28/16, p. 91, l. 6–7).

135. Mr. Munoz (of RTX) testified that the framing was not completed on the Verano Project, and there were problems with the work that was completed. (Tr.,12/29/16, p. 68, l. 5–25; p. 69, l. 1–4). According to Mr. Munoz, electrical work was begun but never completed, and Cedar Park was paid $9,790 for HVAC materials that were never installed. (Tr., 12/28/16, p. 135, l. 18–21). After Cedar Park stopped working on the Verano Project, Mr. Munoz testified that he helped Rio96 rebid numerous items improperly completed by Cedar Park and have them redone. (Tr., 12/29/16, p. 69, l. 5–25; p.70, l. 1–24; p. 72, l. 7–21; p. 73, l. 1–25; p. 74, l. 1–6). Mr. Munoz admitted, however, that he is not a construction estimator. (Tr., 12/28/2016, p. 154, l. 6–7). Like Mr. Swearingen, Mr. Munoz admitted that he could not actually state the value of any work performed by Cedar Park on the Verano Project. (Tr., 12/28/2016, p. 153, l. 13–25; Tr., 12/29/16, p. 71, l. 3–8).

136. In contrast, Mr. McGrath (of Cedar Park) testified that the framing work on the Verano Project was completed by Cedar Park. The only framing not completed (which was not billed for by Cedar Park) was for a recessed "fur-down." (Tr., 12/29/16, p. 24, l. 14–20). Mr. McGrath credibly testified that the electrical work and HVAC work were performed on the Verano Project by Cedar Park. (Tr., 12/29/16, p. 25, l. 5–25; p. 26, l. 1–5). Much of Mr. McGrath's testimony was corroborated by the photographs

introduced into evidence that showed that the HVAC, electrical, and framing work had been completed at the Verano Project. (DX-11). In the end, even Mr. Munoz (of RTX) was forced to admit that Cedar Park "actually did pretty good work." (Tr., 12/28/16, p. 167, l. 6).

137.    No probative estimates of the cost of work that allegedly needed to be completed or redone on the Verano Project were provided to the Court. Rio96's Proof of Claim sets forth the alleged costs of the work not properly completed on the Verano Project, but the Court only took judicial notice of the filing of the Proof of Claim. Just as importantly, the Proof of Claim was filed by Rio96 against RTX, not by Rio96 against Cedar Park. There was little or no proof at trial that RTX had incurred any damages. There was no evidence that RTX had paid Rio96 for the work that Cedar Park allegedly failed to perform or performed incorrectly.

138.    After weighing the evidence, the Court finds that Plaintiff failed to prove that (a) Cedar Park did not properly complete the HVAC, electrical, and framing work on the Verano Project; and (b) RTX suffered any recoverable and quantifiable damages from Cedar Park's HVAC, electrical, and framing work on the Verano Project.

139.    Finally, Plaintiff seems to assert other affirmative damage claims against Cedar Park for breach of contract on the Verano Project—based on a charge for overhead and profit by Cedar Park to RTX of $ 28,381 and a second charge by Cedar Park to RTX for roofing of $19,824. (Plaintiff's Proposed Findings, pp. 13, 27–28, dkt# 57). However, there was insufficient evidence to prove that RTX actually paid Cedar Park for these two charges. As a result, RTX did not suffer any damages that are

affirmatively recoverable from Cedar Park for these two charges that RTX never actually paid.

140.    Instead, Cedar Park filed a Proof of Claim against RTX for the unpaid overhead and profit charge and the second roofing charge on the Verano Project. (PX-3). Plaintiff has objected to the Proof of Claim of Cedar Park (PX-3); (Complaint, dkt# 1). Therefore, the Court will address the contentions made by Plaintiff regarding these two unpaid charges on the Verano Project in the Objection to Claim section of the Court's proposed Findings of Fact and Conclusions of Law.

141.    In sum, after weighing all the evidence and considering the credibility of the witnesses, the Court finds as a factual matter that (a) Cedar Park breached its contract with RTX on the Verano Project for roofing paid for by RTX but not purchased or provided to the Verano Project by Cedar Park; (b) RTX suffered actual damages as a result of Cedar Park's breach in the amount of $12,854 for such roofing; and (c) RTX did not suffer any other actual and recoverable damages based on its breach of contract claim against Cedar Park for the Verano Project.

3.  Cedar Park Defenses

142.    Cedar Park has asserted several defenses to Plaintiff's breach of contract action.

143.    First, Cedar Park contends that Plaintiff's breach of contract action is barred due to RTX's prior material breach of the contracts with Cedar Park. The alleged prior "material breach" by RTX was the failure of RTX to pay Cedar Park on its invoices. (PTO, p. 7, dkt# 38); (Defendants' Proposed Findings, pp. 13–14, dkt# 58). In short, the Court finds that Cedar Park did not prove this defense.

144.     The evidence at trial showed that RTX consistently paid Cedar Park's invoices, up until October 2014 when Cedar Park ceased work and sent its "final invoices" with the disputed charges. Cedar Park does not contest that RTX made payments on its invoices up until October 2014. (Defendants' Proposed Findings, p. 6, dkt# 57); (PX-3).

145.     The evidence at trial also demonstrated that RTX paid Cedar Park on its invoices up until October 2014. On the Old 1431 Project, RTX paid Cedar Park's invoices on July 24, 2014, August 7, 2014, September 19, 2014, September 25, 2014, and September 30, 2014. On the Verano Project, RTX paid Cedar Park's invoices on May 17, 2014, July 8, 2014, August 1, 2014, August 2, 2014, August 12, 2014, September 8, 2014, and October 9, 2014. (PX-3, pp. 4, 10). The only amounts that RTX did not pay were the final charges made by Cedar Park that were disputed in good faith by RTX. RTX, through Mr. Munoz, promptly made repeated efforts to get information from Cedar Park about the disputed charges. (PX-21); (PX-23); (Tr., 12/28/16, p. 127, l. 22–25; p. 128, l. 1–21)

146.     By October 2014 (when RTX stopped making payments), Cedar Park had already breached the contracts with RTX on the Old 1431 Project and Verano Project. Cedar Park breached the contracts first—and prior to the non-payment by RTX of the disputed charges—in October 2014. In early August 2014, RTX paid Cedar Park $17,204 for roofing on the Verano Project, but Cedar Park did not use all of such funds to pay for roofing on the project. (¶¶ 121–127 of Findings of Fact above). In early August 2014, RTX also paid Cedar Park $12,234 for framing lumber and $2,500 for beams and trusses on the Old 1431 Project, but Cedar Park did not use such funds to

pay for those materials on the project. (¶¶ 104–105 of Findings of Fact above). In September 2014, RTX also paid Cedar Park $13,487 for door materials, $7,959 for window materials, and $1,587 for a fireplace on the Old 1431 Project; but, Cedar Park did not use such funds to pay for those materials and did not provide those materials to the project. (¶¶ 107–112 of Findings of Fact above).

147.   In sum, as a factual matter, the Court finds that there was no prior material breach of the contracts for the Old 1431 Project and the Verano Project by RTX that would bar recovery by Plaintiff on its breach of contract action against Cedar Park.

148.   Second, Cedar Park has asserted boilerplate-type defenses of "waiver, estoppel and laches" in its Proposed Findings. (Defendants' Proposed Findings, pp. 13–14, dkt# 58). As a legal matter, Cedar Park has waived theses defenses. (¶¶ 319–320 of Conclusions of Law below).

149.   Even if the Court were to consider these affirmative defenses, as a factual matter, Cedar Park did not prove any of the defenses with probative evidence that convinced the Court. These defenses appear to be centered around Cedar Park's contentions that RTX paid several invoices with single checks which Cedar Park then applied to the oldest outstanding invoice, RTX allowed Cedar Park to submit draw requests ahead of time, RTX directed Cedar Park to use funds from one line item to another, and RTX treated all the construction projects as a whole. (Defendants' Proposed Findings, pp. 5, 13–14, dkt# 58).

150.   It does appear that Cedar Park sometimes applied payments from RTX to the oldest outstanding invoices on the projects. (Tr., 12/29/16, p. 13, l. 1–25; p.14, l. 1–13) (DX-10) (check nos. 1253, 1265). But, this was Cedar Park's business practice;

there was no probative evidence that RTX actually agreed to this "oldest invoice first" practice by Cedar Park. (Tr., 12/28/16, p. 115, l. 14–25; p. 116, l. 1–9). There was also some evidence that RTX, from time to time, would allow Cedar Park to use funds from one line item on an invoice to pay for another item. (Tr., 12/28/16, p. 169, l. 19–25; p. 170, l. 1–5); (DX-15, p. 11). Mr. McGrath also generally testified that all funds received by Cedar Park from RTX went into the RTX construction projects. (Tr., 12/28/16. p. 73, l. 13–15; p. 74, l. 6–11).

151.    More importantly, however, the evidence clearly showed that Cedar Park actually received payment from RTX for framing lumber, beams, trusses, door materials, window materials, and a fireplace on the Old 1431 Project and for roofing materials on the Verano Project. (¶¶ 104–112, 120–127 of Findings of Fact above). There was no believable evidence that RTX agreed to permit Cedar Park to use such funds for materials other than framing lumber, beams, trusses, door materials, window materials, and fireplace on the Old 1431 Project and for roofing materials on the Verano Project.

152.    The evidence also clearly showed that Cedar Park did not use such funds for, did not ever pay for, and did not ever deliver the framing lumber, beams, trusses, door materials, window materials, and fireplace to the Old 1431 Project and the roofing materials to the Verano Project. (¶¶ 104–112, 120–127 of Findings of Fact above). It is these materials that Cedar Park was paid for by RTX on the Old 1431 Project and Verano Project, which are the basis for the Court's finding that Cedar Park breached its contracts with RTX. Indeed, on several occasions at trial Mr. McGrath admitted that Cedar Park had been paid for materials by RTX, but that Cedar Park did not pay

vendors, did not order the materials, and did not deliver the materials to the projects. (Tr., 12/28/16, p. 30, l. 13–24; p. 33, l. 9–23; p. 34, l. 24–25; p. 35, l. 1).

153.    Mr. McGrath's general testimony that all funds received by Cedar Park from RTX were used by Cedar Park for expenses on the RTX construction projects could not be verified and was not persuasive to the Court. Cedar Park produced only heavily redacted statements for one bank account. (Tr, 12/28/16, p. 74, l. 2–5); (PX-4). According to Mr. McGrath, the account information that was redacted did not relate to Cedar Park's financial transactions with RTX. (Tr., 12/28/16, p. 62, l. 7–20); (PX-4). But, Cedar Park had received funds from RTX within the timeframes reflected on several of the redacted bank statements. Due to the redactions, the payments from RTX to Cedar Park were not identifiable on the produced bank statements as deposited funds received from RTX. (Tr., 12/28/16, p. 63, l. 10–19). It was not possible to verify that funds received by Cedar Park from RTX were used by Cedar Park only for RTX projects due to the redactions. Indeed, Mr. McGrath even admitted that in some instances Cedar Park did not accurately report or document its construction expenses for the Old 1431 Project and the Verano Project. (Tr., 12/28/16, p. 47, l. 7–20).

154.    In sum, as a factual matter, the Court finds that Cedar Park did not prove, by credible and believable evidence, any affirmative defenses of waiver, estoppel, and laches.

4.  Summary—Breach of Contract

155.    In summary, the Court finds as a factual matter, that Cedar Park is liable to Plaintiff for breach of contract in the total amount of $50,621, consisting of $37,767 in damages caused by Cedar Park to RTX on the Old 1431 Project and $12,854 in

damages caused by Cedar Park to RTX on the Verano Project.

156. However, the amount of damages recoverable by Plaintiff against Cedar Park for breach of contract will be subject to "setoff" by the amount validly owed by RTX in the Proof of Claim filed by Cedar Park. (¶¶ 214–216 of Findings of Fact below).

**J. Proof of Claim by Cedar Park**

157. As a creditor, Cedar Park filed a sworn Proof of Claim against RTX in this bankruptcy case for unpaid charges owed by RTX on the construction projects (herein "Proof of Claim"). (PX-3); (main bankruptcy case no. 14-11732, claim no. 12-1). The total amount of the Proof of Claim, as originally filed, is $90,008. Cedar Park filed the Proof of Claim with the Court on February 24, 2015.

158. The Proof of Claim summarizes the amounts billed by Cedar Park and paid by RTX, the outstanding balance owed by RTX to Cedar Park, and the beginning and ending dates of work by Cedar Park on the construction projects, as follows:

| Property | Invoiced | Paid | Balance | Start Date | Stop Date |
|---|---|---|---|---|---|
| Zen Gardens | $255,603 | $247,318 | $ 8,285 | 03/21/14 | 10/16/14 |
| Valley View | $198,029 | $188,671 | $ 9,358 | 03/26/14 | 10/08/14 |
| Verano | $194,876 | $149,645 | $45,231 | 05/17/14 | 10/09/14 |
| Camino Del Verde | $ 20,555 | $ 15,000 | $ 5,555 | 05/21/14 | 09/11/14 |
| Angel Valley | $ 3,701 | $ 1,971 | $ 1,730 | 04/14/14 | 10/22/14 |
| Old 1431 | $139,116 | $119,267 | $19,849 | 07/24/14 | 09/30/14 |
| Total | $811,879 | $721,871 | **$90,008** | | |

(PX-3).

159. After trial was completed, Cedar Park filed a Notice of Reduction in Claim with the Court on February 15, 2017. (main case no. 14-11732, dkt# 77). Cedar Park voluntarily reduced the amount of the Proof of Claim against RTX by $12,174, which represented the amount Cedar Park incorrectly charged to RTX for cornish and frame lumber on the Old 1431 Project. Cedar Park also voluntarily reduced its Proof of Claim

by the additional amount of $34,000. The $34,000 reduction is based on payments Cedar Park and Ja Mar Roofing received from Rio96 through settlements in connection with the Verano Project. (main case no. 14-11732, dkt# 77); (Defendants' Proposed Findings, p. 4, dkt# 58).

160.    The total reduction in the Proof of Claim made by Cedar Park post-trial is the amount of $46,174 ($12,174 plus $34,000). As a result, the remaining balance on Cedar Park's Proof of Claim is the amount of $43,834 ($90,008 Proof of Claim minus $46,174 reduction).

**K.** **Objections to Proof of Claim**

161.    Plaintiff has objected to the Proof of Claim of Cedar Park on multiple grounds in this Adversary Proceeding. (Complaint, dkt# 1); (Plaintiff's Proposed Findings, pp. 13–16, dkt# 57).

162.    Basically, the Proof of Claim filed by Cedar Park sets forth the amount of *unpaid* charges on the projects that Cedar Park contends are owed by RTX. To the extent that Plaintiff's objections also sought affirmative damages against Cedar Park for charges actually paid by RTX to Cedar Park, the Court has already made its factual findings regarding the substance of the objections in the Breach of Contract section above. Plaintiff's remaining objections, which relate to unpaid charges in the Proof of Claim, are addressed by the Court below separately by construction project.

163.    Many of Plaintiff's objections to Cedar Park's Proof of Claim are based on a "laundry list" of allegedly defective, improper, or incomplete work by Cedar Park at the six construction projects, compiled by Mr. Munoz. (PX-7); (PX-8). These two exhibits (PX-7 and PX-8) were prepared by Mr. Munoz for trial and were admitted by the Court

only as demonstrative exhibits. (Tr., 12/28/16, p. 142, l. 3–23; p. 145, l. 14–25; p.146, l. 1–3).

164. Very little competent testimony from Mr. Munoz supported the "laundry list" in these demonstrative exhibits. (PX-7); (PX-8). For example, Mr. Munoz admitted that he rarely visited the project construction sites, he was not a contract estimator, he could not state the value of work that Cedar Park performed, and that his experience was only on the development and financial side of projects. (Tr., 12/28/16, p. 102, l. 12–16; p. 153, l. 13–25; p. 154, l. 6–7; p. 155, l. 3–10). For the most part, Mr. Munoz provided self-serving and conclusory testimony to support the laundry list of items. Only one homeowner (Rio96) of one project (Verano) testified at trial. As a result, the Court gives very limited weight to the testimony of Mr. Munoz regarding the "laundry list" of allegedly defective, improper, and incomplete items at the construction projects that he blamed on Cedar Park.

1. <u>Old 1431 Project</u>

165. In its Proof of Claim, Cedar Park claims that $19,849 is owed by RTX to Cedar Park for construction work on the Old 1431 Project. (PX-3).

166. Specifically, Plaintiff objected to a cornish and frame lumber charge of $12,174 by Cedar Park to RTX on the Old 1431 Project. (PX-3, Invoice# 11682). This $12,174 charge was not paid by RTX. Post-trial, Cedar Park stipulated to a voluntary reduction in its Proof of Claim by the amount of this $12,174 charge for cornish and frame lumber. (main case no. 14-11732, dkt# 77); (Defendants' Proposed Findings, p. 4, dkt# 58); (¶ 159 of Findings of Fact above). So, this particular objection by Plaintiff to the cornish and frame lumber charge of $12,174 on the Old 1431 Project by Cedar

Park has become moot because of Cedar Park's voluntary reduction of its Proof of Claim for this unpaid charge.

2. <u>Verano Project</u>

167. In its Proof of Claim, Cedar Park claims that $45,231 is owed by RTX to Cedar Park for construction work on the Verano Project. (PX-3).

168. Specifically, Plaintiff objected to a $19,824 second charge for roofing by Cedar Park to RTX on the Verano Project. (PX-3, Invoice# 11687). The evidence did not establish that this $19,824 charge was actually paid by RTX. Post-trial, Cedar Park stipulated to a voluntary reduction in its Proof of Claim based on settlements between Cedar Park, Rio96, and Ja Mar Roofing related to roofing on the Verano Project. (main case no. 14-11732, dkt# 77); (Defendants' Proposed Findings, p. 4, dkt# 58) (¶ 159 of Findings of Fact above). So, this particular objection by Plaintiff to the second roofing charge of $19,824 by Cedar Park has become moot because of Cedar Park's voluntary reduction of its Proof of Claim.

169. Plaintiff also objected to the "overhead and profit" charge of $28,381 by Cedar Park to RTX on the Verano Project. Invoice# 11687 issued by Cedar Park to RTX contains a line item of $28,381 for contractor overhead and profit. (PX-3, Invoice# 11687). RTX did not pay Cedar Park this $28,381 charge, and Cedar Park included this unpaid charge in its Proof of Claim. (PX-3). Plaintiff contends that RTX never agreed to pay Cedar Park an overhead and profit charge on the Verano Project.

170. Mr. McGrath (of Cedar Park) testified that RTX agreed to pay Cedar Park a 10% fee for overhead and profit on the Verano Project. This 10% fee was less than Cedar Park's standard fee of 30% to 40% according to Mr. McGrath. (Tr., 12/28/16, p.

71, l. 22–25; p. 72, l. 1–11). Mr. McGrath testified that he individually worked on behalf of Cedar Park for RTX on the Verano Project, but he did not bill his time. Therefore, according to Mr. McGrath, the parties agreed that Cedar Park would be compensated for his time through the 10% overhead and profit charge. (Tr., 12/28/16, p. 76, l. 22–25; p. 77, l. 1–3).

171.    Mr. McGrath's testimony is supported in some respects by Cedar Park's invoices and summaries on the Verano Project. These documents do not reflect any itemized charges for time spent by Mr. McGrath on the Verano Project. (PX-3); (DX-9). It seems doubtful to the Court that Cedar Park would have agreed to not be compensated at all for Mr. McGrath's services on the Verano Project. Mr. McGrath and Cedar Park clearly provided substantial construction work for RTX on the Verano Project. Mr. McGrath testified in detail about his work on this project. Specifically, Mr. McGrath testified that he had oversight for the underground plumbing rough, handling the slab, the framing, the roof, the stucco, the door and window installation, the HVAC rough (ducts and boxes for the air conditioning), the electrical, painting, rock mockup, and the fireplace installation. (Tr., 12/29/16, p. 9, l. 1–22).

172.    On the other hand, Mr. Munoz (of RTX) insisted that there was not an agreement with Cedar Park for RTX to pay a 10% overhead and profit charge on the Verano Project. (Tr., 12/28/16, p. 112, l. 14–25; p. 113, l. 1–4; p. 137, l. 15–25; p. 138, l. 1–3.). Mr. Munoz testified that on the Verano Project, Cedar Park was acting only as a subcontractor and paid only for line items that Cedar Park completed. (Tr., 12/28/16, p. 112, l. 11–20). This testimony was undercut by Mr. Munoz's later testimony that Cedar Park was acting as a subcontractor on all of the construction projects. (Tr. 12/28/16, p.

167, l. 20–24). And, the evidence showed that RTX paid an overhead and profit charge to Cedar Park on many other construction projects where Cedar Park was acting as a subcontractor.

173.   According to Mr. Munoz, the Verano Project was different from the other projects because it was a custom "spec" home built for Rio96. In Mr. Munoz's view, Cedar Park was not required to deal directly with a homeowner that was going to live in the home at the Verano Project, unlike the other projects. (Tr., 12/29/16, p. 61, l. 22–25; p. 62, l. 1–25).

174.   Given the conflicting testimony on the Verano Project, the Court will examine whether an overhead and profit charge was paid by RTX to Cedar Park on the other construction projects. RTX agreed to pay and did pay Cedar Park a 10% overhead and profit charge on the Old 1431 Project, Zen Gardens Project, and Valley View Project. (Tr., 12/28/2014, p. 112, l. 21–24; p. 155, l. 25; p.156, l. 1–8). Cedar Park's invoices submitted on the Old 1431 Project, the Zen Gardens Project, and the Valley View Project all reflect Cedar Park invoiced RTX for overhead and profit at 10% and RTX paid such 10% charge. (PX-3, Invoice# 11672, Invoice# 11686 and Invoice# 11679). A small overhead and profit charge was also paid by RTX to Cedar Park on the Angel Valley Project. (PX-3, Invoice# 11655).

175.   The Camino Del Verde Project was the only project where no overhead and profit charge was invoiced or paid by RTX to Cedar Park. (PX-3). The Camino Del Verde Project was small in comparison to most of the other construction projects undertaken by Cedar Park. On the Camino Del Verde Project, Cedar Park invoiced RTX a total of $20,555. (PX-3). The Camino Del Verde Project was a situation where Cedar

Park just took over and finished the little remaining construction Terry Ford Custom Homes had been unable to complete.

176.    In contrast, the construction services provided by Cedar Park on most of the projects that had a 10% overhead and profit charge were much more substantial projects. On the Old 1431 Project, Cedar Park invoiced RTX for over $139,000; on the Zen Gardens Project, Cedar Park invoiced RTX over $255,000; and on the Valley View Project, Cedar Park invoiced RTX for over $198,000. (PX-3). RTX had no complaint about the 10% overhead and profit charge on these three large projects.

177.    The Verano Project was also a large project that Cedar Park worked on for about five months and invoiced RTX over $194,000 for construction services. The Verano Project was much more like the other three large projects where a 10% fee was charged and paid by RTX (the Old 1431, Zen Gardens, and Valley View Projects). The Verano Project had little similarity to the small Camino Del Verde project where the 10% fee was not charged. Given Mr. McGrath's significant experience in the construction industry and the substantial oversight and construction duties of Cedar Park on the Verano Project, it is apparent to the Court that Cedar Park would not have undertaken the Verano Project unless there was an agreement for an overhead and profit charge to be paid by RTX to Cedar Park.

178.    After weighing and considering all the evidence, the Court finds that RTX agreed to pay Cedar Park a 10% overhead and profit charge on the Verano Project.

179.    A dispute also exists regarding the correct dollar amount of the 10% overhead and profit charge on the Verano Project. Cedar Park contends that the correct amount of the overhead and profit charge is $28,381, as set forth in its Proof of Claim.

(PX-3, Invoice# 11687). Yet, Cedar Park only invoiced RTX a total of $194,876 on the Verano Project (which includes the $28,381 overhead and profit charge). At trial, Mr. McGrath tried to justify the dollar amount of the $28,381 charge based on other invoices paid directly by RTX to subcontractors on the Verano Project. (Tr. 12/28/16, p. 56, l. 7–17). Mr. McGrath's testimony in this regard was not persuasive, as no real support for the amount of these other payments by RTX to subcontractors was provided to the Court.

180.    Therefore, the Court will calculate the correct dollar amount of the 10% overhead and profit charge owed by RTX to Cedar Park for the Verano Project. The Court's calculation is based on the amounts properly invoiced by Cedar Park to RTX on the Verano Project as shown at trial.

181.    To start, Cedar Park invoiced RTX a total of $194,876 on the Verano Project. (PX-3). This $194,876 invoice total included the $28,381 overhead and profit charge, so this overhead and profit charge must be removed for the purpose of calculation. This results in $166,495 of invoiced expenses ($194,876 minus $28,381). The Court has previously determined that Cedar Park did not properly invoice RTX for $12,854 in roofing charges on the Verano Project. (¶ 127 of Findings of Fact above). So, this results in $153,641 of invoiced expenses ($166,495 minus $12,854). Finally, post-trial, Cedar Park voluntarily reduced its Proof of Claim by $34,000 on the Verano Project. (main case no. 14-11732, dkt# 77); (Defendants' Proposed Findings, p. 4, dkt# 58). So, this results in $119,641 of properly invoiced expenses by Cedar Park on the Verano Project ($153,641 minus $34,000).

182.   In sum, the Court finds that the amount of properly invoiced expenses by Cedar Park to RTX on the Verano Project is $119,641, for the purpose of calculating the 10% overhead and profit charge. This yields an overhead and profit charge owed to Cedar Park by RTX of $11,964 ($119,641 times 10%). Cedar Park claimed an overhead and profit charge of $28,381 on the Verano Project in its Proof of Claim. Therefore, the Court finds that the Proof of Claim must be reduced and disallowed in the amount of $16,417 ($28,381 claimed minus $11,964 allowed).

183.   The Court finds that all other objections made by Plaintiff (if any) to the Proof of Claim filed by Cedar Park based on the Verano Project lack any probative factual merit.

3.   Camino Del Verde Project

184.   In its Proof of Claim, Cedar Park claims $5,555 is owed by RTX for construction work on the Camino Del Verde Project. (PX-3). Specifically, Cedar Park claims $570 is owed by RTX on Invoice# 11693. (PX-3). Also, Cedar Park claims $4,985 is owed by RTX on Invoice# 11692. (PX-3). These two invoices together total $5,555.

185.   Plaintiff has objected to Cedar Park's Proof of Claim based on the Camino Del Verde Project. Plaintiff does not dispute Cedar Park's Invoice# 11693 for $570. Plaintiff's objection is to Invoice# 11692 for $4,985, which is dated May 30, 2014. According to Mr. Munoz (of RTX), this Invoice# 11692 was not received by RTX until October 2014 even though the materials were provided in May 2014 (several months before). (Tr., 12/28/16, p. 126, l. 18–25; p. 127, l. 1–7; Tr., 12/29/16, p. 63, l. 19–22).

186.    Mr. Munoz asserts that this Invoice# 11692 did not contain any detail as to what was done for the $4,985 charge, and that when he asked Mr. McGrath (of Cedar Park) for an explanation, Mr. McGrath indicated he would have to get back to Mr. Munoz. (Tr.. 12/28/16, p. 126, l. 18–25; p. 127, l. 1–9; p. 143, l. 4–10); (PX-7). According to Mr. Munoz, Mr. McGrath never provided an explanation. (Tr., 12/28/16, p. 126, l. 18–25; p. 127, l. 1–9; p. 143, l. 4–10); (PX-7). Email correspondence between the parties supports this testimony. (DX-19); (PX-21). Mr. McGrath explained that RTX filed suit against Cedar Park and Mr. McGrath soon after this correspondence, so he did not get a chance to provide the requested information to Mr. Munoz on Invoice# 11692. (Tr., 12/29/16, p. 57, l. 3–16).

187.    At trial, Mr. McGrath (of Cedar Park) testified that Invoice# 11692 was a summary that sets forth a charge of $4,985 for a specialty item. (Tr., 12/29/16, p. 54, l. 20–25; p. 55, l. 1; Tr., 12/29/16, p. 57, l. 3–6). Invoice# 11692 codes the $4,985 charge as an "Item 22 specialty" and the quantity ordered as "1." (PX-3). However, the description of this specialty item on Invoice# 11692 merely indicates "Account Balance." The invoice, on its face, does not contain a specific description of the specialty item.

188.    Mr. McGrath testified that the work done on the Camino Del Verde Project included finishing issues, which included stucco, rock work, and a fire pit. (Tr., 12/29/16, p. 8, l. 8–10). Mr. McGrath credibly explained that the $4,985 charge on Invoice# 11692 was for a fire pit that was actually installed in the home by Cedar Park. (Tr., 12/29/16, p. 16, l. 10–23). Mr. McGrath testified that fire pits are not materials often ordered in the normal course of business. (Tr., 12/29/16, p. 57, l. 7–14). Since there was not a particular code in Cedar Park's invoicing system specifically for fire pits, Mr. McGrath

testified that the specialty item code was used on the invoice. (Tr., 12/29/16, p. 57, l. 7–14).

189.   Mr. Munoz testified that he had never heard that the $4,985 charge was for a fire pit. (Tr., 12/29/2016, p. 63, l. 14–19). Mr. Munoz, however, did not dispute that the $4,985 was for a fire pit, and Mr. Munoz did not dispute that Cedar Park had installed a fire pit at the Camino Del Verde Project. Nor did Mr. Munoz suggest that RTX had already paid Cedar Park for the fire pit.

190.   After weighing the evidence, the Court finds that the $4,985 specialty item on Invoice# 11692 was for a fire pit that Cedar Park provided to the Camino Del Verde Project. The Court further finds that RTX has not paid Cedar Park for the fire pit. As a result, the Court finds that the objection made by Plaintiff to Cedar Park's Proof of Claim based on the Camino Del Verde Project should be denied.

4. Valley View Project

191.   In its Proof of Claim, Cedar Park claims $9,357 is owed by RTX to Cedar Park for construction work on the Valley View Project. (PX-3). Specifically, Cedar Park claims a balance of $6,677 is owed by RTX on Invoice# 11679. (PX-3). Cedar Park also claims a balance of $2,680 is owed by RTX on Invoice# 11685. (PX-3). These two invoices together total $9,357.

192.   Plaintiff does not dispute that payment is still owed by RTX to Cedar Park for the items listed on Invoice# 11679 and Invoice# 11685. Instead, Plaintiff has objected to two items on a different invoice for the Valley View Project (Invoice# 11670 dated July 8, 2014). This Invoice# 11670 was already paid by RTX to Cedar Park on August 27, 2014. (PX-3). Specifically, Plaintiff objects to item no. 23 for $5,000 in

flooring materials and item no. 12 for $3,514 in doors and trim on Cedar Park's Invoice# 11670. (PX-3).

193. The basic gist of Plaintiff's objection is that Cedar Park did not obtain change orders for these items on the Valley View Project and change orders were required. At trial, Mr. Munoz (of RTX) testified that Cedar Park did not submit a change order for the $5,000 flooring overage. (Tr., 12/28/16, p. 143, l. 20–24); (PX-7). Mr. Munoz also testified that the $3,514 for doors and trim was incorrectly charged to RTX's account at BMC Lumber and that BMC Lumber was never paid by Cedar Park. (Tr., 12/28/16, p. 143, l. 11–19); (PX-7).

194. Mr. McGrath (of Cedar Park) explained that flooring for the Valley View Project was grossly underbid by RTX and its predecessor Terry Ford Custom Homes. According to Mr. McGrath, the Valley View Project was about a 3500 square foot home with only a $5,000 flooring allowance. (Tr., 12/29/16, p. 16, l. 25; p. 17, l. 1–16). The same problem existed with the doors and trim, in that the allowances bid were much less than what they would actually cost. (Tr., 12/29/16, p. 16, l. 25; p. 17, l. 1–16). Even Mr. Munoz (of RTX) confirmed that some of the projects were underbid. (Tr., 12/28/16, p. 111, l. 5–8).

195. There was no change order procedure in place with RTX, according to Mr. McGrath. (Tr., 12/29/16, p. 18, l. 1–5). Mr. Munoz (of RTX) testified that there were not many items requiring change orders, but suggested that change orders were a "standard" process. (Tr., 12/29/16, p. 64, l. 20–24). Yet, Mr. Munoz did not explain what that "standard" process would entail.

196.    There was no written agreement between RTX and Cedar Park on the Valley View Project. There was no written or verbal agreement that addressed change orders or change order procedure on the Valley View Project. There was no evidence as to how change orders were to even be submitted by Cedar Park to RTX on the Valley View Project, even if change orders were somehow required. Indeed, there was no real proof that a change order was ever submitted by Cedar Park to RTX on any of the construction projects. Under these circumstances, it is not possible for the Court to believe that a "standard" process was in place between Cedar Park and RTX requiring change orders on the Valley View Project, as suggested by Mr. Munoz of RTX.

197.    There was no probative evidence (by testimony, documents or otherwise) that a change order was actually required by Cedar Park on the Valley View Project. Likewise, there was no probative evidence (by testimony, documents or otherwise) that Cedar Park charged the doors and trim to BMC Lumber and never provided RTX with credit. The only evidence was Mr. Munoz's self-serving and conclusory testimony based on a demonstrative exhibit that change orders were required and charges were made. (Tr., 12/28/16, p. 143, l. 13–19); (PX-7). Just as importantly, no credible explanation was provided to the Court as to why RTX had actually paid Cedar Park's invoices for the flooring, doors, and trim on the Valley View Project if RTX really did not think it owed Cedar Park the money.

198.    In sum, the Court finds that the only facts established at trial with respect to the Valley View Project are as follows. Cedar Park submitted Invoice# 11670 for flooring, doors and trim on the Valley View Project to RTX for payment. RTX then paid Cedar Park the amount of Invoice# 11670 without complaint. There was no written

agreement between RTX and Cedar Park regarding the Valley View Project. There was no agreement between RTX and Cedar Park setting forth whether change orders were required on the Valley View Project or how change orders would be processed. Simply put, these facts are not sufficient to show that Cedar Park was improperly paid by RTX for the flooring, doors and trim on the Valley View Project. Finally, Cedar Park's Proof of Claim is based on different unpaid invoices for the Valley View Project (Invoice# 11679 and Invoice# 11685).

199.    As a result, as a factual matter, the Court finds that Plaintiff's objection to the Proof of Claim of Cedar Park for $9,357 on the Valley View Project should be denied.

5. <u>Zen Gardens Project</u>

200.    In its Proof of Claim, Cedar Park claims $8,285 is owed to Cedar Park by RTX for construction work on the Zen Gardens Project. (PX-3). Specifically, Cedar Park claims a balance of $6,125 is owed by RTX on Invoice# 11686. (PX-3). Cedar Park also claims a balance of $2,160 is owed by RTX on Invoice# 11691. These two invoices together total $8,285.

201.    Plaintiff has objected to Cedar Park's Proof of Claim based on the Zen Gardens Project. Once again, a primary gist of Plaintiff's objection is that Cedar Park was required to submit change orders for these charges, but Cedar Park did not.

202.    According to Mr. Munoz (of RTX), most of the charge of $6,125 on Invoice# 11686 was for items that should have been handled through change orders by Cedar Park. (Tr., 12/28/2016, p. 144, l. 8-15); (PX-7). Mr. Munoz identified $4,420 on Invoice# 11686 that he believed were construction changes requested by the

homeowners on the Zen Gardens Project on the following nine items: cabinet lighting, color changes, crown molding changes, extension of garage door wires, dishwasher trim, master bath plumbing, waterfall/fountain power, fan rods, and patio fireplace mantel. (PX-7). According to Mr. Munoz, change orders should have been obtained for these items by Cedar Park, and so RTX was unable to collect the amounts from the homeowner.

203. To try to support Mr. Munoz's testimony, Plaintiff introduced several emails in an effort to show that Cedar Park was going to either issue change orders or work out the charges for the specific items directly with the homeowners on the Zen Gardens Project. Although some of these emails may suggest that change orders were anticipated with respect to two items (cabinet lighting and crown molding), the emails do not show that Cedar Park would definitively be required to submit change orders for those two items. (PX-13); (PX-22). And, other than the cabinet lighting and crown molding, there was no reference in the emails to the other seven items challenged by Mr. Munoz for lack of change orders. (PX-13); (PX-22). There was also insufficient probative evidence that Mr. McGrath (of Cedar Park) was required to work out payment from the homeowners in connection with these specific items. (PX-22).

204. There was no change order procedure in place with RTX, according to Mr. McGrath (of Cedar Park). (Tr., 12/29/16, p. 18, l. 1–5). According to Mr. Munoz (of RTX), there were not many items requiring change orders, but he suggested that change orders were a "standard" process. (Tr., 12/29/16, p. 64, l. 23–24). Yet, Mr. Munoz did not explain what that "standard" process would entail. In an email dated October 17, 2017, from Mr. Munoz to Mr. McGrath, Mr. Munoz addressed these

invoices submitted by Cedar Park with respect to the Zen Gardens Project. (PX-22); (DX-19). Yet, there is no reference by Mr. Munoz in such email that RTX required change orders for these items totaling $4,420. (PX-22); (DX-19).

205.    There was no written agreement between RTX and Cedar Park on the Zen Gardens Project. There was no written or verbal agreement that addressed change orders or change order procedure on the Zen Gardens Project. There was no agreement as to how change orders were to even be submitted on the Zen Gardens Project, even if change orders were somehow required. There is no proof that a change order was ever submitted by Cedar Park to RTX on any of the construction projects. Under these circumstances, it is not possible for the Court to believe that a "standard" process was in place between Cedar Park and RTX requiring change orders on the Zen Gardens Project, as suggested by Mr. Munoz.

206.    There was no probative evidence that change orders were actually required on the $4,420 worth of items challenged by Plaintiff. Most of the exhibits, when read separately (or even when read together) do not establish that these items required change orders from Cedar Park. (PX-13); (PX-22). The Court was left with Mr. Munoz's self-serving and conclusory testimony, based primarily on a demonstrative exhibit, that change orders were required. (Tr., 12/28/16, p. 144, l. 8–13); (PX-7). As a result, after considering all of the evidence, the Court finds that there was no probative evidence that change orders were required from Cedar Park for Invoice# 11686 on the Zen Gardens Project.

207.    Plaintiff also disputes that Cedar Park is entitled to its full charge for overhead and profit on the Zen Gardens Project. (Plaintiff's Proposed Findings, p. 14,

dkt# 57); (Tr., 12/29/16, p. 52, l. 18–25; p. 53, l. 1); (PX-7). A portion of the $6,125 balance owed by RTX on Invoice# 11686 appears attributable to Cedar Park's overhead and profit. Mr. Munoz disputes that Cedar Park was entitled to its full overhead and profit on the Zen Gardens Project because of Cedar Park's poor workmanship on this project. (Plaintiff's Proposed Findings, p. 14, dkt# 57); (PX-7). The Court finds that there was no probative evidence that Cedar Park's workmanship on the Zen Gardens Project was poor. Mr. Munoz's conclusory testimony, loosely based on a demonstrative exhibit, is not sufficient evidence that Cedar Park's workmanship was substandard on this project. (PX-7).

208.   On Invoice# 11691, Plaintiff disputes the $2,160 charge by Cedar Park. (Tr. 12/29/16, p. 53, l. 2–10). Mr. Munoz (of RTX) asserts that all of the items billed on this Invoice# 11691 were charges for work by Cedar Park that had to be redone or needed to be completed because they were missed by Cedar Park. (PX-7). Again, the Court finds that there was no probative evidence that Cedar Park failed to complete work or improperly completed work on the Zen Gardens Project. The Court really only had Mr. Munoz's conclusory, self-serving testimony and a demonstrative "laundry list" exhibit. (PX-7).

209.   The items on Invoice# 11691 for the Zen Gardens Project are for certain electrical outlet installations, relocation of lighting fixtures, certain master bath installations, and other miscellaneous construction services. (PX-3). The amounts on this Invoice# 11691 for each item in question are minimal, each itemized amount being less than $350. (PX-3). Other invoices submitted by Cedar Park on other construction projects denote similar services provided by Cedar Park, for which RTX paid Cedar

Park. (PX-3); (Invoice# 11694 on the Angel Valley Project; and Invoice# 11693 on the Camino Del Verde Project).

210. In sum, after weighing all the evidence, the Court finds that Plaintiff's objection to the Proof of Claim of Cedar Park for $8,285 on the Zen Gardens Project should be denied.

### 6. Angel Valley Project

211. Cedar Park claims the amount of $1,730 remains unpaid by RTX for construction services on the Angel Valley Project. (PX-3). Mercifully, Plaintiff did not dispute these charges. (Plaintiff's Proposed Findings, p. 15, dkt# 57). As a result, the Court finds that any objection to the $1,730 claim by Cedar Park on the Angel Valley Project should be denied.

### 7. Summary—Objections to Proof of Claim

212. Cedar Park filed a Proof of Claim in the amount of $90,008 for unpaid charges owed by RTX on the construction projects. Post-trial, Cedar Park voluntarily reduced its Proof of Claim to the amount of $43,834 ($90,008 Proof of Claim minus $46,174 voluntary reduction).

213. In summary, the Court finds that the Proof of Claim by Cedar Park against RTX should be further reduced and disallowed in the amount of $16,417 for overhead and profit charges on the Verano Project. All other objections to the Proof of Claim by Plaintiff lack factual merit and should be denied. As a result, Cedar Park has an allowed and valid Proof of Claim against RTX in the amount of $27,417 ($43,834 minus $16,417).

**L.** **Setoff**

214.  The Court has previously found that Cedar Park is liable to Plaintiff (as owner of the claims of RTX) for $50,621 in damages for breach of contract. The Court also finds that the breach by Cedar Park occurred and the damages were caused to RTX prior to RTX's bankruptcy filing on November 24, 2014. (¶¶ 101–155 of Findings of Fact above).

215.  The Court has previously found that the valid amount of the Proof of Claim filed by Cedar Park against RTX is $27,417. The Court also finds that the Proof of Claim is for debt owed by RTX to Cedar Park prior to RTX's bankruptcy filing on November 24, 2014. (¶¶ 157–213 of Findings of Fact above).

216.  The Court finds, as a factual matter, that the amount owed by Cedar Park to RTX for breach of contract ($50,621) may be setoff and reduced by the amount validly owed by RTX to Cedar Park on its allowed Proof of Claim ($27,417). As a result, the Court finds that the amount of recoverable damages by Plaintiff against Cedar Park is $23,204 ($50,621 owed by Cedar Park minus $27,417 owed by RTX).

### III.
### PROPOSED CONCLUSIONS OF LAW

217.  Following are the Court's proposed Conclusions of Law, organized by the causes of action asserted by Plaintiff and related defenses asserted by Defendants.

218.  The Complaint filed by Plaintiff sets forth six causes of action, summarized as follows. (dkt# 1). First, Plaintiff seeks to recover certain payments made by RTX to Cedar Park on the Old 1431 Project and the Verano Project as "constructive fraudulent transfers" under the Bankruptcy Code. Second, Plaintiff seeks to recover certain

payments made by RTX to Cedar Park on various projects as "preferences" under the Bankruptcy Code. Third, Plaintiff seeks recovery from Cedar Park and Mr. McGrath under the Texas Construction Trust Fund Act (Texas Property Code, Chapter 162) for misapplication of construction trust funds on the Old 1431 Project and the Verano Project. Fourth, Plaintiff seeks recovery for breach of contract between RTX and Cedar Park on the Old 1431 Project and the Verano Project. Fifth, Plaintiff objects to the Proof of Claim filed by Cedar Park in this bankruptcy case based on the construction projects. Finally, Plaintiff sought recovery from Cedar Park and Mr. McGrath under the Texas Theft Liability Act for unlawful appropriation of RTX property, but Plaintiff did not pursue this claim at trial.

219. Plaintiff also seeks recovery of attorneys' fees in his Complaint. Post-trial, Plaintiff filed a Fee Motion. (dkt# 62).

220. Defendants asserted various defenses in their Answer, including setoff. (dkt# 5). Post-trial, Defendants filed a Fee Motion. (dkt# 63).

## A. **Constructive Fraudulent Transfer Cause of Action**

221. First, Plaintiff (as assignee of the Trustee) seeks to avoid and recover certain payments made by RTX to Cedar Park as "constructive fraudulent transfers" under § 548(a)(1)(B) of the Bankruptcy Code. The thrust of Plaintiff's claim is that RTX paid Cedar Park more than the value actually provided by Cedar Park on two construction projects, and payments made by RTX to Cedar Park are therefore recoverable as constructively fraudulent.

222. Specifically, Plaintiff seeks to recover certain payments made by RTX to Cedar Park with respect to the Old 1431 Project and Verano Project during the period of

July 2014 through September 2014, which total $70,447 (herein "<u>Fraudulent Transfer Payments</u>"). The Fraudulent Transfer Payments are detailed in ¶ 78 of the Court's Finding of Fact above.

223.   Plaintiff asserts that RTX received less than reasonably equivalent value for these payments to Cedar Park. Plaintiff also contends that these payments were made to Cedar Park while RTX was insolvent or that RTX became insolvent due to the payments. (Complaint, ¶ 17, dkt# 1).

224.   Section 548(a)(1)(B) of the Bankruptcy Code provides for the avoidance of a transfer of property by a debtor if two requirements are satisfied, and is often called a "constructive fraudulent transfer." In pertinent part, § 548(a)(1)(B) of the Bankruptcy Code provides:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, *if the debtor* voluntarily or involuntarily—
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . . ; and
> >
> > (ii)(I) *was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer* . . . .

11 U.S.C. § 548(a)(1)(B) (emphasis added).

225.   To recover a constructive fraudulent transfer, the Bankruptcy Code requires that the debtor be "insolvent" on the date of the transfers or be made "insolvent" by the transfers. 11 U.S.C. § 548(a)(1)(B)(ii)(I). The trustee has the burden to prove insolvency by a preponderance of the evidence. *See, e.g.*, *Harvey v. Orix Credit All., Inc. (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994);

*Osherow v. Nelson Hensley & Consol. Fund Mgmt., LLC (In re Pace)*, 456 B.R. 253, 273 (Bankr. W.D. Tex. 2011) (supporting citations omitted).

226.    Here, Plaintiff (as assignee of the Trustee) has the burden to prove that RTX was "insolvent" on the date the Fraudulent Transfer Payments were made to Cedar Park or that RTX was made "insolvent" by such payments. In short, the Court concludes that Plaintiff did not meet its burden of proof of RTX's insolvency during the required time period.[9] (¶¶ 80–86 of Finding of Fact above). As a result, Plaintiff's constructive fraudulent transfer claims against Cedar Park must fail.

227.    "Insolvent" is a defined term in the Bankruptcy Code. A corporate debtor is insolvent when the "sum of its debts is greater than all of its property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). Traditionally, courts refer to this as the "balance sheet test" of insolvency. *Lamar Haddox*, 40 F.3d at 121; *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 891 (Bankr. W.D. Tex. 1992).

228.    Whether a debtor is insolvent often requires a fact-intensive determination based on review of the debtor's financial records and status at the time of transfers. *See Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC)*, 499 B.R. 542, 551 (Bankr. S.D. Tex. 2013). A bankruptcy court has broad discretion when considering evidence to support a finding of insolvency. *Lawson v. Ford Motor Co. (In re Roblin Indus. Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996) (supporting citations omitted).

---

[9] There is no statutory presumption of a debtor's insolvency in a suit to recover a "fraudulent transfer." In contrast, in a suit to recover a "preference," there is a statutory presumption that a debtor was insolvent within the 90 days prior to the bankruptcy filing. *Cf.* 11 U.S.C. § 547(f) (preference); 11 U.S.C. § 548(a) (fraudulent transfer). As a result, recovery of a fraudulent transfer can often be more difficult and expensive for a trustee to successfully prove than recovery of a preference.

229. The relevant time period to examine whether a debtor is insolvent are the dates that the transfers were made. 11 U.S.C. § 548(a)(1)(B)(ii)(I). So, Plaintiff must establish that RTX was insolvent during the time period of July 2014 through September 2014 when the Fraudulent Transfer Payments were made to Cedar Park, or that RTX became insolvent as a result of the transfers.[10]

230. Here, the primary document provided by Plaintiff at trial to prove insolvency of RTX was the 2013 Balance Sheet attached to RTX's 2013 Tax Return. (PX-24). For a host of reasons, this 2013 year-end Balance Sheet of RTX is not probative evidence that RTX was insolvent on the dates of the payments to Cedar Park in 2014.

231. The figures contained on a debtor's financial balance sheet may not be the fair valuation of a debtor's property. Section 101(32) of the Bankruptcy Code requires a "fair valuation" of the assets and debts shown on a balance sheet to prove insolvency. *See Lamar Haddox*, 40 F.3d at 121. The fair value of assets is determined by estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions. In contrast, corporate financial statements usually reflect the "book value" of assets—the cost of the property minus accumulated tax depreciation. *See Lamar Haddox*, 40 F.3d at 121.

232. In *Lamar Haddox*, the Fifth Circuit reversed a finding of a debtor's insolvency when the determination was based on the "book value" of the debtor's assets set forth on corporate financial statements. *Lamar Haddox*, 40 F.3d at 121. For similar reasons, the bankruptcy court in *In re Titanis* determined that the debtor's

---

[10] Whether or not RTX was insolvent at the time of the transfers to Cedar Park or was made insolvent by the transfers was a disputed issue at trial. (PTO, p. 5, dkt# 38).

balance sheet attached to its federal income tax return was not evidence of the fair value of the assets of the debtor and was insufficient to prove insolvency. *Floyd v. Price (In re Titanis)*, No. 06-03674, 2008 WL 1924282, at *2 (Bankr. S.D. Tex. May 1, 2008).

233. Here, the 2013 Balance Sheet of RTX sets forth the "book value" of RTX's assets and liabilities, as is typical for a balance sheet attached to a federal tax return. The Court was provided with no probative evidence of the "fair value" of the assets of RTX on the balance sheet. Mr. Munoz (of RTX) did not testify regarding the fair value of RTX's assets. Indeed, Mr. Munoz admitted that he did not know the definition of fair market value and had no business valuation or appraisal expertise. Mr. Munoz also acknowledged that he did not prepare RTX's 2013 Tax Return or 2013 Balance Sheet.

234. Finally, the year end 2013 Balance Sheet of RTX does not reflect the assets and liabilities of RTX in July 2014 through September 2014, the critical time period when the Fraudulent Transfer Payments were made to Cedar Park. The Court was provided with no probative evidence of the "fair value" of RTX's assets during the July 2014 through September 2014 time period, or for that matter, during any period of time. Mr. Munoz's conclusory and general testimony that RTX's financial condition worsened in the year 2014 does not establish that RTX was insolvent. *See, e.g.*, *Lamar Haddox*, 40 F.3d at 122 (stating that conclusory testimony as to insolvency does not meet the burden to prove insolvency); *Titanis*, 2008 WL 1924282, at *2 (tax returns and bankruptcy schedules, when unaccompanied by competent valuation testimony, did not prove insolvency).

235. Plaintiff also contends that RTX's bankruptcy schedules reflecting assets of $78,466 and liabilities of $614,802 proves that RTX was insolvent. (PX-25). At trial,

the Court was requested to take judicial notice of RTX's bankruptcy schedules. Judicial notice was taken by the Court to establish the fact that the RTX bankruptcy schedules were filed, not for the truth of the facts set forth in the bankruptcy schedules. A judicially noticed fact must be one that is not subject to reasonable dispute because it is either (1) generally known within the territorial jurisdiction of the court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

236.    A court can take judicial notice that a debtor has filed and the debtor has made statements in its bankruptcy schedules. A court, however, should not take judicial notice of the truth of the facts set forth in the bankruptcy schedules. *See, e.g.*, *Burdick v. Lee*, 256 B.R. 837, 840 (Bankr. D. Mass. 2001) (bankruptcy schedules showing liabilities in excess of assets do not constitute *prima facie* evidence of insolvency as of the date of an alleged fraudulent transfer); *Annis v. First State Bank of Joplin (In re Annis)*, 78 B.R. 962, 967 (Bankr. W.D. Mo. 1987).

237.    There was no other evidence regarding the possible value of RTX's assets and liabilities as of the date of its bankruptcy filing, other than the Court taking judicial notice of the filing of RTX's bankruptcy schedules. Further, the RTX bankruptcy schedules reflect RTX's assets and liabilities on November 24, 2014, well after the dates of the Fraudulent Transfer Payments to Cedar Park. In short, RTX's bankruptcy schedules do not establish that RTX was insolvent on the relevant dates of the payments to Cedar Park.

238.    Simply put, one tax return of a debtor (RTX) and the bankruptcy schedules filed by a debtor (RTX) are not sufficient to prove insolvency in this case. This is

particularly true when there is no testimony of the fair value of the debtor's assets and no competent testimony supports the assets and liabilities shown on the tax return and bankruptcy schedules.

239.   In conclusion, the Court determines that Plaintiff failed to prove that RTX was insolvent on the dates the Fraudulent Transfer Payments were made to Cedar Park or that RTX became insolvent as a result of such transfers.[11] Accordingly, Plaintiff's constructive fraudulent transfer cause of action against Cedar Park must be denied for failure to establish the required element under § 548(a)(1)(B)(ii)(I) of the Bankruptcy Code. As a result, it is unnecessary for the Court to reach the other issues raised with respect to Plaintiff's constructive fraudulent transfer cause of action.

## B. <u>Preference Cause of Action</u>

240.   Next, Plaintiff (as assignee of the Trustee) seeks to avoid and recover certain payments made by RTX to Cedar Park as "preferences" under § 547 of the Bankruptcy Code. The thrust of Plaintiff's claim is that payments made by RTX to Cedar Park within 90 days of its bankruptcy filing are recoverable because such payments preferred Cedar Park ahead of other creditors of RTX.

241.   Specifically, Plaintiff seeks to recover transfers made by RTX to Cedar Park as payments for work on the Old 1431, Verano, Zen Gardens, and Valley View Projects. These payments were made to Cedar Park within the 90 days prior to RTX's bankruptcy filing and total $180,256 (herein "<u>Preference Payments</u>"). The Preference Payments are detailed in ¶ 88 of the Court's Finding of Fact above.

---

[11] The Court previously denied Plaintiff's Motion for Partial Summary Judgment on the fraudulent transfer claim for the same reason—insufficient proof of RTX's insolvency. (dkt# 26).

242.    Section 547(b) of the Bankruptcy Code sets forth the necessary elements to recover a preference and states:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of *an interest of the debtor in property*—
>
> > (1) to or for the benefit of a creditor;
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> > (3) made while the debtor was insolvent;
> > (4) made—
> >
> > > (A) on or within 90 days before the date of the filing of the petition; or
> > > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> >
> > (5) *that enables such creditor to receive more than such creditor would receive if*—
> >
> > > (A) *the case were a case under chapter 7 of this title;*
> > > (B) *the transfer had not been made; and*
> > > (C) *such creditor received payment of such debt to the extent provided by the provisions of this title.*

11 U.S.C. § 547(b) (emphasis added).

243.    The trustee has the burden to prove each of the required elements of a preference under § 547(b). *See* 11 U.S.C. § 547(g) (trustee has the burden of proving the avoidability of a transfer under § 547(b)); *Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg., Inc.)*, 81 F.3d 592, 596 (5th Cir. 1996). So here, Plaintiff (as assignee of the Trustee) must prove each of the requirements of § 547(b) to recover the Preference Payments from Cedar Park.

244.    In short, the Court concludes that two of the required elements of a preference were not established. First, the Preference Payments made to Cedar Park were not from "an interest of the debtor (RTX) in property." 11 U.S.C. § 547(b). Second,

the Preference Payments did not enable Cedar Park to receive more than Cedar Park would have received in a hypothetical Chapter 7 liquidation of RTX. 11 U.S.C. § 547(b)(5). As a result, Plaintiff's preference cause of action against Cedar Park must fail.

245.   Notably, the evidence at trial demonstrated that the Preference Payments were made by RTX to Cedar Park from "construction trust funds" held by RTX. These factual findings are detailed in ¶¶ 66–68, 90–91 of the Court's Finding of Fact above.

246.   Chapter 162 of the Texas Property Code (known as the Texas Construction Trust Fund Act) defines "construction trust funds." Construction payments are "trust funds" if the payments are made to a contractor or subcontractor (or an officer, director, or agent of a contractor or subcontractor) under a construction contract for the improvement of specific real property in Texas. Tex. Prop. Code Ann. § 162.001(a); *see also Holladay v. CW & A, Inc.,* 60 S.W.3d 243, 246 (Tex. App.—Corpus Christi, 2001, pet. denied). A contractor or subcontractor (or an officer, director, or agent of a contractor or subcontractor) who receives trust funds, or who has control or direction of trust funds, is a "trustee" of the trust funds. Tex. Prop. Code Ann. § 162.002; *Holladay,* 60 S.W.3d at 246.

247.   In sum, the Court has previously found that (a) RTX acted as a general contractor; (b) RTX (as a general contractor) received funds from homeowners for construction of improvements on real property in Texas (the Old 1431, Verano, Zen Gardens, and Valley View Projects) under contracts; (c) RTX used the funds it received from homeowners to pay Cedar Park (as subcontractor) for construction of improvements on such projects; and (d) RTX had control and direction over the funds it

received for construction. (¶¶ 57, 66–68 of Findings of Fact above). Indeed, Mr. Munoz effectively acknowledged that RTX (and its predecessor Terry Ford Custom Homes) were handling "trust funds" as a contractor. According to Mr. Munoz, RTX "would pay [Cedar Park] when [RTX] got paid" by the homeowners. (Tr., 12/28/16, p. 156, l. 16–25; p. 181, l. 25; p. 182, l. 1–4). As a result, the Court concludes that the Preference Payments were made by RTX (as general contractor) to Cedar Park (as subcontractor) from "construction trust funds" held by RTX as a "trustee" under Texas Property Code §§ 162.001(a) and 162.002.

248.  A required element to establish a preference under the Bankruptcy Code is that the debtor (here RTX) transfer "an interest of the debtor [RTX] in property."[12] 11 U.S.C. § 547(b). Here, because the Preference Payments were made to Cedar Park by RTX (the debtor) from "construction trust funds" that RTX held as "trustee," there was not a transfer of an interest of the debtor (RTX) in property within the meaning of § 547(b) of the Bankruptcy Code.

249.  State law defines the property interests of a debtor in bankruptcy cases, as well as in preference suits brought under the Bankruptcy Code. *See Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (property interests of a debtor are creatures of state law in absence of any controlling federal law); *Butner v. U.S.*, 440 U.S. 48, 55 (1979) (recognizing that Congress has generally left the determination of property rights in the assets of a debtor's bankruptcy estate to state law); *Tower Credit, Inc. v. Schott (In re Jackson)*, 850 F.3d 816, 818 (5th Cir. 2017) (state law determines the nature of property interests involved in recovery of preferential transfers in absence of controlling federal

---

[12] Whether the Preference Payments were made from property of the debtor (RTX) was a disputed issue at trial. (PTO, p. 5, dkt# 38).

law); *Maple Mortg.*, 81 F.3d at 596 (state law defines the substantive nature of property rights held by a debtor in absence of controlling federal law).

250.    Texas state law expressly provides that "construction trust funds" are <u>not</u> an interest in property of a debtor (like RTX). Specifically, in 2009, the Texas legislature amended Chapter 162 of the Texas Property Code to provide:

> (d)  Trust funds paid to a creditor under this chapter are *not property or an interest in property of a debtor* who is a trustee described by Section 162.002.

Tex. Prop. Code Ann. § 162.001(d) (emphasis added).

251.    One legislative purpose of this Texas Property Code amendment was to prevent payment of construction trust funds by a contractor (like RTX) to its subcontractor (like Cedar Park) from being recoverable in bankruptcy as a preference. The 2009 amendments to Chapter 162 of the Texas Property Code are based on House Bill 1513.[13] The Texas House Committee Report from the Business and Industry Committee describes the purpose of House Bill 1513 as follows:

> HB 1513 revises the Texas Construction Trust Fund Act to deal with the effects of the preferential transfer statute and to clarify remedies intended to be provided by the act.  Specifically, the bill states that trust funds in the hands of a construction trustee are expressly removed from the debtor's bankruptcy estate, states that the commingling of funds by a construction trustee with other funds of the construction trustee does not destroy the trust nature of the funds, and clarifies that the act applies to both public and private projects in Texas whether bonded or not.

House Comm. on Bus. & Indus., Bill Analysis, Tex. H.B. 1513, 81st Leg., R.S. (2009).

252.    Here, the Preference Payments were made by RTX (the debtor) from "construction trust funds" held by RTX as a "trustee" to Cedar Park (a creditor and subcontractor). After applying Texas state law, the Court concludes that the Preference

---

[13] Act of June 19, 2009, 81st Leg. R.S., ch. 1277, §§ 2, 5, 2009 Tex. Gen. Laws 4029, 4029 (codified at Tex. Prop. Code §§ 162.001(d), 162.031(d)).

Payments did not constitute a transfer of "an interest of the debtor (RTX) in property" within the meaning of § 547(b) of the Bankruptcy Code. As a result, Plaintiff cannot recover the Preference Payments from Cedar Park.

253.    In the context of a preference suit, one other Texas bankruptcy court has also recognized that "construction trust funds" under Chapter 162 of the Texas Property Code are not property of the debtor-contractor under § 547(b) of the Bankruptcy Code. *See Rodriguez v. Consol. Elec. Dist., Inc. (In re Martin Wright Elec. Co.)*, No. 07-05041-C, 2008 WL 114926, at *6–8 (Bankr. W.D. Tex. Jan. 9, 2008). In *Martin Wright*, the court also recognized that commingling of the debtor-contractor's funds could destroy the trust created by Chapter 162 of the Texas Property Code. With respect to this commingling point, it is significant to note that the *Martin Wright* decision was rendered in the year 2008.  In the year 2009, the Texas Legislature amended Chapter 162 of the Texas Property Code to expressly provide that commingling of construction trust funds would not destroy the trust created by the Texas statute. The Texas Property Code, as of 2009, now provides:

> (d)   A trustee who commingles trust funds with other funds in the trustee's possession does not defeat a trust created by this chapter.

Tex. Prop. Code Ann. § 162.031(d).

254.    In sum, state law determines a debtor's interest in property for the purposes of applying the bankruptcy preference statute (§ 547(b) of the Bankruptcy Code). Here, applicable state law (Chapter 162 of the Texas Property Code) specifically excludes "construction trust funds" from being property of a debtor. As a result, since the Preference Payments to Cedar Park were made from "construction trust funds" held

by RTX (the debtor) as a "trustee" under state law, the Court concludes that Plaintiff cannot recover the Preference Payments.

255. Buttressing the Court's conclusion is another provision of the Bankruptcy Code and Supreme Court precedent regarding payment of trust funds held by a debtor. Section 541(d) of the Bankruptcy Code provides that property in which the debtor holds only legal title and not an equitable interest, is not property of the bankruptcy estate. 11 U.S.C. § 541(d). The Supreme Court has recognized that "property of the estate" under § 541(d) should be read as the post-petition analog to what constitutes "property of a debtor" under § 547(b) (the preference statute). *See Begier v. IRS*, 496 U.S. 53, 58 (1990). The Supreme Court in *Begier* held that payments made by a debtor from statutory trust funds under the Internal Revenue Code could not be recovered as a preference under § 547(b) of the Bankruptcy Code.

256. In *Begier*, the Supreme Court recognized that if funds are held in a statutory "trust" by a debtor, then transfer of those funds by the debtor cannot be recovered as a bankruptcy preference because no "interest of the debtor in property" has been transferred. *See Begier*, 496 U.S. at 66–67. Like the statutory trust funds held by the debtor in *Begier* under the Internal Revenue Code, RTX (the debtor) held the "construction trust funds" in a statutory trust created by Chapter 162 of the Texas Property Code. As a result, the payment of the construction trust funds by RTX to Cedar Park cannot be recovered as a preference under § 547(b) of the Bankruptcy Code.

257. There is a second independent reason why Plaintiff cannot recover the Preference Payments from Cedar Park. Another statutory requirement to recover a preference was not established at trial, namely § 547(b)(5) of the Bankruptcy Code. In

substance, Plaintiff was required to prove that Cedar Park received more from the Preference Payments than Cedar Park would have received in a hypothetical Chapter 7 liquidation of RTX. 11 U.S.C. § 547(b)(5). Plaintiff did not establish this necessary requirement.

258.   Basically, § 547(b)(5) of the Bankruptcy Code requires that for a transfer to be a recoverable preference, the creditor (Cedar Park) must receive more from the transfer than the creditor (Cedar Park) would have received if the debtor (RTX) had been in Chapter 7 bankruptcy, the transfer had not been made, and the creditor (Cedar Park) received payment to the extent provided by bankruptcy law. In essence, this requires a "hypothetical" Chapter 7 liquidation analysis of the debtor to determine what the creditor would have received if the challenged transfers had not taken place. *See, e.g.*, *Lowe v. Palmetco, Inc. (In re N.A. Flash Found., Inc.)*, 298 F. App'x 355, 359 (5th Cir. 2008) (unpublished) (*citing Cunningham v. T & R Demolition, Inc. (In re ML & Assocs., Inc.)*, 301 B.R. 195, 202 (Bankr. N.D. Tex. 2003)).

259.   In a hypothetical Chapter 7 liquidation analysis, the court assumes that all persons would act in a commercially reasonable and businesslike manner. *See Flash Found.*, 298 F. App'x at 359 (*citing ML & Assocs.*, 301 B.R. at 202). If the creditor receives a greater percentage distribution due to the pre-bankruptcy payments than the creditor would have received in a hypothetical Chapter 7 bankruptcy distribution, then this preference requirement is met. *See generally Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, L.P.)*, 171 F.3d 253–54 (5th Cir. 1999).

260.   To be a recoverable preference, the transfer must have depleted the debtor's estate. *See Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 460 (5th

Cir. 2006). The preference statute was designed to prevent a transfer to one creditor that would diminish the estate of the debtor that otherwise would be available for distribution to all creditors. *See Flash Found.*, 298 F. App'x at 359 (*citing Triad Int'l Maint. Corp. v. S. Air Transp., Inc. (In re S. Air Transp., Inc.)*, 511 F.3d 526, 530 (6th Cir. 2007)).

261.   Applying these legal principles, the Court concludes that the Preference Payments did not result in Cedar Park receiving more than Cedar Park would have received in a hypothetical Chapter 7 liquidation of RTX for the following reasons.

262.   The Preference Payments were made to Cedar Park by RTX from "construction trust funds," as has already been explained by the Court. RTX was a general contractor and Cedar Park was a downstream subcontractor for RTX. The "construction trust funds" were funds paid to RTX by homeowners and were held by RTX in a statutory trust created by Chapter 162 of the Texas Property Code. RTX was then obligated to pay its downstream subcontractor Cedar Park from such statutory trust funds.

263.   In a hypothetical Chapter 7 case, RTX would have been required to hold the construction trust funds received from the homeowners in the statutory trust for the benefit of its subcontractor Cedar Park. Cedar Park would have a priority claim against the trust funds held by RTX in a hypothetical Chapter 7 case and would have received full payment ahead of unsecured creditors of RTX. *See, e.g.*, *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1118 (5th Cir. 1995) (recognizing that funds held in a constructive trust provide a creditor with priority over unsecured creditors); *Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc.)*, 12 F.3d 426, 436 (5th Cir. 1994)

(recognizing that a bankruptcy trustee would be ordered to turn over funds held in a constructive trust to the beneficiary). For similar reasons, the bankruptcy estate of RTX (the debtor) was not diminished by the Preference Payments made to Cedar Park. The construction trust funds held by RTX would not have been available to pay other creditors of RTX in a hypothetical Chapter 7 liquidation.

264.    Chapter 162 of the Texas Property Code (the Texas Construction Trust Fund Act) makes it a class A misdemeanor, and sometimes a third degree felony, for a trustee to misapply construction trust funds. Tex. Prop. Code Ann. § 162.032. In a hypothetical Chapter 7 case of RTX, a bankruptcy trustee would likely not take the risk of misapplying construction trust funds by paying other creditors from such trust funds. *See ML & Assocs.*, 301 B.R. at 202 (recognizing that in a hypothetical Chapter 7 liquidation, the court assumes that all persons would act in a commercially reasonable and businesslike manner).

265.    For these reasons, the Court concludes that Cedar Park did not receive more through the Preference Payments than Cedar Park would have received in a hypothetical Chapter 7 liquidation of RTX. Consequently, Plaintiff did not establish the necessary element of § 547(b)(5) of the Bankruptcy Code to recover the Preference Payments from Cedar Park.

266.    Albeit in an unpublished decision, the Fifth Circuit has dealt with an almost identical factual situation and determined that payments by a debtor-contractor to a creditor-subcontractor could not be recovered as preferences under § 547(b) of the Bankruptcy Code. *See Flash Found.*, 298 F. App'x at 359. In *Flash Foundation*, the debtor-contractor worked directly with homeowners on construction of houses. The

creditor-subcontractor was a supplier of steel to the debtor-contractor. Prior to the debtor's bankruptcy filing, the debtor-contractor made payments to the creditor-subcontractor from its general operating account and by endorsed check. Subsequently, the debtor-contractor filed bankruptcy. The bankruptcy trustee for the debtor-contractor then sued the creditor-subcontractor to recover the payments as preferences under § 547(b) of the Bankruptcy Code. *Flash Found.*, 298 F. App'x at 357.

267. Both the bankruptcy court and the district court for the Western District of Texas found that the payments made to the creditor-subcontractor were not recoverable preferences. *Lowe v. Palmetco, Inc. (In re N.A. Flash Found., Inc.)*, No. SA-05-CA-0814-WWJ (W.D. Tex. Jun. 4, 2007); *Lowe v. Palmetco, Inc. (In re N.A. Flash Found., Inc.)*, No. 04-5062-RBK (Bankr. W.D. Tex. June 28, 2005). On appeal, the Fifth Circuit affirmed, and likewise, held that the payments were not recoverable preferences. *Flash Found.*, 298 F. App'x at 361.

268. The Fifth Circuit in *Flash Foundation* based its decision on the hypothetical Chapter 7 distribution requirement of § 547(b)(5) of the Bankruptcy Code, which is a necessary element to recover a preference. In short, the Fifth Circuit found that in a hypothetical Chapter 7 case, the creditor-subcontractor would have received full payment due to Chapter 162 of the Texas Property Code (the Texas Construction Trust Fund Act). The Fifth Circuit's analysis of how the requirement of § 547(b)(5) of the Bankruptcy Code applies to payments made by a debtor-contractor to a creditor-subcontractor is similar to the analysis undertaken by this Court above. Notably however, the Fifth Circuit did not even require the creditor-subcontractor to prove a "construction trust fund" theory under the Texas Property Code. Instead, the Fifth Circuit

held that a construction trust fund theory can be used to demonstrate that the creditor-subcontractor would receive the same amount in a hypothetical Chapter 7 case as it received from the allegedly preferential payments. *Flash Found.*, 298 F. App'x at 360.

269.    In summary, the Court concludes that Plaintiff did not establish two of the necessary requirements to recover the Preference Payments from Cedar Park under § 547(b) of the Bankruptcy Code. First, the Preference Payments were not made from an interest of the debtor (RTX) in property, within the meaning of § 547(b) of the Bankruptcy Code. Second, the Preference Payments did not enable Cedar Park to receive more than Cedar Park would have received in a hypothetical Chapter 7 liquidation of RTX, as required by § 547(b)(5) of the Bankruptcy Code. For these two independent reasons, Plaintiff's preference cause of action against Cedar Park must be denied. Consequently, it is not necessary for the Court to reach the other issues (including affirmative defenses) raised with respect to Plaintiff's preference cause of action.

## C. Texas Construction Trust Fund Act Cause of Action

270.    Next, Plaintiff sues Cedar Park and Mr. McGrath for misapplication of "construction trust funds" paid by RTX to Cedar Park under Chapter 162 of Texas Property Code (the Texas Construction Trust Fund Act). The thrust of Plaintiff's claim is that Cedar Park utilized trust funds paid by RTX for purposes other than paying for labor and materials on two construction projects and thus misapplied such trust funds.

271.    Specifically, Plaintiff contends that Cedar Park received "construction trust funds" from RTX to pay for certain materials and labor on the Old 1431 Project and

Verano Project, and Cedar Park did not use the funds to pay for such materials and labor. The payments allegedly misapplied by Cedar Park total the amount of $70,445 (herein "<u>Construction Trust Fund Payments</u>"). The Construction Trust Fund Payments are detailed in ¶ 94 of the Court's Finding of Fact above.

272.    Plaintiff asserts that the Construction Trust Fund Payments received by Cedar Park from RTX constituted "construction trust funds" under Texas Property Code § 162.001(a). Plaintiff contends that Cedar Park (and Mr. McGrath, as an officer of Cedar Park) were each a "trustee" of the trust funds under Texas Property Code § 162.002. Plaintiff alleges that Cedar Park "misapplied" the Construction Trust Fund Payments received from RTX by utilizing such funds for purposes other than paying for labor and materials on the Old 1431 Project and the Verano Project. As a result, Plaintiff asserts that Cedar Park and its officer, Mr. McGrath, are liable to Plaintiff for misapplication of trust funds under Texas Property Code § 162.031(a).

273.    Chapter 162 of the Texas Property Code (the Texas Construction Trust Fund Act) defines "construction trust funds" as follows:

> Construction payments are trust funds . . . if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

Tex. Prop. Code Ann. § 162.001(a).

274.    Here, Cedar Park was a subcontractor to RTX (as general contractor) for the construction of improvements in Texas (including the Old 1431 and Verano Projects). Cedar Park received payments from RTX for such construction pursuant to contracts. (¶¶ 66–68 of Finding of Fact above). Therefore, the Court concludes that the

Construction Trust Fund Payments received by Cedar Park from RTX constituted "construction trust funds" under § 162.001(a) of the Texas Property Code.

275.    The Texas Construction Trust Fund Act defines the "trustee" of construction trust funds as follows:

> A contractor, subcontractor, or owner, or an officer, director or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds.

Tex. Prop. Code Ann. § 162.002.

276.    Cedar Park was a subcontractor, Mr. McGrath was the President and managing member of Cedar Park, and Mr. McGrath controlled disbursement of funds by Cedar Park. At trial, Mr. McGrath effectively acknowledged that Cedar Park was handling "trust funds." (¶ 67 of Finding of Fact above). As a result, the Court concludes that Cedar Park and Mr. McGrath were each a "trustee" of construction trust funds received from RTX under § 162.002 of the Texas Property Code.

277.    However, Cedar Park and Mr. McGrath (Defendants) contend that RTX is not a protected "beneficiary" under Chapter 162 of the Texas Property Code (the Texas Construction Trust Fund Act) of the construction trust funds paid to Cedar Park by RTX.[14] The thrust of Defendants' argument is that Cedar Park was a downstream subcontractor of RTX, and RTX (as the upstream contractor) cannot sue Cedar Park (the downstream contractor) for any alleged "misapplication" of construction trust funds under the Texas Construction Trust Fund Act.[15]

---

[14]   Whether RTX was a "beneficiary" of the construction trust funds was a disputed issue at trial. (PTO, p. 6, dkt# 38); (Defendants' Proposed Findings, p. 12, dkt# 58).

[15]   Defendants also deny that they "misapplied" any construction trust funds and contend that Plaintiff did not prove any "misapplication" at trial. (PTO, p. 6, dkt# 38); (Defendants' Proposed Findings, p. 12, dkt# 58).

278.    The Court agrees with the Defendants. The Court concludes that RTX (and Plaintiff on behalf of RTX) is not a beneficiary that has a right to sue Defendants under Chapter 162 of the Texas Property Code (the Texas Construction Trust Fund Act), for the following reasons.

279.    RTX acted as a general contractor on these two projects (Old 1431 Project and Verano Project). RTX (as general contractor) contracted with Cedar Park (as subcontractor) for Cedar Park to provide construction work on the projects. RTX paid Cedar Park for its construction work on the projects using "construction trust funds." So, RTX was an "upstream contractor" that paid Cedar Park as a "downstream contractor" for construction. (¶¶ 57–68, 95–97 of Findings of Fact above).

280.    RTX did not provide materials to or perform services for Cedar Park with respect to the Old 1431 Project or the Verano Project. Cedar Park was not obligated to pay RTX for any construction services or materials provided by RTX to Cedar Park on these projects. (¶ 98 of Findings of Fact above). The construction trust funds that Plaintiff alleges were misapplied by Cedar Park were, according to Plaintiff, supposed to be paid by Cedar Park for framing, lumber, doors, windows, a fireplace, and roofing on the projects. (Plaintiff's Proposed Findings, p. 17, dkt# 57). RTX did not provide these construction materials and services to Cedar Park. Cedar Park may have been obligated to pay its materialmen and suppliers that worked on the projects at the request of Cedar Park; but there was no evidence that RTX was a materialmen or supplier to Cedar Park.

281.    With these basic facts in mind, the Court next turns to the governing statute. A short march through three provisions of the Texas Construction Trust Fund

Act makes plain that RTX is not a "beneficiary" of the construction trust funds paid to Cedar Park.

282.  First, the Texas Construction Trust Fund Act generally defines a "beneficiary" of construction trust funds as follows:

> An artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a *beneficiary* of any trust funds paid or received in connection with the improvement.

Tex. Prop. Code Ann. § 162.003(a) (emphasis added).

283.  Next, the Texas Construction Trust Fund Act describes a beneficiary of "misapplied" construction trust funds as follows:

> A trustee who . . . directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all *current or past due obligations incurred by the trustee to the beneficiaries* of the trust funds, has *misapplied* the trust funds.

Tex. Prop. Code Ann. § 162.031(a) (emphasis added).

284.  Finally, the Texas Construction Trust Fund Act defines "current or past due obligations" owed to a beneficiary as follows:

> Current or past due obligations" are those obligations *incurred or owed by the trustee for labor or materials furnished* in the direct prosecution of the work under the construction contract prior to the receipt of the trust funds and which are *due and payable by the trustee* no later than 30 days following receipt of the trust funds.

Tex. Prop. Code Ann. § 162.005(2) (emphasis added).

285.  Reading these provisions of the Texas Construction Trust Fund Act together, the Court concludes that RTX is not a "beneficiary" of the construction trust funds received by Cedar Park from RTX. For the purposes of the Act, Cedar Park is a "trustee." Cedar Park would have "misapplied" the trust funds if Cedar Park did not first

pay obligations owed or incurred by Cedar Park to a "beneficiary" for "labor or materials" furnished by the "beneficiary" in direct prosecution of the construction work. Here, RTX did not furnish labor or materials to Cedar Park for the two projects. Cedar Park did not owe RTX for any labor or materials that RTX furnished for the two projects. Consequently, RTX is not a statutory "beneficiary" under the Texas Construction Trust Fund Act.

286.    The Court's conclusion that RTX is not a beneficiary also finds support in the purpose of the Texas Construction Trust Fund Act. According to the Fifth Circuit, the Texas Construction Trust Fund Act was enacted as a "special protection for subcontractors and materialmen in situations where contractors or their assignees refused to pay the subcontractor or materialmen for labor and materials." *Exchanger Contractors, Inc. v. Comerica Bank-Texas (In re Waterpoint Int'l, LLC)*, 330 F.3d 339, 345 (5th Cir. 2003). In a similar vein, the Texas Supreme Court has stated "subcontractors or suppliers who furnish labor or materials are considered beneficiaries" under the Act. *Dealers Elec. Supply Co. v. Scroggins*, 292 S.W.3d 650, 657 (Tex. 2009). Here, RTX was not a subcontractor, supplier or materialmen to Cedar Park; and Cedar Park did not fail to pay RTX for any labor or materials that RTX furnished on the projects. [16]

287.    The Texas Construction Trust Fund Act does not expressly provide for civil liability for violations of the Act; it only expressly provides for criminal penalties. Tex. Prop. Code Ann. § 162.032. As a consequence, Texas courts have consistently

---

[16]    RTX also is not a protected "beneficiary" as the owner of the properties. RTX did not own the properties under construction at the Old 1431 Project or the Verano Project. Instead, third party homeowners owned the properties and contracted with RTX for the construction. (¶¶ 56–57, 66–68 of Findings of Fact above).

stated that civil remedies may be pursued under the Texas Construction Trust Fund Act only if the plaintiff is within the "class of people [the Act] was designed to protect and have asserted the type of injury [the Act] was intended to prohibit." *See, e.g.*, *C & G, Inc. v. Jones*, 165 S.W.3d 450, 453 (Tex. App.—Dallas 2005, pet. denied) (examining situation where plaintiff was supplier of equipment to defendant contractor); *Holladay*, 60 S.W.3d at 246 (plaintiff was subcontractor that provided services to defendant general contractor); *Lively v. Carpet Servs., Inc.*, 904 S.W.2d 868, 873 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (plaintiff was subcontractor that provided materials and services to defendant general contractor).

288.   Here, RTX was not a subcontractor or supplier to Cedar Park; instead, the opposite is true—Cedar Park was a subcontractor to RTX. RTX is not within the class of persons that the Texas Construction Trust Fund Act was designed to protect—RTX is not owed any money by Cedar Park for materials or services furnished by RTX to the projects.

289.   The courts dealing with a similar factual situation have held that a contractor (RTX) is not a statutory beneficiary of construction trust funds it has paid to its subcontractor (Cedar Park). Case law confirms that RTX (the upstream contractor) cannot bring a claim against Cedar Park (its downstream contractor) for civil liability under the Texas Construction Trust Fund Act. *See Robax Corp. v. Prof'l Parks, Inc.*, No. 3:07-CV-1399-D, 2008 WL 3244150, at *3–4 (N.D. Tex. Aug. 8, 2008); *T.D. Farrell Constr., Inc. v. Schreiber (In re Schreiber)*, 466 B.R. 903, 912 (Bankr. S.D. Tex. 2012).

290.   In *Robax*, the plaintiff was a contractor that subcontracted with the defendant for the manufacture and installation of aquatic facilities by the defendant

subcontractor. The defendant subcontractor then hired a supplier to manufacture water slides for the project. The plaintiff contractor paid "construction trust funds" to the defendant subcontractor, but the defendant subcontractor did not pay the supplier of the waterslides. The plaintiff contractor then sued the defendant subcontractor for "misapplication" of the construction trust funds, because the defendant subcontractor had failed to pay the supplier. *Robax*, 2008 WL 3244150, at *3.

291.    The district court in *Robax* held that the plaintiff contractor could not bring a claim against its subcontractor for "misapplication" of trust funds under the Texas Construction Trust Fund Act (Chapter 162 of the Texas Property Code). The district court found that the plaintiff was an upstream contractor that had paid construction trust funds to its "downstream" subcontractor defendant. The district court determined that the plaintiff contractor was not a "beneficiary" of the construction trust funds it paid to its defendant subcontractor, as the plaintiff contractor had not performed any services or provided any materials to the defendant subcontractor on the project.

292.    In sum, the *Robax* court determined that the plaintiff contractor (that had paid trust funds to its subcontractor) was not within the class of persons that the Texas Construction Trust Fund Act was intended to protect. *Robax*, 2008 WL 3244150, at *3 (*citing Waterpoint Int'l*, 330 F.3d at 345). The district court in *Robax* stated that it could find no cases where a plaintiff contractor successfully sued its subcontractor for misapplication of trust funds under the Texas Construction Trust Fund Act. Likewise, this Court has found no such cases (and Plaintiff has not cited any cases) that support the notion that RTX is a statutory beneficiary of construction trust funds that it paid to its downstream subcontractor Cedar Park.

293.    Similarly, in *Schreiber*, the bankruptcy court held that an upstream contractor could not assert a claim against an officer of a downstream subcontractor for misapplication of trust funds. The plaintiff contractor argued that it was a beneficiary of the construction trust funds paid to its subcontractor by the contractor under the Texas Construction Trust Fund Act. The bankruptcy court rejected the argument and concluded that the contractor was not a beneficiary under the Act that could sue a downstream subcontractor for misapplication of trust funds. *Schreiber*, 466 B.R. at 912.

294.    Here, the fundamental facts are similar to the factual settings addressed by the courts in the *Robax* and *Schreiber* cases. RTX was the upstream contractor that paid construction trust funds to Cedar Park, its downstream subcontractor. RTX did not provide any labor or materials to Cedar Park for the projects at issue. Inescapably, RTX is not a "beneficiary" of any construction trust funds that it paid to Cedar Park under the Texas Construction Trust Fund Act and has no claim for any "misapplication" of trust funds by Cedar Park under the Act.

295.    In summary, the Court determines that RTX is not a statutory "beneficiary" under the Texas Construction Trust Fund Act (Chapter 162 of the Texas Property Code). As a result, Plaintiff has no claim on behalf of RTX for "misapplication" of construction trust funds paid by RTX (as contractor) to Cedar Park (its subcontractor) under the Texas Construction Trust Fund Act. RTX is not a protected beneficiary of the construction trust funds received by Cedar Park under the text or purpose of the Act. Courts that have dealt with this situation have consistently held that an upstream

contractor (RTX) has no claim under the Act against its downstream contractor (Cedar Park) for misapplication of construction trust funds paid by the upstream contractor.[17]

296.   For these reasons, the Court concludes that Plaintiff's cause of action against Cedar Park and Mr. McGrath under the Texas Construction Trust Fund Act must be denied. Consequently, it is not necessary for the Court to reach the other issues raised with respect to this particular cause of action asserted by Plaintiff.

## D. **Breach of Contract Cause of Action**

297.   Plaintiff has sued Cedar Park for breach of contract on two projects—the Old 1431 Project and the Verano Project. The Court will first set forth its conclusions of law on the breach of contract action by project, and then address Cedar Park's defenses to the breach of contract action.

### 1. Old 1431 Project

298.   Plaintiff has sued Cedar Park for breach of contract with respect to the Old 1431 Project. The primary reason Plaintiff contends that Cedar Park breached the contract is because RTX paid Cedar Park for certain materials as requested, but Cedar Park did not purchase the materials or provide the materials to the Old 1431 Project.

299.   Under Texas law, to establish a breach of contract, a plaintiff must prove the following four elements: (1) the existence of a valid contract; (2) performance or tendered performance by plaintiff; (3) breach of contract by defendant; and (4) damages were sustained by plaintiff as a result of the breach. *See, e.g.,* *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 767 (5th Cir. 2016) (applying Texas law); *Sanders Oil & Gas GP, LLC v. Ridgeway Elec.*, 479 S.W.3d 293, 299–300 (Tex. App.— El Paso 2015, no

---

[17]   This is not to say that an upstream contractor (like RTX) would not have a claim against a downstream subcontractor (like Cedar Park) for breach of contract. *See Robax*, 2008 WL 3244150, at *11–12.

pet.); *McLaughlin, Inc. v. Northstar Drilling Tech., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.) (supporting citations omitted). A party may recover actual damages for breach of contract. *See generally Mead v. The Johnson Grp., Inc.*, 615 S.W.2d. 685, 687 (Tex. 1981) (supporting citations omitted).

300.    A valid written contract existed between RTX and Cedar Park with respect to the Old 1431 Project. (PX-30); (DX-1); (¶¶ 61–62 of Findings of Fact above). Under the Old 1431 Contract, Cedar Park was entitled to payment from RTX upon invoice for materials provided and for work completed by Cedar Park on the project. (¶¶ 61–62 of Findings of Fact above). The Court concludes that Plaintiff has proven the first element of a breach of contract action with respect to the Old 1431 Project.

301.    RTX was performing under the contract on the Old 1431 Project. RTX was paying Cedar Park's invoices on the project. (¶¶ 102–112, 144–145 of Findings of Fact above). The Court concludes that Plaintiff has proven the second element of a breach of contract action with respect to the Old 1431 Project.

302.    Cedar Park breached the contract with RTX on the Old 1431 Project. Cedar Park invoiced RTX and Cedar Park was paid $37,767 by RTX for framing lumber, beams, trusses, door materials, window materials, and a fireplace for the Old 1431 Project. Cedar Park did not purchase these materials, did not provide the materials to the Old 1431 Project, and did not complete work on the Old 1431 Project with the materials. (¶¶ 104–115 of Findings of Fact above). The Court concludes that Plaintiff has proven the third element of a breach of contract action with respect to the Old 1431 Project.

303.    Damages were suffered by RTX as a result of Cedar Park's breach of contract on the Old 1431 Project. RTX suffered actual damages in the amount of $37,767—the amount paid by RTX to Cedar Park for materials that Cedar Park did not purchase or provide to the Old 1431 Project. (¶ 115 of Findings of Fact above). The Court concludes that Plaintiff has proven the fourth element of a breach of contract action with respect to the Old 1431 Project.

304.    Plaintiff did not establish any other breaches of contract by Cedar Park with respect to the Old 1431 Project that would entitle Plaintiff to an affirmative damages recovery against Cedar Park. Other Cedar Park charges on the Old 1431 Project (such as cornish and frame lumber charges) were not shown as actually being paid by RTX. As a result, RTX suffered no actual damages. (¶¶ 113–114 of Findings of Fact above).

2.  Verano Project

305.    Plaintiff has also sued Cedar Park for breach of contract with respect to the Verano Project. The primary reason Plaintiff contends that Cedar Park breached the contract is because RTX paid Cedar Park for certain materials as requested, but Cedar Park did not purchase the materials or provide the materials to the Verano Project.

306.    Under Texas law, to establish a breach of contract, a plaintiff must prove the following four elements: (1) the existence of a valid contract; (2) performance or tendered performance by plaintiff; (3) breach of contract by defendant; and (4) damages were sustained by plaintiff as a result of the breach. *See, e.g.*, *Villarreal* 814 F.3d at 767 (applying Texas law); *Sanders Oil & Gas*, 479 S.W.3d at 299–300 (supporting citations omitted). A party may recover actual damages for breach of contract. *See generally Mead*, 615 S.W.2d. at 687 (supporting citations omitted).

307.    No written contract was signed between RTX and Cedar Park with respect to the Verano Project. After considering the evidence, the Court has already found that RTX and Cedar Park had a valid oral construction agreement with respect to the Verano Project. (¶¶ 63–65, 116 of Findings of Fact above). The agreement (like the written contract on the Old 1431 Project) was that Cedar Park was entitled to payment from RTX upon invoice for materials provided and for work completed by Cedar Park on the Verano Project. (¶¶ 65, 116 of Findings of Fact above).

308.    Under Texas law, construction contracts are not required to be in writing to be valid. *See, e.g.*, *Purdin v. Jenkins*, 337 S.W.2d 418, 421 (Tex. Civ. App.—Dallas 1960, no writ); *Luglan v. Tomlin*, 287 S.W.2d 188, 189 (Tex. Civ. App.—San Antonio 1956, writ ref'd n.r.e.); *Kirkwood & Morgan, Inc. v. Roach*, 360 S.W.2d 173, 175 (Tex Civ. App.—San Antonio 1962, writ ref'd n.r.e.).

309.    In determining whether there was a meeting of the minds on material terms to create a valid oral contract, courts look at the communications between the parties and the surrounding acts and circumstances. *See, e.g.*, *Gallier v. Woodbury Fin. Servs., Inc.*, 171 F. Supp. 3d 552, 567 (S.D. Tex. 2016) (interpreting Texas law). After considering the surrounding acts and circumstances, the Court has found that RTX and Cedar Park had a meeting of the minds on material terms with respect to the Verano Project. (¶¶ 63–65 of Findings of Fact above). As a result, the Court concludes that Plaintiff has proven the first element of a breach of contract action with respect to the Verano Project—that a valid contract existed.

310.    RTX was performing under the contract on the Verano Project. RTX was paying Cedar Park's invoices on the project. (¶¶ 117, 144–145 of Findings of Fact

above). The Court concludes that Plaintiff has proven the second element of a breach of contract action with respect to the Verano Project.

311.    Cedar Park breached the contract with RTX on the Verano Project. Cedar Park invoiced RTX and Cedar Park was paid $17,204 by RTX for roofing materials on the Verano Project. Cedar Park used only $4,350 of these funds to pay for roofing on the Verano Project. (¶¶ 127, 141 of Findings of Fact above). The Court concludes that Plaintiff has proven the third element of a breach of contract action with respect to the Verano Project.

312.    Damages were also suffered by RTX as a result of Cedar Park's breach of contract for the Verano Project. RTX suffered actual damages in the amount of $12,854—the amount paid by RTX to Cedar Park for roofing materials of $17,204 less the $4,350 actually paid by Cedar Park for roofing materials on the Verano Project. (¶¶ 127, 141 of Findings of Fact above). The Court concludes that Plaintiff has proven the fourth element of a breach of contract action with respect to the Verano Project.

313.    Plaintiff did not establish any other breaches of contract by Cedar Park with respect to the Verano Project that would entitle Plaintiff to an affirmative damage recovery against Cedar Park. Plaintiff did not prove any breach of contract or that any damages were suffered by RTX with respect to the alleged poor workmanship and incomplete work by Cedar Park on the Verano Project. (¶¶ 128–138 of Findings of Fact above). Other Cedar Park charges that Plaintiff has challenged (such as overhead and profit charges and the second roofing charge on the Verano Project) were not shown as actually being paid by RTX. As a result, RTX suffered no actual damages. (¶¶ 139–140 of Findings of Fact above).

3. <u>Cedar Park Defenses</u>

314.    Cedar Park has asserted a variety of defenses to Plaintiff's breach of contract action.

315.    First, Cedar Park contends that Plaintiff's breach of contract action is barred due to RTX's prior material breach of the contracts with Cedar Park. The alleged prior "material breach" by RTX was the failure of RTX to pay Cedar Park on its invoices. (PTO, p. 7, dkt# 38); (Defendants' Proposed Findings, p. 13, dkt# 58). In short, the Court concludes that Cedar Park did not prove this defense.

316.    Under Texas law, if a party is complying with a contract at the time the other party breaches the contract, that party's subsequent breach does not excuse performance by the other party. *See, e.g.*, *Mead v. The Johnson Grp., Inc.*, 615 S.W.2d. 685, 689 (Tex. 1981) (supporting citations omitted) (stating that a party in default on a contract is not relieved by a subsequent breach by the other party).

317.    Here, RTX consistently paid Cedar Park's invoices up until October 2014 when Cedar Park ceased work and sent its "final invoices" with the disputed charges. RTX was in compliance with the contracts for the Old 1431 Project and the Verano Project up until October 2014 when the invoices with the disputed charges were sent by Cedar Park. Cedar Park had already breached the contracts with RTX on the Old 1431 Project and Verano Project prior to the non-payment by RTX of the disputed charges in October 2014. (¶¶ 144–147 of Findings of Fact above).

318.    The Court concludes that there was no prior material breach of the contracts for the Old 1431 Project and the Verano Project by RTX that would bar recovery by Plaintiff on its breach of contract action against Cedar Park.

319.    Second, Cedar Park has raised boilerplate-type defenses of "waiver, estoppel and laches" in its post-trial Proposed Findings. (Defendants' Proposed Findings, pp. 13–14, dkt# 58). As a legal matter, Cedar Park has waived theses defenses. These affirmative defenses of waiver, estoppel, and laches were not pled in Defendants' Answer and were not set forth in the Joint Pretrial Order filed by Cedar Park in this Adversary Proceeding. (Answer, dkt# 5; PTO, dkt# 38). As a result, these defenses have been waived. *See, e.g.*, *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) (supporting citations omitted).

320.    These affirmative defenses of "waiver, estoppel and laches" first surfaced post-trial, when Cedar Park filed Defendants' Proposed Findings. (Defendants' Proposed Findings, pp. 13–14, dkt# 58). However, the Post-Trial Order entered by the Court specifically stated that a party was not authorized to include affirmative defenses in its proposed findings post-trial if the party had not already pled the affirmative defenses. (Post-Trial Order, ¶ 7, dkt# 47). As a result, it is not necessary for the Court to address these affirmative defenses of waiver, estoppel, and laches raised post-trial by Cedar Park.

321.    Even if the Court were to consider these affirmative defenses, the Court concludes that Cedar Park did not prove any of the defenses. The "waiver, estoppel, and laches" defenses appear to be centered around Cedar Park's contentions that RTX paid several invoices with single checks, which Cedar Park then applied to the oldest outstanding invoice, RTX allowed Cedar Park to submit draw requests ahead of time, RTX directed Cedar Park to use funds from one line item to another, and RTX treated all the construction projects as a whole. (Defendants' Proposed Findings, pp. 13–14,

dkt# 58). For the reasons set forth in detail in ¶¶ 149–154 of the Court's Findings of Fact above, these "waiver, estoppel, and laches" defenses of Cedar Park lack any legal merit even if they were to be considered by the Court.

322. The Court concludes, as a legal matter, that all defenses by Cedar Park to Plaintiff's breach of contract action lack merit, with the exception of Cedar Park's "setoff" defense. The Court will separately address the setoff defense in ¶¶ 347–354 of the Conclusions of Law below.

4. Summary—Breach of Contract

323. In summary, the Court concludes that Cedar Park is liable to Plaintiff for breach of contract in the total amount of $50,621, consisting of $37,767 in damages caused by Cedar Park to RTX on the Old 1431 Project and $12,854 in damages caused by Cedar Park to RTX on the Verano Project. The Court also concludes that Cedar Park's defenses to breach of contract have no legal or factual merit.

324. However, the amount of damages recoverable by Plaintiff against Cedar Park for breach of contract will be subject to "setoff" by the amount validly owed by RTX in the Proof of Claim filed by Cedar Park. The Court will address Cedar Park's setoff defense separately in ¶¶ 347–354 of the Conclusions of Law below.

**E. Objections to Proof of Claim**

1. Cedar Park Proof of Claim

325. As a creditor, Cedar Park filed a sworn Proof of Claim against RTX in this bankruptcy case (herein "Proof of Claim"). (PX-3); (main bankruptcy case no. 14-11732, claim no. 12-1). The Proof of Claim sets forth the amount that Cedar Park contends was still owed by RTX on the six construction projects as of RTX's bankruptcy filing on

November 24, 2014. The specific amounts owed on each project, according to the Proof of Claim, are set forth in the ¶ 158 of the Court's Findings of Fact above. The total amount of the Proof of Claim, as originally filed by Cedar Park, is $90,008.

326.    Post-trial, Cedar Park voluntarily reduced the amount of the Proof of Claim against RTX by the total amount of $46,174. (main case no. 14-11732, dkt# 77); (Defendants' Proposed Findings, p. 4, dkt# 58). As a result, the remaining balance on Cedar Park's Proof of Claim is the amount of $43,834 ($90,008 Proof of Claim minus $46,174 reduction).

2.  Burden of Proof

327.    Plaintiff objected to Cedar Park's Proof of Claim in this Adversary Proceeding on various grounds. (Complaint, dkt# 1). In general, Plaintiff disputes particular amounts set forth on invoices submitted by Cedar Park to RTX with respect to the construction projects. These invoices are attached to Cedar Park's Proof of Claim. (PX-3).

328.    Section 501 of the Bankruptcy Code provides that a creditor may file a proof of claim against a debtor in a bankruptcy case. 11 U.S.C. § 501(a). In turn, § 502 of the Bankruptcy Code addresses the allowance and disallowance of proofs of claims. 11 U.S.C. § 502. A proof of claim is deemed allowed unless an objection is filed to the proof of claim. 11 U.S.C. §502(a). If an objection to a proof of claim is filed, the bankruptcy court is required to determine and allow the valid amount of the claim as of the date of the bankruptcy filing. 11 U.S.C. § 502(b).

329.    A properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and amount of the claim. *See* Bankruptcy Rule 3001(f); *In re 804*

*Congress, LLC*, 529 B.R. 213, 219 (Bankr. W.D. Tex. 2015) (supporting citations omitted). If a party files an objection to the proof of claim, the burden is on the objecting party to present sufficient evidence to overcome the *prima facie* effect of a validly filed proof of claim. If the objecting party meets this burden, then the burden shifts back to the creditor to prove the validity of its claim by a preponderance of the evidence. *See, e.g.*, *McGee v. O'Connor (In re McGee)*, 153 F.3d 258, 260 (5th Cir. 1998) (supporting citations omitted); *Cal. State Bd. of Equalization v. Official Unsecured Creditors' Comm. (In re Fid. Holding Co.)*, 837 F.2d 696, 698 (5th Cir. 1988); *804 Congress*, 529 B.R. at 219.

330.    Here, Cedar Park is the creditor that filed the Proof of Claim against RTX (the debtor). (PX-3). The Court concludes that the Proof of Claim was executed by Cedar Park and filed using the official form and attached sufficient supporting information (invoices). *See* Bankruptcy Rule 3001(c). As a result, the Court concludes that the Proof of Claim constitutes *prima facie* evidence of the validity and amount of the claim of Cedar Park against RTX.[18]

331.    Consequently, the burden is on Plaintiff (the objecting party) to provide sufficient evidence to overcome the *prima facie* validity of Cedar Park's Proof of Claim. Only if Plaintiff provides sufficient evidence to rebut the *prima facie* validity of the Proof of Claim, does the burden then shift back to Cedar Park to prove the validity of its claim by a preponderance of the evidence.

332.    Here, most of Plaintiff's objections to the Proof of Claim are based on a "laundry list" of allegedly defective, improper, or incomplete work by Cedar Park at the

---

[18]   Plaintiff does not dispute that Cedar Park's Proof of Claim is entitled to *prima facie* validity. (Plaintiff's Proposed Findings, p. 23, dkt# 57).

six construction projects. (PX-7); (PX-8). The laundry list was compiled by Mr. Munoz (Plaintiff) for trial. These two exhibits (PX-7 and PX-8) were admitted by the Court only as demonstrative exhibits. (Tr., 12/28/16, p. 142, l. 22–23; p. 146, l. 2-3).

333.   Very little competent testimony from Mr. Munoz supported the laundry list in these demonstrative exhibits. Mr. Munoz admitted that he rarely visited the project construction sites, he was not a contract estimator, he could not state the value of work that Cedar Park performed, and that his experience was only on the development and financial side. (Tr., 12/28/16, p. 102, l. 12–16; p. 153, l. 13–25; p. 154, l. 6–7). For the most part, Mr. Munoz provided self-serving and conclusory testimony to support the laundry list of items. (¶ 164 of Findings of Fact above).

334.   As a result, the Court gives very little weight to the testimony of Mr. Munoz regarding his "laundry list" of defective, improper, and incomplete items at the construction projects that he blamed on Cedar Park. (¶ 164 of Findings of Fact above). In many instances, the evidence provided by Plaintiff (Mr. Munoz) was not even sufficient to shift the burden of proof back to Cedar Park to prove the validity of its claim on certain of the construction projects.

### 3. Specific Objections to Claims by Project

335.   The Court will next set forth its Conclusions of Law on the specific objections made by Plaintiff to Cedar Park's Proof of Claim separately by project.[19] The Court has already made extensive findings of fact with respect to the objections on a project-by-project basis. (¶¶ 165–211 of Findings of Fact above).

---

[19]   To the extent that Plaintiff's objections have sought affirmative damages against Cedar Park, such objections have been addressed by the Court in the Breach of Contract section above.

336.    On the Old 1431 Project, Cedar Park claimed $19,849 was owed by RTX in its Proof of Claim. Plaintiff objected to a cornish and frame lumber charge of $12,174 by Cedar Park. Post-trial, Cedar Park stipulated to a voluntary reduction of its claim for the cornish and frame lumber. (¶¶ 159, 166 of Findings of Fact above). As a result of Cedar Park's reduction of its claim for this charge, the Court concludes that any objections by Plaintiff to the Proof of Claim on the Old 1431 Project are now moot and should be denied.

337.    On the Verano Project, Cedar Park claimed that $45,321 was owed by RTX in its Proof of Claim. Plaintiff objected to a $19,824 second charge for roofing by Cedar Park to RTX. Post-trial, Cedar Park stipulated to a voluntary reduction in its Proof of Claim based on roofing settlements. (¶¶ 159, 168 of Findings of Fact above). As a result of Cedar Park's reduction of its claim, the Court concludes that the objection by Plaintiff to the second roofing charge of $19,824 by Cedar Park has become moot and should be denied.

338.    On the Verano Project, Plaintiff also objected to an "overhead and profit charge" of $28,381 by Cedar Park. The Court has found that RTX agreed to pay a 10% overhead and profit charge on the Verano Project to Cedar Park. The Court has also found that the correct amount of the overhead and profit charge owed to Cedar Park is $11,964. (¶¶ 169–182 of Findings of Fact above). As a result, the Court concludes that the Proof of Claim of Cedar Park must be reduced and disallowed in the amount of $16,417 ($28,381 claimed minus $11,964 allowed).

339.    The Court also concludes that, with respect to all other objections made by Plaintiff (if any) to the Proof of Claim based on the Verano Project, Plaintiff did not

provide sufficient evidence to overcome the *prima facie* validity of Cedar Park's claim for the project. As a result, any other objections by Plaintiff to the Proof of Claim based on the Verano Project should be denied.

340.    On the Camino Del Verde Project, Cedar Park claimed $5,555 was owed by RTX in its Proof of Claim. Plaintiff objected to $4,985 of such claim. The Court has found that the $4,985 was for a fire pit that Cedar Park provided to the project and that RTX did not pay for such fire pit. (¶¶ 187–190 of Findings of Fact above). As a result, the Court concludes that the objection filed by Plaintiff to the Proof of Claim for the Camino Del Verde Project should be denied.

341.    On the Valley View Project, Cedar Park claimed $9,357 was owed by RTX in its Proof of Claim based on two invoices. Plaintiff objected to the claim based on a different invoice that RTX actually paid for flooring, doors and trim. In sum, Plaintiff contended that a change order was required, and there was an improper charge. (¶¶ 192–198 of Findings of Fact above). The Court concludes that Plaintiff did not provide sufficient evidence to overcome the *prima facie* validity of Cedar Park's Proof of Claim based on the Valley View Project. Even if the burden shifted to Cedar Park, the Court concludes that Cedar Park proved its claim on this project by a preponderance of the evidence. As a result, the Court concludes that the objection filed by Plaintiff to the Proof of Claim for the Valley View Project should be denied.

342.    On the Zen Gardens Project, Cedar Park claimed $8,285 was owed by RTX in its Proof of Claim. Plaintiff objected to charges on this project contending that change orders were required, improper work was done, and Cedar Park was not entitled to full payment of its overhead and profit. (¶¶ 201–209 of Findings of Fact

above). The Court concludes that Plaintiff did not provide sufficient evidence to overcome the *prima facie* validity of Cedar Park's Proof of Claim based on the Zen Gardens Project. Even if the burden shifted to Cedar Park, the Court concludes that Cedar Park proved its claim on this project by a preponderance of the evidence. As a result, the Court concludes that the objection filed by Plaintiff to the Proof of Claim for the Zen Gardens Project should be denied.

343.   On the Angel Valley Project, Cedar Park claimed $1,730 was owed by RTX in its Proof of Claim. Plaintiff did not specifically object to this claim. As a result, the Court concludes that the objection filed by Plaintiff (if any) to the Proof of Claim for the Angel Valley Project should be denied.

### 4.   Summary—Objections to Proof of Claim

344.   Cedar Park filed a Proof of Claim in the original amount of $90,008. Post-trial, Cedar Park voluntarily reduced its Proof of Claim to the amount of $43,834 ($90,008 Proof of Claim minus $46,174 voluntary reduction).

345.   In summary, the Court concludes that, based on Plaintiff's objections, the amount of the Proof of Claim filed by Cedar Park should be further reduced and disallowed in the amount of $16,417 for overhead and profit charges on the Verano Project. All other objections to the Proof of Claim by Plaintiff lack legal merit and should be denied.

346.   As a result, the Court concludes that the Proof of Claim filed by Cedar Park is valid and should be allowed in the amount of $27,417 ($43,834 minus $16,417), under § 502(b) of the Bankruptcy Code.

**F.  <u>Setoff</u>**

347.    Cedar Park pled the affirmative defense of "setoff" in its Answer and this defense was included in the Joint Pretrial Order filed with the Court. (Answer, p. 3, dkt# 5; PTO, p. 7, dkt# 38). In substance, Cedar Park is requesting that any amounts that Cedar Park may be found to be liable to Plaintiff (as owner of the claims of RTX) be setoff by any amounts that RTX owes Cedar Park in its Proof of Claim

348.    The Bankruptcy Code expressly preserves a creditor's right of setoff. Section 553 of the Bankruptcy Code, in pertinent part, provides:

> Except as otherwise provided . . . this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . .

11 U.S.C. § 553(a).

349.    According to the Fifth Circuit, the three requirements for setoff are: (1) the creditor has a valid and enforceable claim against the debtor that arose prior to the bankruptcy; (2) the creditor owes a valid and enforceable debt to the debtor that arose prior to the bankruptcy; and (3) the claim and the debt are mutual obligations. *See, e.g.*, *Galaz v. Galaz (In re Galaz)*, 480 F. App'x 790, 793 (5th Cir. 2012) (unpublished) (supporting citations omitted); *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir. 1987). The claim and the debt do not have to be of the same character for setoff to apply. *Braniff Airways*, 814 F.2d at 1035.

350.    The setoff doctrine allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the "absurdity of making A pay B when B owes A." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (*citing*

*Studley v. Boylston Nat'l Bank of Bos.*, 229 U.S. 523, 528 (1913)). If the parties have not offset their pre-petition debts prior to filing for bankruptcy, then it is left to the court to apply the setoff doctrine after a bankruptcy proceeding is filed. *See Studley*, 229 U.S. at 528–29.

351. Bankruptcy courts often allow a setoff of a debt owed by a creditor to a debtor for breach of contract against amounts owed by a debtor to a creditor on a proof of claim. *See, e.g.*, *Windmill Run Assocs., Ltd. v. Fed. Nat'l Mortg. Assoc. (In re Windmill Run Assocs., Ltd.)*, 566 B.R. 396, 451 (Bankr. S.D. Tex. 2017); *Frank v. Benzel Bretzel Bakery, Inc. (In re Clintondale Mills, Inc.)*, 216 B.R. 742, 748 (Bankr. M.D. Penn. 1998).

352. Here, the Court concludes that the three requirements for setoff have been satisfied. First, the creditor (Cedar Park) has a claim against RTX (the debtor) based on its Proof of Claim, which has been allowed and found to be valid by the Court in the amount of $27,417. (¶ 213 of Findings of Fact and ¶ 346 of Conclusions of Law above). Second, the creditor (Cedar Park) owes a debt to RTX based on breach of contract, which the Court has found to be valid in the amount of $50,621. (¶ 155 of Findings of Fact and ¶ 323 of Conclusions of Law above). Third, the claim and debt are mutual, as both arose prior to the bankruptcy filing and are owed between Cedar Park and RTX. (¶¶ 214–216 of Findings of Fact).

353. Plaintiff purchased and is now the owner of the claims held by RTX against Cedar Park. (PTO, p. 4, dkt# 38). The Court concludes that Cedar Park is entitled to setoff the amount of its valid claim against RTX ($27,417) against the amounts owed by Cedar Park to Plaintiff for breach of contract ($50,621).

354.    As a result, the Court concludes that the damage recoverable by Plaintiff against Cedar Park is the amount of $23,204 ($50,621 owed by Cedar Park to RTX minus $27,417 owed by RTX to Cedar Park).

## G. Recovery of Attorney's Fees

355.    Both Plaintiff and Defendants seek recovery of attorney's fees and expenses in this Adversary Proceeding.[20]

356.    After completion of trial, the Court entered an Order Requiring Post-Trial Submissions (herein "Post-Trial Order"). (dkt# 47). The Post-Trial Order required the parties to file detailed fee requests with this Court if attorney's fees and expenses were being sought in this Adversary Proceeding.

357.    Typically, a motion for award of attorney's fees is filed within 14 days after entry of judgment. *See* Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure ("Rules"), which is made applicable to bankruptcy adversary proceedings by Bankruptcy Rule 7054(b)(2). However, Rule 54(d)(2)(B) expressly permits the Court to order "otherwise." Here, the Court ordered otherwise in the Post-Trial Order by requiring that any motion for attorney's fees be filed after trial but before the entry of judgment. (Post-Trial Order, ¶9, dkt# 47). This approach was taken by the Court because the District Court must enter a final judgment in this Adversary Proceeding, and this Court wanted to lessen the burden on the District Court by reviewing the fees and making proposed findings and conclusions on any fee award to the District Court.

358.    The Post-Trial Order entered by the Court required that if either Plaintiff or Defendants were seeking an award of attorney's fees and expenses in this Adversary

---

[20]    To the extent that the determinations made by the Court with respect to recovery of attorney's fees constitute findings of fact, they are hereby adopted by the Court as findings of fact.

Proceeding, such award must be sought by filing an application ("<u>Fee Motion</u>") with the Court. The Post-Trial Order also required that the Fee Motion (a) identify the legal grounds and legal basis for the fees and the particular claim or defense upon which the fees were sought; (b) attach supporting documents, including the attorney's name, dates of service, hourly rate, and the number of hours spent on a particular activity with a brief description of the services rendered, and a description of expenses incurred and the amount of such expenses; (c) organize and allocate the fees and expenses based on the claim or defense upon which the award is sought; and (d) be accompanied by an affidavit certifying that the hours expended and expenses incurred were actually expended, are reasonable, and the hourly rate is reasonable. Finally, the Post-Trial Order required that any objections to the Fee Motion be made in writing. (Post-Trial Order, ¶¶9-11, dkt# 47).[21]

      1. <u>Plaintiff's Fees and Expenses</u>

359. On February 15, 2017, Plaintiff filed a Motion for Allowance of Attorneys' Fees with the Court (herein "<u>Plaintiff's Fee Motion</u>"). (dkt# 62). On February 24, 2017, Defendants filed their Objection to Plaintiff's Fee Motion. (dkt# 65).

360. Through his Fee Motion, Plaintiff seeks an award of attorney's fees of $24,898 and out of pocket expenses of $2,129. Plaintiff sets forth two claims and legal bases for the fees sought: (1) Plaintiff's claim for breach of contract under § 38.001 of the Texas Civil Practices & Remedies Code; and (2) Plaintiff's claim under the Texas Construction Trust Fund Act (Chapter 162 of the Texas Property Code). (Plaintiff's Fee Motion, ¶ 4, dkt# 62).

---

[21] At the request of the parties, the Court extended the deadline in the Post-Trial Order for filing Fee Motions and Objections to Fee Motions. (dkt# 59, 60).

361.    Defendants objected to Plaintiff's Fee Motion contending that the Texas Construction Trust Fund Act does not provide for recovery of attorney's fees. Defendants argue that Plaintiff's fees and expenses allocable to his claim under the Texas Construction Trust Fund Act (about 50% of the fees) should not be awarded. As a result, Defendants request that the fees be reduced by 50% of the amount sought by Plaintiff, if any fees are awarded. (dkt# 65, ¶ 3).

362.    The Court agrees with the objection filed by Defendants in this regard. The Texas Construction Trust Fund Act (Chapter 162 of the Texas Property Code) does not provide for recovery of attorney's fees for claims brought under the Act. *See Schwertner Backhoe Servs, Inc.*, 525 B.R. 325, 334–337 (Bankr. W. D. Tex. 2015) (analyzing Texas law). Even more importantly here, Plaintiff was unsuccessful on his claim against Defendants under the Texas Construction Trust Fund Act. (¶¶ 270–296 of Conclusions of Law above).

363.    For these reasons, the Court concludes that Plaintiff is not entitled to an award of attorney's fees and expenses attributable to pursuit of his claim under the Texas Construction Trust Fund Act against Defendants.

364.    The Court has reviewed the Fee Motion of Plaintiff, the attached supporting declaration with billing entries, and Plaintiff's own allocation methodology for fees and expenses in the Fee Motion. The Court concludes that 50% of the fees and expenses requested by Plaintiff in the Fee Motion are allocable to services rendered and expenses incurred in connection with his claim under the Texas Construction Trust Fund Act. As a result, $12,449 of the attorneys' fees requested (50% of $24,898) and

$1,065 of the expenses (approximately 50% of $2,129) will not be awarded to Plaintiff by the Court.

365.    The other claim for which Plaintiff seeks attorneys' fees and expenses is breach of contract. Section 38.001(8) of the Texas Civil Practices & Remedies Code provides that a plaintiff may recover reasonable attorney's fees if a claim is for an "oral or written contract." According to the Fifth Circuit, an award of fees is required under Texas law if a party prevails in a breach of contract action and there is proof of reasonable attorney's fees. *See DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d 421, 433 (5th Cir. 2003). Of particular note, Plaintiff's Complaint specifically requested recovery of attorney's fees for the breach of contract cause of action, and generally requested recovery of attorney's fees in the prayer for relief. (Complaint, pp. 7, 9, dkt# 1).

366.    The Court has already determined that Defendant Cedar Park breached its written contract with RTX on the Old 1431 Project and its oral contract with RTX on the Verano Project. The Court has also found that Defendant Cedar Park is liable for damages to Plaintiff for breach of contract. (¶¶ 297–324 of Conclusions of Law above). So, an award of attorneys' fees and expenses to Plaintiff against Cedar Park is required since there is definitive proof of the reasonableness of the fees and expenses, and the fees were specifically requested by Plaintiff in his Complaint.

367.    The Fifth Circuit has made clear that Texas law governs the "reasonableness" of attorney's fees when Texas state law supplies the rule of decision. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). The Texas Supreme Court has identified  the following factors to determine the reasonableness of attorney's fees: (1) the time and labor required; (2) the novelty and difficulty of the questions

involved; (3) the skill required to perform the legal service properly; (4) the likelihood that acceptance of the particular employment will preclude other employment by the lawyer; (5) the fee customarily charged in the locality for similar legal services; (6) the amount involved and the results obtained; (7) the time limitations imposed by the client or by the circumstances; (8) the nature and length of the professional relationship with the client; (9) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (10) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

368.    These factors examined under Texas law are essentially the same as the so-called "Johnson" factors considered by the Fifth Circuit in determining the reasonableness of attorney's fees, after calculation of the "lodestar" amount. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) (setting forth the traditional "Johnson" factors); *see also In re Cahill*, 428 F.3d 536, 539–40 (5th Cir. 2005) ("lodestar" amount is the number of hours reasonably spent times the community hourly rate).

369.    With these factors and the reasonableness standard in mind, the Court has examined the Plaintiff's Fee Motion, with attached supporting declaration and detailed billing statement entries by the attorneys. At bottom, the Court concludes that the attorney's fees and expenses sought by Plaintiff attributable to the breach of contract claim are very reasonable.[22]

370.    Here, the billing statements of Plaintiff's attorneys describe in detail the time and labor required and undertaken. The hourly rates charged by attorneys for

---

[22]  Defendants did not object to the reasonableness of attorney's fees for Plaintiff. (dkt# 65).

Plaintiff are at or less than hourly rates charged by similarly skilled attorneys in this community. The attorneys representing Plaintiff (as well as attorneys for Defendants) are lawyers with considerable skill, experience, reputation, and professionalism. In the Court's view, the attorneys representing Plaintiff handled the case quite efficiently. The time limitations imposed were significant, particularly under the circumstances—the Court gave the parties a "holiday setting" requiring the parties and their counsel to try the case between Christmas Day and New Year's Day.

371.　The actual results obtained by Plaintiff's attorneys are more of a "mixed bag." Plaintiff sought about $116,000 in damages for breach of contract in this Adversary Proceeding.[23] (Plaintiff's Proposed Findings, pp. 27–28, dkt# 57). In the end, and after considering Cedar Park's affirmative defense of setoff, only $23,204 in breach of contract damages have been awarded to Plaintiff by the Court. However, reduction of Plaintiff's contract damages based on setoff does not make the attorney's fees sought unreasonable. Under Texas law, a plaintiff's breach of contract damages may be totally setoff resulting in no net recovery, and a plaintiff is still entitled to an award of reasonable attorney's fees. *See Palmco Corp. v. Am. Airlines, Inc.*, 983 F.2d 681, 688 (5th Cir. 1993) (applying Texas law).

372.　For these reasons, the Court concludes that Plaintiff should be awarded $12,449 in reasonable attorneys' fees (50% of the $24,898 requested in the Plaintiff's Fee Motion) and $1,065 in expenses (approximately 50% of the $2,129 requested in the Plaintiff's Fee Motion). This amount of attorneys' fees and expenses are reasonable and

---

[23]　Plaintiff sought considerably more in the "fraudulent transfer" and "preference" claims made against Cedar Park (over $250,000). (Plaintiff's Proposed Findings, pp. 18, 26-27, dkt# 57). Although Plaintiff was not successful on these claims, Plaintiff's attorney has not sought an award of attorney's fees for time expended in pursuing such claims.

are allocable to legal services and expenses of Plaintiff in successfully pursuing a breach of contract claim against Cedar Park in this Court. The total reasonable attorney's fees and expenses awarded by the Court is the amount of $13,514 ($12,449 plus $1,065). These reasonable attorney's fees and expenses of Plaintiff should be awarded only against Cedar Park (the Defendant liable for breach of contract).

373. In the future, the District Court may find it appropriate to award additional attorneys' fees and expenses to Plaintiff for legal services that continue to be rendered for Plaintiff relating to his breach of contract claim. If this dispute continues to the District Court for rendition of a final judgment in this Adversary Proceeding under Bankruptcy Rule 9033, Plaintiff will undoubtedly incur additional attorneys' fees and expenses.

2. Defendants' Fees and Expenses

374. On February 17, 2017, Defendants filed their Application for Recovery of Attorneys' Fees and Costs with the Court (herein "Defendants' Fee Motion"). (dkt# 63). On February 24, 2017, Plaintiff filed a Response to Defendants' Fee Motion. (dkt# 64). On March 2, 2017, Defendants filed a Limited Reply to such Response. (dkt# 66).

375. Through their Fee Motion, Defendants seek an award of attorneys' fees of $42,265 and expenses of $1,131 for "defense" of Plaintiff's claim under the Texas Theft Liability Act (herein "Theft Act"). Tex. Civ. Prac. & Rem. Code Ann. § 134.005(b).

376. Plaintiff objected to Defendants' Fee Motion on multiple grounds. First, Plaintiff contends that Defendant never sought recovery of attorney's fees in their Answer and did not disclose the fees as damages in their Initial Disclosures under Rule 26(a), so they cannot request an award of attorney's fees now. Second, Plaintiff contends that Defendants did not "prevail" under the Theft Act entitling them to fees, as

the Theft Act claim was not tried, was abandoned by Plaintiff prior to trial, and the parties spent very little time and effort addressing the tangential Theft Act claim. Third, Plaintiff contends that Defendants failed to segregate and allocate their fees attributable to the Theft Act defense as required by the Court's Post-Trial Order. Plaintiff suggests that, at most, $2,600 in fees could perhaps be attributed to defense of the Theft Act claim (much less than the $42,265 requested by Defendants). (dkt# 64). Defendants filed a limited reply, arguing that attorney's fees are not damages that require disclosure under Rule 26(a). (dkt# 66).

377.   Here, Plaintiff's Complaint was filed against Defendants on October 27, 2015. The Complaint asserted a two-sentence cause of action against Defendants under the Theft Act, as one of six causes of action. (Complaint, ¶¶ 38-39, dkt# 1). On November 16, 2016, Plaintiff filed a motion seeking leave of Court to amend his Complaint to remove the Theft Act claim, which Defendants opposed. (dkt# 25, 30). The Court denied Plaintiff's motion to amend his Complaint, because the deadline for amending pleadings had expired. (dkt# 31). On December 20, 2016, Plaintiff filed a Joint Pretrial Order with the Court, again stating that he would not pursue the Theft Act claim at trial. (PTO, p.1, dkt# 38). At trial, as expected, Plaintiff did not pursue a claim under the Theft Act.

378.   Defendants did not request (specifically or generally) an award of attorney's fees under the Theft Act in their Answer. (dkt# 5). In fact, Defendants did not request an award of attorney's fees against Plaintiff in any manner or on any grounds in their Answer or any timely amended or supplemental pleading.[24]

---

[24]   Whether a party must plead for affirmative relief to recover attorney's fees as a prevailing party was a disputed legal issue at trial. (PTO, p. 7, dkt# 38).

379.    To start, the Fifth Circuit has repeatedly recognized that fee awards are governed by the same law that serves as the rule of decision on the substantive issue in the case. *See Mathis*, 302 F.3d at 461 (supporting citations omitted). As a result, Texas state law will determine if Defendants are entitled to an award of attorney's fees under the Theft Act (a state law).

380.    Section 134.005(b) of the Theft Act provides that "[e]ach person who *prevails* in a suit under this chapter *shall be awarded* court costs and reasonable and necessary attorney's fees." Tex. Civ. Prac. & Rem. Code Ann. § 134.005(b). The Texas Supreme Court has generally recognized that if a Texas statute provides that a party "shall be awarded" attorney's fees, the award of reasonable attorney's fees is not discretionary. *See Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (supporting citations omitted).

381.    Texas law appears clear that if a party, after trial, successfully defends a Theft Act claim, the party has "prevailed" and is entitled to attorney's fees under the Theft Act. *See, e.g., Arrow Marble, LLC v. Estate of Killion*, 441 S.W.3d 702, 706 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (*citing Johns v. Ram-Forwarding, Inc.*, 29 S.W.3d 635, 637–38 (Tex. App.—Houston [1st Dist.] 2000, no pet.)). If a Theft Act claim is resolved by voluntary dismissal of the claim without prejudice prior to trial, the defending party has not "prevailed" and is not entitled to recovery of attorney's fees. On the other hand, if a Theft Act claim is dismissed with prejudice, then the defending party has "prevailed" and is entitled to an award of attorney's fees. *See Arrow Marble*, 441 S.W.3d at 706 (supporting citations omitted).

382. In this Adversary Proceeding, the procedural situation is more peculiar. Plaintiff attempted to formally drop his Theft Act claim in advance of trial by amending his Complaint. (dkt# 25). Defendants opposed Plaintiff's attempt to amend his Complaint to drop the Theft Act claim against them. (dkt# 30). The Court did not permit Plaintiff to amend his Complaint because of what could be considered a "technical" reason—the deadline for amending pleadings had expired. (dkt# 31). If Plaintiff had been able to amend his Complaint to formally drop the Theft Act claim, the claim would have been effectively dismissed without prejudice, and Defendants could not have "prevailed" under Texas law. Even though Plaintiff was not able to amend his Complaint, Plaintiff made it clear that he was no longer pursuing the Theft Act claim at trial. (PTO, p. 1. dkt# 38). And at trial, Plaintiff did not pursue a Theft Act claim against Defendants.

383. In substance, the Court is being forced to apply Texas case law in the context of federal procedural rules. The relevant Texas case law has been decided by Texas state courts, following the Texas Rules of Civil Procedure. But the Court is making the decision in the context of a federal court proceeding that follows the Federal Rules of Civil Procedure—which requires leave of court to amend a complaint and permits the court to set (and enforce) deadlines for amending pleadings. On balance, the Court concludes that in the unusual circumstances present in this Adversary Proceeding, Defendants have not "prevailed" in a suit under the Theft Act.

384. Thankfully, Texas law provides a clear additional reason why Defendants are not entitled to recovery of attorney's fees under the Theft Act. Simply put,

Defendants did not plead for recovery of attorney's fees under the Theft Act in their Answer or any other amended or supplemental pleading timely filed with the Court.

385.    Texas courts have consistently found that a party seeking recovery of attorney's fees under the Theft Act must file a pleading notifying the court and the opposing party of the party's specific request to be awarded fees under the Theft Act. *See, e.g.*, *Jones v. Frank Kent Motor Co.*, No. 02-14-00216-CV, 2015 WL 4965798, at *3–4 (Tex. App.—Ft. Worth Oct. 15, 2015, no pet.) (denying award of attorney's fees for defense of Theft Act claim for failure to specifically plead for recovery of fees under the Theft Act); *Shaw v. Lemon*, 427 S.W.3d 536, 540 (Tex. App.—Dallas 2014, pet. denied) (stating defendant that fails to specifically request recovery of attorney's fees under the Theft Act in a pleading is not entitled to recovery of fees under the Theft Act), *cert denied*, 135 S. Ct. 1563 (2015); *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 568–69 (Tex. App.—San Antonio 2011, no pet.) (defendant that fails to specifically request recovery of attorney's fees under the Theft Act in a pleading filed with the court, bars recovery of attorney's fees even if defendants successfully defend the Theft Act claim); *Crickett Commc'ns, Inc. v. Trillium Indus., Inc.*, 235 S.W.3d 298, 310 (Tex. Civ. App.—Dallas 2007, no pet.) (failure to affirmatively plead for recovery of attorney's fees under Theft Act precluded recovery of fees).

386.    This line of Texas cases rests on fundamental legal principles. One, the purpose of pleadings is to put the opposing party on notice of the relief sought. *Prize Energy*, 345 S.W.3d at 569 (supporting citations omitted). Two, a judgment cannot be entered on a theory of recovery that has not been specifically pled. *Crickett Commc'ns*, 235 S.W.3d at 310 (supporting citations omitted). The Court could not locate any cases

(and Defendants cite to no cases) that permit a party who successfully defends a Theft Act claim to recover their attorney's fees, when the party has not timely filed a pleading before trial that specifically seeks recovery of attorney's fees under the Theft Act.

387.   Here, Defendants did not plead for recovery of attorney's fees under the Theft Act in their Answer. (dkt# 5). Defendants did not request an award of attorney's fees against Plaintiff in any manner or on any grounds in their Answer. Defendants never filed an amended or supplemental Answer with the Court. A deadline of August 1, 2016 was set by the Court (at the request of Defendants and Plaintiff) for filing all amended and supplemental pleadings in this Adversary Proceeding. (dkt# 15). Defendants did not file an amended Answer, a supplemental Answer, or any type pleading requesting recovery of attorney's fees under the Theft Act by the August 1, 2016 deadline.[25] Due to this failure to affirmatively request recovery of fees under the Theft Act in a timely pleading, the Court determines that Defendants are not entitled to an award of attorneys' fees under the Theft Act against Plaintiff.

388.   In sum, the Court concludes that Defendants cannot recover an award of attorneys' fees against Plaintiff under the Theft Act for three independent reasons. First, Defendants never requested an award of attorney's fees under the Theft Act in their Answer or any other timely pleading filed before the August 1, 2016 deadline for filing amended and supplemental pleadings. Second, Defendants did not prevail in a suit under the Theft Act under the peculiar circumstances of this case. Plaintiff attempted to formally drop its Theft Act prior to trial by amending his Complaint, Defendants opposed Plaintiff's effort to drop the Theft Act claim prior to trial, Plaintiff did not pursue the claim

---

[25]  Plaintiff's motion to amend their Complaint (to drop the Theft Act claim) was denied by the Court due to the expiration of the deadline for amending pleadings of August 1, 2016. (dkt# 31). Defendants must play by the same rules and the same August 1, 2016 deadline.

at trial, and Defendants did not successfully defend a suit under the Theft Act. Third, Defendants' Fee Motion does not allocate reasonable attorneys' fees and expenses to defense of any Theft Act claim as required by the Post-Trial Order. Defendants seek over $42,000 in attorneys' fees for defending one small tangential claim abandoned by Plaintiff prior to trial.

389.    In conclusion, for any and all of these reasons, the Court determines that Defendants' request for award of attorneys' fees against Plaintiff should be denied.

## IV.
## CONCLUSION

390.    To date, the parties and their counsel have expended substantial time, effort, and resources litigating these disputes. The (unfortunate) girth of these Proposed Findings of Fact and Conclusions of Law illustrates the effort undertaken by this Court. The net economic result of this Adversary Proceeding is not significant. Perhaps the parties will revisit resolution of their disputes before even more resources are consumed in the District Court; perhaps they will not.

391.    For the District Court's convenience, this Court has prepared a proposed form of Final Judgment, which is attached hereto as Exhibit A. This proposed Final Judgment is respectfully submitted to the District Court for consideration and review. The proposed Final Judgment is consistent with and implements the Court's Proposed Findings of Fact and Conclusions of Law set forth above. If and when deemed appropriate by the District Court, the proposed Final Judgment may be entered by the District Court under Rule 58(a), which is made applicable to bankruptcy adversary proceedings by Bankruptcy Rule 7058.

392.    In summary, the proposed Final Judgment grants Plaintiff a monetary judgment against Defendant Cedar Park in the amount of $23,204 in actual damages for breach of contract. This damages figure is after the setoff of the entire valid amount owed by RTX to Cedar Park of $27,417 based on Cedar Park's Proof of Claim. For this reason, the Final Judgment also disallows Cedar Park's Proof of Claim against the RTX estate as the valid amount of the Proof of Claim will be extinguished through setoff.

393.    The proposed Final Judgment also awards prejudgment interest to Plaintiff on the actual damages at a rate deemed appropriate by the District Court. This Court proposes that prejudgment interest on the damages begin to accrue on August 2, 2014, the date of RTX's payment to Cedar Park giving rise to the first breach of contract by Cedar Park. Post-judgment interest is proposed to accrue from the date of entry of the Final Judgment by the District Court as set by federal statute. Taxable costs are proposed to be awarded in favor of Plaintiff against Defendant Cedar Park consistent with Bankruptcy Rule 7054(b)(1).

394.    The proposed Final Judgment also awards reasonable attorney's fees and expenses of $13,514 to Plaintiff based on the breach of contract claim. The attorney's fees and expenses are proposed to be awarded only against Defendant Cedar Park, the party that is liable for breach of contract. In the future, the District Court may find it appropriate to award additional attorney's fees and expenses to Plaintiff for legal services that continue to be rendered for Plaintiff relating to his breach of contract claim, assuming this Adversary Proceeding continues through the District Court for rendition of a Final Judgment under the procedures of Bankruptcy Rule 9033.

395.    Finally, the proposed Final Judgment denies all other relief requested by Plaintiff and Defendants. This would include denial of all relief sought by Plaintiff against Defendant Mr. McGrath, and denial of all other relief sought by Plaintiff against Defendant Cedar Park for constructive fraudulent transfers and preferences under the Bankruptcy Code and for any liability under the Texas Construction Trust Fund Act. Likewise, all relief sought by Defendants against Plaintiff, including Defendants' request for an award of attorneys' fees and expenses, would be denied.

***Further, this Court sayeth naught.***

### ### END OF PROPOSED FINDINGS AND CONCLUSIONS ###

(Attached as Exhibit A is a proposed form of Final Judgment)

**EXHIBIT A—PROPOSED FORM OF FINAL JUDGMENT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 14-11732-HCM |
| RTX CUSTOM HOMES, INC. | § | (Chapter 7) |
|     Debtor. | § | |
| RICHARD MUNOZ, JR., assignee of | § | |
| John Patrick Lowe, Trustee | § | |
|     Plaintiff, | § | |
| v. | § | (Adversary No. 15-01110-HCM) |
| | § | |
| CEDAR PARK CONSTRUCTION, LLC, | § | **CAUSE NO. _____** |
| and TOM MCGRATH | § | |
|     Defendants. | § | |

**FINAL JUDGMENT**

BE IT REMEMERED that the Court has reviewed and considered the Proposed Findings of Fact and Conclusions of Law with Respect to Trial in Adversary Proceeding No. 15-01110 ("Proposed Findings and Conclusions") filed and submitted by the U.S. Bankruptcy Court for the Western District of Texas, Austin Division ("Bankruptcy Court") in adversary proceeding no. 15-01110 styled *Richard Munoz Jr. v. Cedar Park Construction, LLC and Tom McGrath* ("Adversary Proceeding"), which was filed in bankruptcy case no. 14-11732 styled *In re RTX Custom Homes, Inc.* in the Bankruptcy Court.

In accordance with and to the extent required by 28 U.S.C. § 157(c)(1) and Rule 9033(d) of the Federal Rules of Bankruptcy Procedure, this Court has made a *de novo* review of the Proposed Findings and Conclusions of the Bankruptcy Court as to which written specific objections have been properly and timely made. The Court has reviewed and considered any and all objections to the Proposed Findings and Conclusions filed

1

by Plaintiff Mr. Richard Munoz, Jr., Defendant Cedar Park Construction, LLC, and Defendant Tom McGrath. The Court finds that any and all objections to the Proposed Findings and Conclusions should be denied. The Proposed Findings and Conclusions of the Bankruptcy Court in the Adversary Proceeding are hereby accepted, approved, and adopted by this Court. Accordingly, the Court finds that the following Final Judgment should be entered by this Court.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, AND FINAL JUDGMENT IS HEREBY RENDERED AS FOLLOWS:**

1.      Plaintiff Mr. Richard Munoz, Jr. shall recover from Defendant Cedar Park Construction, LLC, the amount of $23,204 as actual damages for breach of contract, with prejudgment interest accruing at the rate of __% on such amount from August 2, 2014, until the date of entry of this Final Judgment. Post-judgment interest on this amount shall accrue at the rate of ___% from the date of entry of this Final Judgment until paid in full.

2.      Plaintiff Mr. Richard Munoz, Jr. shall also recover from Defendant Cedar Park Construction, LLC, reasonable attorneys' fees and expenses in the amount of $13,514.

3.      Plaintiff Mr. Richard Munoz, Jr. shall also recover all taxable costs from Defendant Cedar Park Construction, LLC.

4.      Proof of Claim No. 12-1 filed by Defendant Cedar Park Construction, LLC, in the bankruptcy case of RTX Custom Homes, Inc., shall be and is hereby disallowed and extinguished in its entirety.

5.      Plaintiff Mr. Richard Munoz, Jr. shall be entitled to such writs and processes from this Court as necessary to enforce and collect this Final Judgment.

2

6.      Any and all other relief requested by Plaintiff Mr. Richard Munoz, Jr. against Defendant Cedar Park Construction, LLC, that is not expressly granted herein, is DENIED.

7.      All relief requested by Plaintiff Mr. Richard Munoz, Jr. against Defendant Tom McGrath is DENIED.

8.      All relief requested by Defendant Cedar Park Construction, LLC and Defendant Tom McGrath against Plaintiff Mr. Richard Munoz, Jr. is DENIED.

9.      All relief requested and not expressly granted herein is DENIED.

10.     This is a Final Judgment and disposes of all issues, claims, and parties.

11.     This action is hereby CLOSED.

**SO ORDERED.**

**SIGNED** this __ day of _____, 201_.


_____
**UNITED STATES DISTRICT JUDGE**

3